Helge Waldum, M.D., Ph.D.

1           UNITED STATES DISTRICT COURT

2           MIDDLE DISTRICT OF LOUISIANA

3

4

STANLEY P. BAUDIN,                    )

5                                     )

            Plaintiff,                )

6                                     )

      vs.                             ) Case No. 1801063

7                                     )

ASTRAZENECA PHARMACEUTICALS           )

8  LP; ASTRAZENECA LP; AND MERCK       )

SHARP & DOHME CORPORATION,            )

9                                     )

            Defendants.               )

10

11

12

13           VIDEOTAPED VIDEOCONFERENCE DEPOSITION

                             OF

14

                    HELGE WALDUM, M.D., Ph.D.

15

                    Thursday, March 24, 2022

16

17

18

19

20

21

22

23

24           GOLKOW LITIGATION SERVICES

         877.370.3377 ph | 917.591.5672 fax

25              deps@golkow.com

EXHIBIT 11

```
 1            VIDEOTAPED VIDEOCONFERENCE DEPOSITION

 2   of HELGE WALDUM, M.D., Ph.D., a witness in the

 3   above-entitled action, taken pursuant to notice,

 4   pursuant to the Federal Rules of Civil Procedure

 5   before CINDY A. HAYDEN, RMR, CRR, remotely, on the

 6   24th day of March, 2022, at 6:03 a.m. EST.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:
 2            DALIMONTE RUEB STOLLER LLP
              BY:  JOHN M. RESTAINO, ESQ.
 3            5700 Fleet Street
              Carlsbad, CA  92008
 4            888.443.7529
              restaino@drlawllp.com
 5            Counsel for Plaintiff
 6                ~ And ~
 7            DALIMONTE RUEB STOLLER LLP
              BY:  MICHAEL E. GALLANT, ESQ.
 8            1250 Connecticut Avenue NW, Suite 700
              Washington, DC  20036
 9            202.858.1211
              michael.gallant@drlawllp.com
10
11            ARNOLD & PORTER KAYE SCHOLER LLP
              BY:  JULIE B. DU PONT, ESQ.
12            BY:  ALEXANDER COUSINS, ESQ.
              250 West 55th Street
13            New York, NY  10019-9710
              212.836.8572
14            julie.dupont@arnoldporter.com
              alexander.cousins@arnoldporter.com
15            Counsel for Defendants
16                ~ And ~
17            ARNOLD & PORTER KAYE SCHOLER LLP
              BY:  KATHRYN PODSIADLO, ESQ.
18            44th Floor, 777 South Figueroa Street
              Los Angeles, CA  90017-5844
19            213.243.4273
              kathryn.podsiadlo@arnoldporter.com
20
                  ~ And ~
21
              (Appearances continued on next page.)
22
23
24
25
```

```
 1              APPEARANCES CONTINUED
 2

           ICE MILLER LLP
 3         BY:  KATHERINE D. ALTHOFF, ESQ.
           BY:  ALLYSON EMLEY, ESQ.
 4         One American Square, Suite 2900
           Indianapolis, IN  46282-0200
 5         317.236.5924
           katherine.althoff@icemiller.com
 6         allyson.emley@icemiller.com
 7
    ALSO PRESENT:  Melissa Bardwell,
 8                 Videographer/Technician
                   Sarah Megan, Esq., AstraZeneca
 9                 Leo Rakitin, Esq., AstraZeneca
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                       I N D E X
 2                                                  PAGE
 3   EXAMINATION BY MS. DU PONT                      10
 4   EXAMINATION BY MR. RESTAINO                    316
 5
 6                    E X H I B I T S
 7
     WALDUM
 8   NUMBER              DESCRIPTION                PAGE
 9
     EXHIBIT 1     Notice of Oral Remote             20
10                 Videotaped Deposition and
                   Request for Production of
11                 Documents of Helge Waldum,
                   M.D., Ph.D.
12
     EXHIBIT 2A    Document titled Work:  from       25
13                 2019-November 12th, 2021
14   EXHIBIT 2B    Receipts for travel expenses      30
                   on email dated 10/6/21,
15                 Subject:  Reservation
                   confirmed - Tronheim-London on
16                 11/08/2021
17   EXHIBIT 2C    Document titled Travel            31
                   expenses:  Meeting London
18                 November 8th to 11th
19   EXHIBIT 2E    Emails, top one dated 1/31/22,    45
                   Subject:  SV:
20
     EXHIBIT 2F    Emails, top one dated 2/14/22,    47
21                 Subject:  SV:  Chain of
                   Custody Waldum to Mjones
22
     EXHIBIT 2G    Email dated 3/16/22, Waldum       48
23                 Mjones Email
24   EXHIBIT 2H    Emails, top one dated 3/18/22,    49
                   Subject:  SV:  polypper
25
```

| 1 | EXHIBIT 2I | Emails, top one dated 3/18/22, Subject:  SV:  polypper | 54 |
| 2 | | | |
| | EXHIBIT 2J | Email dated 2/1/22, Subject: utlevering av materiale | 43 |
| 3 | | | |
| 4 | EXHIBIT 2K | Email dated 3/2/22, Subject: Dette er bildet som er i rapporten din, synaptofysin | 55 |
| 5 | | | |
| 6 | EXHIBIT 2L | Emails, top one dated 11/15/21, Subject:  Travel expenses & work invoice | 41 |
| 7 | | | |
| 8 | EXHIBIT 3 | Curriculum Vitae of Helge L. Waldum 110546 | 23 |
| 9 | | | |
| | EXHIBIT 4 | Rule 26 Expert Report, Helge Waldum MD, PhD, Doctor d'Etat | 34 |
| 10 | | | |
| 11 | EXHIBIT 5 | Reliance List of Helge L. Waldum | 37 |
| 12 | | | |
| 13 | EXHIBIT 6 | Book titled The Influence of the Pharmaceutical Industry on Medicine, as Exemplified by Proton Pump Inhibitors | 184 |
| 14 | | | |
| 15 | EXHIBIT 7 | World Health Organization Model List of Essential Medicines, 22nd List (2021) | 124 |
| 16 | | | |
| 17 | EXHIBIT 13 | Article titled Hypergastrinemia and mortality in gastric adenocarcinoma:  a population-based cohort study, the HUNT study | 132 |
| 18 | | | |
| 19 | | | |
| 20 | EXHIBIT 16 | Article titled Gastritis, Gastric Polyps and Gastric Cancer | 139 |
| 21 | | | |
| 22 | EXHIBIT 32 | Article titled Towards Understanding of Gastric Cancer Based upon Physiological Role of Gastrin and ECL Cells | 208 |
| 23 | | | |
| 24 | | | |
| 25 | | | |

| 1 | EXHIBIT 37 | Letter dated 8/23/11 from Public Citizen to Margaret A. Hamburg, M.D. | 188 |
| 3 | EXHIBIT 39 | Joint Meeting of the Nonprescription Drugs and Gastrointestinal Drugs Advisory Committees dated 10/20/00 | 180 |
| 6 | EXHIBIT 42 | Letter dated 10/31/14 from Department of Health & Human Services to Eric Nellis, Drs. Almashar, Carome, Wolfe, and Waldum | 192 |
| 9 | EXHIBIT 46 | Article titled Proton pump inhibitor: The dual role in gastric cancer | 212 |
| 11 | EXHIBIT 110 | Medical record, FMOL Health System, dated 9/12/17, Bates Defendants000487-488 | 260 |
| 13 | EXHIBIT 111 | Surgical Pathology Report dated 9/12/17, Pathology Group of Louisiana, Bates Defendants000024-026 | 267 |
| | EXHIBIT 113 | Medical record, FMOL Health System, dated 9/21/17, Bates Defendants000447-462 | 271 |
| | EXHIBIT 114 | Medical record, FMOL Health System, dated 10/5/17, Bates Defendants000978-980 | 275 |
| | EXHIBIT 115 | Surgical Pathology Report dated 10/7/17, Pathology Group of Louisiana, Bates Defendants000021-023 | 274 |
| 22 | EXHIBIT 139 | Office of Surveillance and Epidemiology (OSE) Memorandum dated 12/21/18, Subject: Rebound Acid Hypersecretion | 199 |
| | EXHIBIT 140 | Deposition transcript of Dr. John Tabor dated 4/27/21 | 306 |

```
 1                P R O C E E D I N G S

 2                       * * *

 3              THE VIDEOGRAPHER:  We're now on the

 4     record.  My name is Melissa Bardwell, videographer

 5     for Golkow Litigation Services.  Today is

 6     March 24th of 2022, and the time now is 6:03 a.m.

 7              This remote video deposition is being

 8     held in the matter of Stanley P. Baudin versus

 9     AstraZeneca Pharmaceuticals LP, et al., taken for

10     the U.S. District Court, Middle District of

11     Louisiana.  Our deponent today is Dr. Helge Waldum.

12              All parties to this deposition are

13     appearing remotely and have agreed to the witness

14     being sworn in remotely.  Due to the nature of

15     remote reporting, please pause briefly before

16     speaking to ensure all parties are heard

17     completely.

18              Would counsel present please identify

19     themselves for the record, after which would our

20     court reporter please swear in the witness.

21              MR. RESTAINO:  This is John Restaino

22     representing Stanley Baudin, the plaintiff.

23              MR. GALLANT:  And this is Michael

24     Gallant, also representing the plaintiff,

25     Stanley Baudin.
```

Helge Waldum, M.D., Ph.D.

```
 1                    THE WITNESS:  And this is --

 2                    MS. DU PONT:  Julie --

 3                    THE WITNESS:  And this --

 4                    MR. RESTAINO:  You don't have to.

 5                    MS. DU PONT:  Hi.  This is Julie

 6    du Pont.  I'm joined by Kathryn Podsiadlo on behalf

 7    of AstraZeneca.

 8                    THE REPORTER:  Anybody else?

 9                    Okay.  Will counsel please stipulate

10    that in lieu of formally swearing in the witness,

11    the reporter will instead ask the witness to

12    acknowledge that their testimony will be true under

13    the penalties of perjury, that counsel will not

14    object to the admissibility of the transcript based

15    on proceeding in this way, and that the witness

16    has, in fact, verified that he is, in fact,

17    Dr. Waldum?

18                    MS. DU PONT:  That's fine with

19    AstraZeneca.

20                    MR. RESTAINO:  Yes, fine with the

21    plaintiff.

22                    THE REPORTER:  Great.

23                    Doctor, would you raise your right

24    hand, please.

25                    Do you hereby acknowledge that your
```

Helge Waldum, M.D., Ph.D.

```
1    testimony will be true under the penalties of
2    perjury?
3              THE WITNESS:  Yes.
4              THE REPORTER:  Thank you.
5                        *  *  *
6              HELGE WALDUM, M.D., Ph.D.,
7    testifying under penalty of perjury, was examined
8             and testified as follows:
9                        *  *  *
10                   EXAMINATION
11   BY MS. DU PONT:
12        Q.   Good morning, Dr. Waldum.
13        A.   Good morning.
14        Q.   My name's Julie Du Pont, and I
15   represent AstraZeneca in this case.  And today,
16   we're -- we're here to talk about your opinions in
17   the case of Mr. Baudin.
18             Can you please state your name and
19   business record for the -- business address for the
20   record, please.
21        A.   My name is Helge Waldum.  My business
22   address is St. Olavs Hospital, Trondheim, Norway.
23        Q.   Thank you.
24             You understand that we're conducting
25   this deposition remotely today, correct?
```

1         A.    Yes.

2         Q.    And where are you currently located?

3         A.    At the hotel in Trondheim,

4    Royal Garden.

5         Q.    And is anyone with you in the room?

6         A.    Yes, my -- the two lawyers.

7         Q.    And by that, you mean Mr. Gallant and

8    Mr. Restaino?

9         A.    Yes.

10        Q.    And I understand this is a little

11   unusual, that we're taking this remotely, but can I

12   confirm that your cell phone is turned off and not

13   near you?

14        A.    Yes.

15        Q.    And because of the remote nature of

16   this deposition, I just want to agree that you're

17   not going to communicate, you know, nonverbally or

18   write a note to anyone in the room while we're --

19   we're having questions, okay?

20        A.    Okay.

21        Q.    Have you ever had your deposition taken

22   before?

23        A.    No.

24        Q.    So let me just go over some of the

25   ground rules for depositions because it's a little

Helge Waldum, M.D., Ph.D.

1    unusual.  As you probably have figured out, there's

2    a court reporter, Cindy, here, who is going to be

3    taking down everything that is said on the record

4    today.  And to make her life a little easier, it's

5    best if we try to talk at a, you know, normal pace,

6    not too fast, so she can get down everything we're

7    saying.

8              It's also important to try not to speak

9    over one another.  And I'm very guilty of talking

10   too fast and jumping in too quickly.  So I -- I

11   will try to do my best not to interrupt you, and

12   can you do your best not to interrupt me?

13       A.   Yes, I will.

14       Q.   Okay.  You know, it's important that we

15   answer verbally on the record and not just shake

16   your head yes or no, again, because the court

17   reporter needs to write down what's said verbally

18   on the record.  Understood?

19       A.   Yes.

20       Q.   And important to understand that if you

21   need to take a break at any time, you just have to

22   let me know that.  You know, just -- we just have

23   to finish whatever question and answer is -- is

24   pending at the moment.  But if you need a break,

25   just -- just let me know.

Helge Waldum, M.D., Ph.D.

```
 1                 And -- and the final thing is, is if
 2     you don't understand the question that I've asked,
 3     please let me know that.  And I know it's -- we're
 4     doing this by computer, so if you don't hear it or
 5     there's any problem and you -- you don't fully
 6     understand the question, just let me know.  I can
 7     repeat it.  I can rephrase it.  I just want to make
 8     sure we have a clear record here today, okay?
 9          A.    Understood.
10          Q.    What did you do to prepare for your
11     deposition today?
12          A.    What did you say?
13          Q.    I'm sorry.  What did you do to prepare
14     for your deposition today?
15          A.    Today?
16          Q.    Yes.
17          A.    I haven't done much today, at least
18     this morning.
19                 THE REPORTER:  I'm sorry.  I didn't
20     hear you.
21                 THE WITNESS:  I have not done much
22     today.
23     BY MS. DU PONT:
24          Q.    Okay.  So --
25          A.    I --
```

1    Q.   Go ahead.  Finish.

2    A.   Yeah.  I came to the hotel and waited

3  for the deposition.

4    Q.   How about prior to today?  In the past

5  few days, what did you do to prepare for the

6  deposition?

7    A.   I read the -- my deposition -- my

8  expert report and the report by Wang, Voltaggio and

9  Miele.

10         THE REPORTER:  Can you repeat those

11  names, please.

12  BY MS. DU PONT:

13    Q.   You said Dr. Wang, Miele, and I

14  missed -- I missed the last one.

15    A.   It was Voltaggio.

16    Q.   Voltaggio?

17    A.   Yeah.

18         MS. DU PONT:  Did you get that, Cindy?

19         THE REPORTER:  Yes.  I'll get the

20  spellings later.

21         MS. DU PONT:  Okay.

22  BY MS. DU PONT:

23    Q.   And did you review any medical records

24  for Mr. Baudin to prepare for today?

25    A.   I don't -- no.  I read them before,

1    many times.

2          Q.    Okay.  Did you meet with the attorneys,

3    Mr. Restaino or Mr. Gallant, prior to today?  And I

4    will just caution you, I don't want to know any of

5    the substance of your conversation.  I'm just

6    asking if you met with them.

7          A.    Today?

8          Q.    In the past few days, did you meet with

9    Mr. Restaino and Mr. Gallant?

10          A.    I met him on Sunday.  I met them on

11    Sunday.  Sunday, four days ago, when we had the

12    dinner together.

13          Q.    And --

14          A.    And -- and yesterday and the day

15    before, we prepared ourself and discussed the case.

16          Q.    So on -- okay.

17                And how much time yesterday and the day

18    before did you spend preparing for today's

19    deposition?

20          A.    Yesterday, five hours.  The day before,

21    six hours, perhaps.  Six hours.

22          Q.    Okay.  And at the dinner on Sunday

23    night, did you discuss business at that dinner?

24          A.    No.

25          Q.    No.

```
 1                    Okay.  When did Mr. Baudin's lawyers
 2   first contact you to ask you to be an expert in
 3   this litigation?
 4        A.   Actually, I was on holiday in
 5   Australia, and I would have heard from him in -- it
 6   was in, I think, November 2017.  He -- he didn't
 7   contact me about this special case, but he
 8   contacted me about a paper I wrote in Gut about
 9   PPIs and gastric cancer.
10        Q.   So just so I'm clear, who's "he"?
11        A.   John Restaino.
12        Q.   So John Restaino contacted you in
13   November of 2017 while you were on vacation in
14   Australia to ask you about a paper you had written?
15        A.   He called -- yeah, he contacted me
16   about that.
17        Q.   And at that -- on that phone call, did
18   he ask you if you wanted to be an expert generally
19   in the proton pump inhibitor litigation?
20        A.   We spoke about PPIs and side effects,
21   but they did not specify.  And then in the future,
22   right after that, we had some contacts by email for
23   some time.  He asked me about --
24        Q.   Did you -- okay.
25        A.   He asked me about my point of view
```

1  January --

2      Q.   Understood.

3           When did those contacts by email

4  happen?  And it's okay if you don't know the exact

5  date.  I'm just looking for a general time frame.

6      A.   It may be every third month or

7  something like that.

8      Q.   Did you eventually sign a retainer

9  agreement for -- for litigation work?

10     A.   I -- I signed an agreement in February,

11 this year.

12     Q.   When did you -- when did you first

13 understand, though, that you were going to be a --

14 an expert in the proton pump inhibitor litigation?

15          MR. RESTAINO:  Objection to form.

16          THE WITNESS:  I think I wrote my expert

17 report in -- in the autumn of 2021 and -- oh, wait.

18 Let -- let me see -- say about October 2021.

19 BY MS. DU PONT:

20     Q.   When -- what did you understand, when

21 you began working on your report, what your

22 assignment was -- was to be?

23     A.   I evaluated -- evaluated the case for

24 that.  And, also, I wrote what I meant about

25 pathogenesis of gastric cancer.

1        Q.   When specifically were you asked to

2   provide an opinion on the cause of Mr. Baudin's

3   gastric adenocarcinoma?

4        A.   It must be in October 2021, but I did

5   not sign any -- any -- anything with Restaino at

6   that time.  I signed it in February of 2022.

7        Q.   Prior to October 2021, when you were

8   asked to provide an opinion on the cause of

9   Mr. Baudin's gastric adenocarcinoma, had you

10   reviewed any medical literature with respect to --

11   to PPIs for the specific purpose of serving as an

12   expert in the PPI litigation?

13        A.   I had for -- I have for 50 years read

14   all the literature about gastric cancer and PPI.

15        Q.   When did you conclude that Mr. Baudin's

16   Nexium use contributed to his gastric

17   adenocarcinoma?

18        A.   When I finished the report.

19        Q.   And when did you finish the report?

20        A.   It was -- it was finished in January,

21   but I would -- January this year, but let me say

22   November '21.

23        Q.   Okay.  November 2021 was when you

24   thought you -- you had concluded that Mr. Baudin's

25   Nexium use contributed to his gastric

1    adenocarcinoma?

2         A.    Most probable --

3         Q.    Okay.

4         A.    -- most due to PPI use.

5         Q.    Why did you agree to serve as an expert

6    in this case?

7         A.    This is my area of interest for 50

8    years.  I started long before the PPIs came on the

9    market.  I started with gastrin in '74 and had my

10   first candidate for -- for gas -- for the role of

11   gastrin in gastric cancer.  I got -- got funding

12   for that in 1981.  At least that's been my life

13   interest.

14        Q.    Understood.

15              And -- and have you ever served as an

16   expert in any other litigation?

17        A.    No.

18        Q.    Do you have any family members who work

19   for AstraZeneca?

20        A.    Not now.  My daughter worked as -- I

21   forgot -- AstraZeneca in -- worked for one year --

22              THE REPORTER:  I'm sorry.  Worked as a

23   what?  Your daughter worked as a what?

24              THE WITNESS:  My daughter -- one of my

25   daughters worked for AstraZeneca about 2000 and --

1    2000 -- year 2000, I think.  She worked for one

2    year.  She's a veterinarian.

3    BY MS. DU PONT:

4         Q.   I didn't understand what you just said.

5    What did -- what was that last thing?

6         A.   My -- my daughter worked for

7    AstraZeneca for one year.  I think it was year

8    2000.  And she is a veterinarian.

9         Q.   That's what I missed, veterinarian.

10              Where did your daughter work for

11   AstraZeneca?  What office?

12        A.   In Norway.  In Norway.

13        Q.   In Norway.

14              And was her position related to her

15   being a veterinarian?

16        A.   Yeah, she was -- I suppose so.  But I

17   am not sure.

18        Q.   Okay.  Do you know specifically what

19   her title was?

20        A.   No.

21              MS. DU PONT:  Okay.  I'm going to mark

22   as Exhibit 1 to this deposition the notice of the

23   deposition.  Can we pull that up on the screen.

24              (WALDUM EXHIBIT 1, Notice of Oral

25   Remote Videotaped Deposition and Request for

Helge Waldum, M.D., Ph.D.

1    Production of Documents of Helge Waldum, M.D.,

2    Ph.D., was marked for identification.)

3    BY MS. DU PONT:

4          Q.   And just so you understand,

5    Dr. Waldum -- and I don't know if Mr. Gallant and

6    Restaino explained this to you.  But when I pull up

7    a deposition exhibit, the video tech will also --

8    Melissa will -- will drop it into the chat

9    function.

10          So if -- you know, we -- we'll

11   obviously be able to view it on the screen.  But if

12   you want to page through the document yourself, you

13   can click on the -- the chat, download the document

14   and -- and review it yourself.  I don't know if

15   we're going to have to do it for the notice.  But

16   there may be some longer documents where you

17   actually want to download it and look at it on the

18   screen, okay?

19          A.   Okay.

20          Q.   So have -- have you seen this -- this

21   document before, Dr. Waldum?

22          A.   Yes.

23          Q.   Did you --

24          MR. RESTAINO:  You cannot --

25          MS. DU PONT:  I'm sorry.  I just heard

1  something.

2          MR. RESTAINO:  Yes.  I'm sorry, Julie.

3  Despite your admonition to him about scrolling

4  down, he was attempting to scroll down on the --

5          MS. DU PONT:  Oh.

6          MR. RESTAINO:  -- document on his

7  screen.

8          MS. DU PONT:  Okay.

9  BY MS. DU PONT:

10      Q.   If we can scroll down to the list of

11  items that were requested of the witness.

12          MR. RESTAINO:  And, Julie, just so that

13  there's no confusion or wonderment on your part

14  also, the setup that we have made here so that we

15  can avoid using the microphone for all the

16  different computers and getting the reverb problem

17  we had, we're using the conference room

18  microphone --

19          MS. DU PONT:  Okay.

20          MR. RESTAINO:  -- which is hooked up --

21  which is hooked up to a large -- very large screen,

22  which is to both Dr. Waldum and my left.  So the

23  document is quite large there, easier to read, so

24  if you see the witness or myself looking to the

25  left, that is what we are looking at.

 1              MS. DU PONT:  Got it.  That's helpful.

 2    Thank you, John.

 3              MR. RESTAINO:  You're welcome.

 4    BY MS. DU PONT:

 5        Q.   So this is Exhibit A to the Notice of

 6    Deposition, Dr. Waldum.  And it contains a number

 7    of items that you were asked to bring to the

 8    deposition today.  Did you review this -- this

 9    notice, and did you fully comply with -- with

10    bringing the -- or -- or providing to Mr. Baudin's

11    counsel the documents that were requested?

12        A.   I think so.

13        Q.   Okay.  And if -- if we could go back up

14    to the -- the top of the list, Number 1.  First, it

15    asks for a copy of your most current curriculum

16    vitae.

17              MS. DU PONT:  And if we could pull up

18    Exhibit 3.

19              (WALDUM EXHIBIT 3, Curriculum Vitae of

20    Helge L. Waldum 110546, was marked for

21    identification.)

22    BY MS. DU PONT:

23        Q.   This is the curriculum vitae that was

24    provided to us, along with your expert report.  I

25    understood from Mr. Baudin's counsel that this is

Helge Waldum, M.D., Ph.D.

```
 1    the most current CV that you have, but is this the
 2    most current CV?
 3            A.    I believe so.
 4            Q.    Do you have any updates to this CV that
 5    you have not had a chance to make?
 6            A.    One moment.
 7            Q.    Okay.
 8            A.    The number of publications.
 9                  The other way.  Back.
10                  Published about -- 4,300, and it should
11    be 400 --
12                  THE REPORTER:  I'm sorry.  I can't
13    understand what you're saying.
14    BY MS. DU PONT:
15            Q.    We can't hear you.
16                  MR. RESTAINO:  You better -- best face
17    this way, if you can.
18                  THE WITNESS:  The number of
19    publications that was written there.
20    BY MS. DU PONT:
21            Q.    The number of publications needs to be
22    amended; is that what you're saying?
23            A.    Yes.  I think -- it should be 430.  I
24    think it was 4,300 I have --
25            Q.    Oh, it's a -- it's a mistake.  It
```

1    should say 430, not 4,300?

2         A.    That is correct, I have written.

3         Q.    Okay.  I thought 4,300 was quite

4    ambitious.  But that makes more sense.  430

5    original papers.

6              Okay.  Any other revisions or updates

7    that you haven't had a chance to make to this?

8         A.    No.

9         Q.    Okay.  The next item on the notice --

10   and -- and we don't have to pull it back up -- it

11   basically pertains to the -- the billing and amount

12   of money that you've requested to be paid in this

13   matter as an expert witness.

14             MS. DU PONT:  And if we could pull up

15   Exhibit 2A.

16             (WALDUM EXHIBIT 2A, Document titled

17   Work:  from 2019-November 12th, 2021, was marked

18   for identification.)

19   BY MS. DU PONT:

20        Q.    Now, this document that we've marked as

21   Exhibit 2A is entitled "Work:  from 2019 through

22   November 12th, 2021."  Do you see that?

23        A.    Yes.

24        Q.    And why is it -- why does it start with

25   2019?  Is that when you started the work on the

Helge Waldum, M.D., Ph.D.

```
 1    litigation?

 2         A.    Yes.

 3         Q.    So even though you weren't formally

 4    retained until 2021, you began work with respect to

 5    PPIs and gastric cancer in 2019?

 6         A.    Yes.

 7         Q.    Do you know when in 2019?  What month?

 8         A.    It was consult in services to Restaino.

 9              THE REPORTER:  I'm sorry.  I didn't

10    understand that.

11              THE WITNESS:  We did -- I did some

12    consulting on the phone or email and --

13    BY MS. DU PONT:

14         Q.    I understand you did consulting, but do

15    you know what month that started?

16         A.    No.

17         Q.    No?

18         A.    No.

19         Q.    You don't remember?

20         A.    No.

21         Q.    Okay.  So this work goes from 2019 to

22    November 12th, 2021; is that correct?

23         A.    Yes.

24         Q.    And you're billing 600 U.S. dollars per

25    hour, according to agreement?
```

```
 1          A.    Yes.
 2          Q.    And as of November 12th, 2021, you had
 3    billed for 64,800 U.S. dollars, correct?
 4          A.    Correct.
 5          Q.    And that included writing your expert
 6    report for 30 hours, collecting relevant
 7    information for 20 hours, and answering questions
 8    and commentaries for 20 hours, for a total of 108
 9    hours, correct?
10          A.    Correct.
11          Q.    And sorry, I missed one thing.  There
12    was also a meeting in London for 38 hours between
13    November 8th and 11th of November 2021, correct?
14          A.    Yes.
15          Q.    And tell me, without talking about the
16    conversations that you had with Mr. Restaino -- I'm
17    going to guess it was Mr. Restaino -- but with
18    Mr. Baudin's lawyers, what the purpose of the
19    meeting in London was in November of 2021.
20          A.    The purpose of the meeting in London
21    was to -- to discuss and plan for -- discuss the
22    expert report.
23          Q.    Okay.
24          A.    I had never seen -- I didn't know what
25    was demanded to do.  So I -- so we discussed how it
```

1   should be made, but my -- the content is completely

2   up to me.

3        Q.   Got it.  I just lost my train of

4   thought.

5             After November 12th, 2021, did you do

6   additional work between then and now on

7   Mr. Baudin's case?

8        A.   No.

9        Q.   Did you -- so did -- you didn't --

10  prior to this, you told me that you were still

11  working on Mr. Baudin's expert report in January of

12  2022.  Was that incorrect?

13       A.   I did -- I did some work during this

14  time --

15       Q.   Okay.

16       A.   -- but I had not -- I had not billed

17  it.

18       Q.   Ah, okay.  It's a -- it's a language

19  issue.  What work have you done since

20  November 12th, 2021, that you have not yet billed

21  for?  How many hours?

22       A.   I -- I do not remember exactly, but I

23  have it at home.  It may be 30 hours.

24       Q.   Okay.  Approximately 30 hours --

25       A.   Yes.

```
1              Q.    -- since November 2021?

2              And does that include the -- the 11

3     hours you spent in the past several days preparing

4     for today's deposition or not?

5              A.    Not.

6              Q.    Okay.  So in addition to the 30 hours,

7     you've spent an additional 11 hours preparing for

8     today's deposition?

9              A.    Correct.

10             Q.    And do you plan to bill for that --

11    that 41 hours for additional work in preparation

12    for today's deposition?

13             A.    Yes.

14             Q.    And do you also plan to bill for any

15    time you spent today at this deposition?

16             A.    Perhaps.  I don't know what is usual.

17             Q.    I'll let John --

18             A.    But -- but probably.

19             Q.    -- and Mike tell you what's usual.

20             A.    But probably.

21             Q.    Yes.  Probably, yes.  Okay.

22             MS. DU PONT:  Okay.  Let's pull up

23    Exhibit 2B and mark that for the record.

24             MR. RESTAINO:  I'm sorry, Julie.  2B,

25    as in "boy"?
```

```
 1              MS. DU PONT:  Yes.
 2    BY MS. DU PONT:
 3         Q.   And while she pulls that up, for the
 4    additional time that you spend -- spent, the 41
 5    hours prior to today and the time you spent today,
 6    do you intend to bill at your hourly rate of $600
 7    an hour?
 8         A.   Yes.
 9              (WALDUM EXHIBIT 2B, Receipts for travel
10    expenses on email dated 10/6/21, Subject:
11    Reservation confirmed - Tronheim-London on
12    11/08/2021, was marked for identification.)
13    BY MS. DU PONT:
14         Q.   Okay.  We've pulled up a receipt that
15    was provided to us by Mr. Baudin's counsel.  And it
16    appears to be dated October of 2021, and looks to
17    be a receipt for a plane ticket from Trondheim to
18    Amsterdam; is that correct?
19         A.   It was from Trondheim to London via
20    Amsterdam.
21         Q.   Oh.
22         A.   It's the London --
23         Q.   Yeah, that's --
24         A.   -- London meeting -- London meeting.
25         Q.   Got it.  It's the London meeting.
```

Helge Waldum, M.D., Ph.D.

```
 1              And it looks like the -- the total cost
 2   of that meeting, if we continue to scroll, was
 3   4,438 NOK.
 4         A.    Norwegian kroner, yes, NOK.
 5         Q.    NOK.  Okay.
 6              And there's also some photographs here
 7   on the last page that look to be receipts incurred
 8   during your travel, primarily taxi receipts.
 9         A.    The taxi in Norway.
10         Q.    Okay.
11              MS. DU PONT:  And if we pull up
12   Exhibit 2C.
13              (WALDUM EXHIBIT 2C, Document titled
14   Travel expenses:  Meeting London November 8th to
15   11th, was marked for identification.)
16   BY MS. DU PONT:
17         Q.    This appears to be a summary of the
18   receipts that we just looked at; is that correct?
19         A.    Yes.
20         Q.    And your total travel expenses related
21   to your meeting in London November 8th through 11th
22   were 698 U.S. dollars, correct?
23         A.    Correct.
24         Q.    And that was for this November 8th
25   through 11th meeting in London where you met with
```

1    Mr. Restaino to discuss your expert report,

2    correct?

3           A.   Yes.  Correct.

4                MS. DU PONT:  Okay.  If we could go

5    back to the deposition notice that was marked as

6    Exhibit 1.  And scroll down to the third item.

7    BY MS. DU PONT:

8           Q.   That Item Number 3 asks for the

9    witness's complete file in connection with the

10   witness's investigation and evaluation of the

11   issues involved in this litigation.  Have you

12   brought that with you today or provided that to

13   Mr. Baudin's counsel?

14          A.   Could you repeat it?

15          Q.   Have you brought your complete file

16   with respect to this case to the deposition today,

17   or have you provided that to counsel?

18          A.   Do you mean that I -- I have not billed

19   for -- for the -- I only billed once, but I will

20   bill for when -- for what I am talking about; is

21   that what you mean?

22          Q.   I'm just asking what materials you've

23   sort of kept with respect -- respect to

24   Mr. Baudin's case.  We have your expert report as

25   well as your -- your reliance list or the materials

1    you're relying on in his case.  Beyond that, is

2    there anything else in your, quote/unquote, "file"

3    for Mr. Baudin?  Do you understand my question?

4         A.   I don't -- I'm not quite sure what you

5    mean, but I -- I think I have nothing more about

6    that than what I have.

7         Q.   Okay.

8              MR. RESTAINO:  Julie, if I may --

9              MS. DU PONT:  Sure.

10             MR. RESTAINO:  -- interject to help out

11   also a little bit, he has with him a printout of

12   his expert report, the expert report of Dr. Wang

13   and the expert report of --

14             THE WITNESS:  Of Miele and the -- and

15   the --

16             MR. RESTAINO:  -- Miele -- Dr. Miele

17   and the pathologist.

18             THE WITNESS:  I have the expert --

19             MS. DU PONT:  Dr. Voltaggio?

20             MR. RESTAINO:  Yes.  So he -- he has

21   those with him.

22             MS. DU PONT:  Okay.  Thank you.

23             MR. RESTAINO:  You're welcome.

24   BY MS. DU PONT:

25        Q.   So just so the record is clear, your

1    file for Mr. Baudin includes your report and the

2    exhibits that are attached to it, including your

3    reliance list, but you also have and have reviewed

4    the reports by AstraZeneca's expert witness,

5    Dr. Miele, Dr. Wang and Dr. Voltaggio --

6         A.   Yes.

7         Q.   -- correct?

8         A.   Yes.

9              MS. DU PONT:  Can we mark as the next

10   exhibit here Exhibit 4 for the record, which is

11   your expert report.

12             (WALDUM EXHIBIT 4, Rule 26 Expert

13   Report, Helge Waldum MD, PhD, Doctor d'Etat, was

14   marked for identification.)

15             MS. DU PONT:  And if we could go to

16   Page -- I think it's 143 of the report, but it's

17   144 of the PDF.  Scroll all the way down to the

18   bottom.  There.  Perfect.

19   BY MS. DU PONT:

20        Q.   Doctor, is this the expert report that

21   you tendered in this case?

22        A.   Yes.

23        Q.   And if we're looking at the last page

24   of the report, is this your signature --

25        A.   Yes.

1        Q.    -- dated January 12th?

2        A.    Yes.  Yes.

3        Q.    And does this report contain all of the

4    opinions you intend to offer at trial in

5    Mr. Baudin's case?

6        A.    Yes.  At that time.

7        Q.    I missed the last part of what you just

8    said.

9        A.    Yes.

10        Q.    So this does -- this report does

11    contain all the opinions you intend to offer at

12    trial in Mr. Baudin's case, correct?

13        A.    At that time.  I -- I can't say what

14    may come up before the court time.  There may be

15    new information.

16        Q.    So as we sit here today, does this

17    report contain all of the opinions you intend to

18    offer at trial in Mr. Baudin's case?

19        A.    It -- presently, yes.

20        Q.    So there's nothing in this report you

21    think is inaccurate?

22        A.    Let us discuss it, but I think I -- I

23    think I -- it's pretty accurate.

24        Q.    It's pretty accurate.

25              Are there any mistakes in the report

Helge Waldum, M.D., Ph.D.

1  that you'd like to correct right now?

2        A.   I saw, when I read it, that I said that

3  gastrin is the trophic hormone.  I would say it is

4  trophic only for tissue where you have a cell with

5  a gastrin receptor.

6             THE REPORTER:  Where you have what?

7             THE WITNESS:  Where you have cells

8  having a gastrin receptor.  It is not trophic, for

9  instance, for the colonic mucosa and other places.

10  It's only for the oxyntic mucosa in the stomach.

11  BY MS. DU PONT:

12        Q.   So if I understand it correctly, you,

13  in your report, wrote that gastrin is -- is a -- is

14  a trophic --

15        A.   It -- it -- I wrote it was a trophic

16  hormone, but it -- it's trophic in the way that it

17  influences the proliferation.  It is only in the

18  oxyntic, in the acid-producing, part of the

19  stomach.

20        Q.   Okay.

21        A.   It's not a -- it's not a generally

22  trophic hormone.

23        Q.   Other than that correction, is there

24  anything else you'd like to correct in your report?

25        A.   No, I don't think so.

Helge Waldum, M.D., Ph.D.

1         Q.    Okay.  And we can -- I can ask some

2    questions about that later to better understand

3    that.

4              MR. RESTAINO:  And, Julie, we've

5    already discussed the fact that he's not published

6    4,300 articles.

7              MS. DU PONT:  Okay.

8              THE WITNESS:  No.

9              MS. DU PONT:  That was a correction on

10    his CV.  We already corrected that.

11              MR. RESTAINO:  Oh, okay, okay.

12    BY MS. DU PONT:

13         Q.    Okay.  Now, I want to pull up as

14    Exhibit 5 your reliance list.

15              (WALDUM EXHIBIT 5, Reliance List of

16    Helge L. Waldum, was marked for identification.)

17              MS. DU PONT:  And if we could just

18    briefly page through it.

19    BY MS. DU PONT:

20         Q.    Do you recognize this document to be

21    your reliance list that provides the materials you

22    relied upon to support the opinions set forth in

23    your expert report that we've marked as Exhibit 4?

24         A.    Yeah.

25         Q.    And do you have any additions to this

1   Exhibit 5?

2          A.   No.

3          Q.   Okay.

4               MS. DU PONT:  We can stop scrolling for

5   now.

6   BY MS. DU PONT:

7          Q.   Do you know --

8               MS. DU PONT:  And -- and you can pull

9   it down.

10  BY MS. DU PONT:

11         Q.   Do you know any of the experts for

12  Plaintiff Mr. Baudin in this litigation, the other

13  experts that were disclosed by Mr. Baudin in

14  addition to yourself?

15         A.   I know Patricia Mjønes.

16         Q.   Anyone else?

17         A.   No.

18         Q.   Are you familiar with Alfred Neugut, an

19  epidemiology expert, who is also an oncologist at

20  Columbia?

21         A.   I have never met him, but I know him by

22  name.

23         Q.   Did you review his expert report?

24         A.   No.

25         Q.   Are you familiar with Nacer Abrouk, a

Helge Waldum, M.D., Ph.D.

```
 1   biostatistician?

 2       A.   No.

 3       Q.   Are you familiar with William

 4   Hrushesky, an oncology expert who put in a report

 5   in this case?

 6       A.   No.

 7       Q.   And finally, are you familiar with

 8   Joshua Sharlin, a regulatory expert who put in a

 9   report in this case?

10       A.   No.

11       Q.   And I take it that you have not

12   reviewed the expert reports for Dr. Abrouk,

13   Hrushesky or Sharlin, correct?

14       A.   Correct.

15            MS. DU PONT:  Let's pull back up the

16   deposition notice that we've marked as Exhibit 1.

17   BY MS. DU PONT:

18       Q.   Okay.  We've gone through 3, 4 and 5.

19   So let's scroll down to 6.  This asks for all

20   documents and [sic] nonprivileged communications

21   between the witness and any person, including but

22   not limited to Dr. Patricia Mjønes, in this matter

23   regarding the pathology report, or any drafts

24   thereof or regarding the subject matter of this

25   litigation.
```

Helge Waldum, M.D., Ph.D.

1          Do you see that request that I'm

2   reading from?

3          A.   Yes.

4          Q.   And you are aware your colleague,

5   Dr. Mjønes, was deposed earlier this week on

6   March 21st, 2022, correct?

7          A.   Once more, please.

8          Q.   You are aware that Dr. Mjønes gave a

9   deposition, like you're giving today, earlier this

10  week on March 21st, 2022, correct?

11         A.   You mean Patricia Mjønes?

12         Q.   Yes, Mjønes.  I'm not pronouncing her

13  name correctly.

14         A.   Okay.

15         Q.   I'm sorry.

16         A.   Okay.  That's correct.

17         Q.   And you asked Dr. Mjønes to review

18  Dr. Baudin's pathology, and she did so at your

19  request, correct?

20         A.   Yes.

21         Q.   And we've received a series of emails

22  between you and Dr. Mjønes prior to her deposition

23  and prior to your deposition in this case.

24         A.   Yes.

25         Q.   Are you aware that counsel for

Helge Waldum, M.D., Ph.D.

```
1     Mr. Baudin provided us with those emails?
2          A.   Yes.
3          Q.   Did they ask you to search your -- your
4     inbox for emails from --
5          A.   Yes.
6          Q.   -- Dr. Mjønes?
7          A.   Yes.
8          Q.   Okay.  And you provided those emails to
9     counsel for Mr. Baudin?
10         A.   Yes.
11         Q.   And we've translated them for purposes
12    of this deposition, because many of them were in
13    Norwegian, which I don't understand.  And I think
14    most jury -- people on the jury may not understand
15    either.
16              But I just want to -- we've translated
17    them.  So as I pull up these emails, I want you to
18    let me know if there's anything that we need to
19    correct about the translation from your
20    perspective, okay?
21         A.   Okay.
22              MS. DU PONT:  So if we could pull up
23    Exhibit 2L.
24              (WALDUM EXHIBIT 2L, Emails, top one
25    dated 11/15/21, Subject:  Travel expenses & work
```

1    invoice, was marked for identification.)

2    BY MS. DU PONT:

3          Q.    And this is an email dated

4    November 15th -- sorry -- November 15th, 2021, from

5    you to Patricia Mjønes, and she appears to be

6    attaching a --

7                Well, first of all, if we scroll down.

8    Sorry.  You forwarded to her an email from

9    Mr. Restaino, dated November 14th, where you appear

10   to have been disclosing -- or enclosing a bill for

11   your work.  Do you see that?

12         A.    Yes.  It's not latest things, okay?

13         Q.    It's not what?

14         A.    It's okay.

15         Q.    I didn't hear you.  Sorry.

16         A.    It is okay.  It -- it seems correct.

17         Q.    Okay.  And then if we scroll up, you

18   seem to be saying to her that they are offering

19   $400 per hour and that I have -- you and I have

20   probably come to the conclusion that 25 hours would

21   be okay and to send the bill as soon as possible.

22               Is that a general -- generally accurate

23   translation of the email?

24         A.    Yes.

25         Q.    And how did you and Dr. Mjønes come to

1    the conclusion that she should charge $400 an hour?

2         A.    She has a shorter CV than me.

3         Q.    Okay.  So you're charging $600 an hour,

4    but because she's not practiced for as long as you

5    have, has not written as much as you have, she

6    should only charge $400 an hour; is that the

7    thinking?

8         A.    Yes.

9         Q.    And why did you tell her to send the

10   bill as soon as possible?

11        A.    I thought that both bills should be

12   treated -- treated at the same time or something

13   like that.  It's -- it did not --

14              THE REPORTER:  I didn't hear that.

15              THE WITNESS:  It -- I -- I thought that

16   both the bill from me and her should come at a

17   reasonably same time.

18              MS. DU PONT:  Okay.  Let's pull up

19   Exhibit 2J.

20              (WALDUM EXHIBIT 2J, Email dated 2/1/22,

21   Subject:  utlevering av materiale, was marked for

22   identification.)

23   BY MS. DU PONT:

24        Q.    Okay.  This appears to be an email from

25   Dr. Mjønes to you, Dr. Waldum, dated February 1st,

1    2022.  And it says:  See attachment.  Consent from

2    the patient and a copy of identification for

3    delivery is required the material.  Will try to

4    pass this on to John.

5              Is that a generally accurate

6    translation of the email?

7         A.   Yes.

8         Q.   And was Dr. Mjønes telling you she was

9    getting ready to ship the pathology for Mr. Baudin

10   that she'd stained?

11        A.   Yes.

12        Q.   And also reviewed?

13             MR. RESTAINO:  I think you need --

14   BY MS. DU PONT:

15        Q.   Okay.

16             MR. RESTAINO:  -- to repeat -- repeat

17   your answer.

18   BY MS. DU PONT:

19        Q.   Yeah, I think --

20        A.   Yes, yes.

21        Q.   So -- we can get into this in a bit.

22   But Dr. Mjønes reviewed some previously stained

23   pathology that was stained in Louisiana, but she

24   also did additional staining by herself, correct?

25        A.   Correct.

Helge Waldum, M.D., Ph.D.

1          Q.   And she was shipping all of that

2     material to -- to plaintiff's counsel in the

3     United States?

4          A.   I -- I didn't review it in London or

5     my --

6               THE REPORTER:  I'm sorry?

7               THE WITNESS:  I -- I took it when I

8     went to the meeting in London, or was this later?

9     BY MS. DU PONT:

10         Q.   This is in February of 2022.

11         A.   We hadn't sent any material off at

12    that -- after that, I think.  I -- Patricia must

13    have done it.  I -- I do not know --

14         Q.   Okay.

15         A.   -- exactly when it was done.

16         Q.   Okay.

17              MS. DU PONT:  Let's pull up Exhibit 2E

18    and mark that for the record.

19              (WALDUM EXHIBIT 2E, Emails, top one

20    dated 1/31/22, Subject:  SV:, was marked for

21    identification.)

22    BY MS. DU PONT:

23         Q.   So this appears to be correspondence

24    between you and Dr. Mjønes on January 31st, 2022.

25    Do you see that?

Helge Waldum, M.D., Ph.D.

1        A.    Yes.

2        Q.    And you write -- if we scroll down to

3    the first email -- You must write a time list for

4    additional work you receive with, quote/unquote,

5    "deposit" preparation.  What did you mean by that?

6        A.    I meant that she must note the time she

7    use to prepare for -- for this deposition on

8    Monday.  If she -- if she needed to do more work,

9    she must notice it -- note it.

10        Q.    Got it.  And if we scroll up to the

11    next email, it says:  It is okay.  I -- I do not

12    know if I -- I will have time to prepare so much

13    for this, that this is the busiest season for me

14    teaching, meeting activities, work, activities in

15    relation to the children.  Has John --

16        A.    It is --

17        Q.    -- given -- I'm sorry.  Did you want to

18    say something?

19        A.    It is correct -- correct translation.

20        Q.    Okay.  And then she says:  Has John

21    given you an indication of when they might consider

22    taking the trip to Trondheim?  The later, the

23    better for my part.  I do not plan to answer

24    anything other than what is included my report.

25        A.    Correct.

```
 1        Q.    Okay.

 2              MS. DU PONT:  If we can pull up

 3   Exhibit 2F.

 4              (WALDUM EXHIBIT 2F, Emails, top one

 5   dated 2/14/22, Subject:  SV:  Chain of Custody

 6   Waldum to Mjones, was marked for identification.)

 7              MS. DU PONT:  And if we scroll down to

 8   the first email.  Just scroll up a little bit.

 9   Sorry.

10   BY MS. DU PONT:

11        Q.    This is an email from Mr. Gallant to

12   you, attaching a chain of custody form for the

13   transfer of the tissue blocks from you to

14   Dr. Mjønes, correct?

15        A.    Yes.

16        Q.    And if we scroll up further, it appears

17   that you forward the chain of custody form to

18   Dr. Mjønes, and you say to her:  We have to fill

19   this in.  I have started, as you can see, from

20   Attachment 2.  If you disagree with the dates I

21   have set, you need to change them.  Send it back to

22   me when you have signed.  This is something urgent,

23   so it would be nice if we could send it back to the

24   U.S. over the weekend.

25              Is that an approximate translation of
```

```
 1    the email?

 2         A.   Yes.

 3         Q.   And -- so -- so you were directing

 4    Dr. Mjønes regarding the chain of custody, correct?

 5              MR. RESTAINO:  Objection to form.

 6              THE WITNESS:  Yes.

 7    BY MS. DU PONT:

 8         Q.   Dr. Baudin's counsel did not email her

 9    directly regarding the chain of custody, correct?

10         A.   Yes.  Yes.

11         Q.   So on February 14th, Dr. Mjønes

12    responds and asks Waldum to read it over, and if it

13    is accurate, she can sign it.  Is that

14    approximately what she says?

15         A.   Yes.

16         Q.   Okay.

17              MS. DU PONT:  Let's pull up Exhibit 2G

18    and mark that for the record.

19              (WALDUM EXHIBIT 2G, Email dated

20    3/16/22, Waldum Mjones Email, was marked for

21    identification.)

22    BY MS. DU PONT:

23         Q.   And this is an email from Dr. Mjønes to

24    you, Dr. Waldum, dated March 16th, 2022.  So a

25    little over a week ago, correct?
```

```
 1        A.    Yes.
 2        Q.    And she writes to you, and we
 3   understand it to say:  Have talked to John, and was
 4   a little stressed after talking to him.
 5        A.    Little less stressed.
 6        Q.    Little less stressed -- you're right --
 7   after talking to him.
 8              And then she says something -- my
 9   name -- this -- this translation is not correct.
10   But I think she's saying she was going to meet with
11   them on Saturday.
12        A.    Yes.
13        Q.    And she will take a look through what I
14   have written and what Lysandra Voltaggio has
15   written on Saturday.
16        A.    Yes.
17        Q.    Is that correct?
18        A.    Yes.
19              MS. DU PONT:  Okay.  Let's pull up
20   Exhibit 2H and mark that for the record.
21              (WALDUM EXHIBIT 2H, Emails, top one
22   dated 3/18/22, Subject:  SV:  polypper, was marked
23   for identification.)
24              MS. DU PONT:  Okay.  And if we could
25   scroll down to your email where it starts.
```

1    Actually -- yeah, thank you.  Scroll up.

2    BY MS. DU PONT:

3         Q.    This appears to be an email from you to

4    Dr. Mjønes on March 17th, 2022.  So approximately a

5    week ago?

6         A.    Yes.

7         Q.    And the -- I think the translation from

8    the Norwegian is:  What was the diagnosis of the

9    polyps in the hernia?  Hyperplastic or adeno --

10   adenomatous?

11        A.    That is correct.  That is correct.  You

12   are reading Norwegian.

13        Q.    Okay.  Now, go up to the next email.

14   And she responds:  Most of the patient's polyps

15   were fundus gland polyps, and some were

16   hyperplastic polyps.  The patient's cancer was an

17   adenoma with high-grade dysplasia/intramucosal

18   adenocarcinoma, and it was located 1.2 centimeters

19   from the gastroesophageal junction as far as I

20   remember.  Cannot remember that there were any

21   adenomas otherwise, but will get incisions on

22   Saturday, and then I will look over all the cuts

23   once more.

24              When I read the report of Lysandra,

25   (she has also had access to clinical information)

1  it may look like it was fundus gland polyps in the

2  hernia, but will check this further on Saturday.

3           Is that an approximate translation of

4  what was written --

5       A.   Yes.

6       Q.   -- in Norwegian?

7       A.   Yes.  Yes.

8       Q.   Okay.  And so you respond and say:

9  Fine.  I think the endoscopist describes the three

10  as hyperplastic in terms of appearance, and it

11  would fit me best.  However, it is the histology

12  that gives the answer.  I thought it was a

13  hyperplastic polyp with a development of

14  adenocarcinoma.

15          Did I read that accurately --

16      A.   That's accurate.

17      Q.   -- or is that an accurate translation?

18      A.   Yes.  Yes.

19      Q.   Why did you suggest that hyperplastic

20  would fit you best?

21      A.   The adenomatous polyps, that was the

22  other possibility.  We had so scarce information

23  about that.  And the endoscopist described them as

24  hyperplastic as the cause of this histology and the

25  pathologist that decides what it is.  And Patricia

```
 1   is (indiscernible) impress of me --
 2              THE REPORTER:  I'm sorry.  I didn't
 3   hear the last part of that.
 4              THE WITNESS:  Patricia -- Patricia
 5   Mjønes is not -- she was not impressed by my wish.
 6              THE REPORTER:  She was not impressed by
 7   my --
 8   BY MS. DU PONT:
 9        Q.   She was not impressed by your wish; is
10   that what you said?
11        A.   Influenced.  She -- she made, of
12   course, her own decision.
13        Q.   Why was it your wish that it be
14   hyperplastic?
15        A.   As I said, we have more information
16   about hyperplastic polyps and the -- and the cause
17   of hyperplastic polyps.
18        Q.   I understand.  You have more
19   information --
20        A.   Adenoma --
21        Q.   You're saying you have more information
22   in the medical literature about hyperplastic polyps
23   and the use of PPIs; is that what you mean?
24        A.   Yeah, also by PPIs.  But the
25   adenomatous polyps, that was the alternative.  They
```

 1   are so seldom that there are little information

 2   about them.

 3          Q.   Got it.  Understood.

 4               Okay.  And so if we scroll up to the

 5   top email, she says:  This is what Lysandra writes:

 6   Polypoid intramucosal adenocarcinoma arising in a

 7   gastric adenoma in the background of cardio-oxyntic

 8   mucosa with acute and chronic inflammation and

 9   hyperplastic polyps.  I have written something

10   similar, so everyone who has assessed the test

11   agrees.  Do you see that?

12          A.   Yes.

13          Q.   And is that an accurate translation

14   from the Norwegian?

15          A.   Yes.

16          Q.   So Dr. Mjønes is essentially saying she

17   sees the cancer arising from the adenoma, not the

18   hyperplastic polyp, and that she agrees with

19   Dr. Voltaggio, who is AstraZeneca's expert?

20               MR. RESTAINO:  Objection to form.

21               THE WITNESS:  I -- I do not -- I will

22   not say anything about whether she -- whether she

23   agrees with Voltaggio.  But she -- Patricia Mjønes

24   says that the polyp -- that the -- the cancer

25   developed in a adenoma and not a hyperplastic

1  polyp.

2          THE REPORTER:  Is not a hyperplastic

3  polyp?

4          MS. DU PONT:  Yes.

5  BY MS. DU PONT:

6      Q.   But here, it says:  This is what

7  Lysandra -- who I understood to be Dr. Voltaggio --

8  writes.  And she -- Dr. Mjønes says that she has

9  written something similar to Dr. Voltaggio, so

10  everyone who has assessed the test agrees.

11          Do you agree with that, Dr. Waldum?

12  That's what it says?

13      A.   It was -- it is my -- it is a correct

14  translation.

15      Q.   Okay.  Thank you.

16          MS. DU PONT:  And if we could pull up

17  Exhibit 2I and mark that for the record.

18          (WALDUM EXHIBIT 2I, Emails, top one

19  dated 3/18/22, Subject:  SV:  polypper, was marked

20  for identification.)

21  BY MS. DU PONT:

22      Q.   And this is the same email, except for

23  the top email of the chain we were just looking at.

24  The only thing that is different is this top email

25  from Dr. Mjønes to you, Dr. Waldum, and it's dated

Helge Waldum, M.D., Ph.D.

1    March 18th, 2022.

2         A.    Yes.

3         Q.    And she -- and she responds to your

4    question about whether it's a hyperplastic polyp or

5    an adenoma.  And she says:  No, I don't think so.

6    It is another type of gastric adenoma with a

7    high-degree dysplasia/intramucosal adenocarcinoma.

8    Nearby, however, there was one hyperplastic polyp.

9    Is that the --

10        A.    That's --

11        Q.    -- correct translation?

12        A.    -- correct translation.  Correct.

13        Q.    Thank you.

14              MS. DU PONT:  And let's pull up

15    Exhibit 2K.

16              (WALDUM EXHIBIT 2K, Email dated 3/2/22,

17    Subject:  Dette er bildet som er i rapporten din,

18    synaptofysin, was marked for identification.)

19    BY MS. DU PONT:

20        Q.    And this is an email from Dr. Mjønes to

21    you, Dr. Waldum, dated March 2nd, 2022.  We've

22    marked this as Exhibit 2K for the record.

23              And it appears to be an image.  And the

24    subject line says:  This is the image in your

25    report, synaptophysin.  Is that the correct

1    translation?

2         A.    Yes.

3         Q.    Do you know why she sent you this

4    image?

5         A.    She -- she knew that I was interested

6    in -- in the research.

7         Q.    What specifically -- what about this

8    image were you interested in?

9         A.    Because nobody had stain for

10   neuroendocrine cells --

11              THE REPORTER:  No one had a stain for

12   what?

13              THE WITNESS:  Stain for neuroendocrine

14   cells before.  And it was important to see whether

15   the mucosa had been exposed to high gastrin values,

16   and this clearly shows that.

17              THE REPORTER:  Had been exposed to high

18   gastric what?

19              THE WITNESS:  High gastrin -- not

20   "gastric," but "gastrin."

21   BY MS. DU PONT:

22        Q.    Okay.  Maybe I'll ask you some

23   questions about that later.

24              MS. DU PONT:  We can pull down this

25   exhibit.

1          THE REPORTER:  Can we go off the record

2   for one second?

3          MS. DU PONT:  Sure.

4          THE VIDEOGRAPHER:  The time now is

5   7:09 a.m.  We are off the record.

6                      *  *  *

7          (Whereupon, there was a recess in the

8   proceedings from 7:09 a.m. to 7:11 a.m.)

9                      *  *  *

10         THE VIDEOGRAPHER:  The time now is

11  7:11 a.m.  We are back on the record.

12  BY MS. DU PONT:

13      Q.   So we've just gone through several

14  emails between you, Dr. Waldum, and Dr. Mjønes.  As

15  the emails suggest, you were the primary person

16  communing with -- communicating with Dr. Mjønes

17  regarding her review of Mr. Baudin's pathology,

18  correct?

19      A.   Probably.

20      Q.   So you were the one that was speaking

21  to Mr. Baudin's lawyers.  They were not speaking

22  directly with Dr. Mjønes until quite recently --

23      A.   They had met --

24      Q.   -- in the past week?

25      A.   They had met before.

1      Q.    They had met before?

2      A.    Yes.

3      Q.    When?

4      A.    At the meeting.

5      Q.    At the meeting this week --

6      A.    No.

7      Q.    -- in the past week?

8      A.    Two years ago, when -- when I --

9  before, Patricia Mjønes and another of my previous

10  candidates were at the W -- DDW Week.  And there, I

11  met Restaino, and I presented them for -- for him.

12      Q.    So they --

13      A.    Two years --

14      Q.    -- met brief -- they met briefly at a

15  conference?

16      A.    Briefly, yeah, yeah.

17      Q.    Okay.  But after that conference, you

18  were the primary person that was communicating with

19  Dr. Mjønes about Mr. Baudin's pathology.  It was

20  not Mr. Restaino, correct?

21      A.    Yes, it would -- I would say so.  But

22  Restaino had also some communication with her, but

23  not often.

24      Q.    Now, Mr. Baudin's counsel initially

25  sent Mr. Baudin's pathology specimens directly to

1    you, correct?

2         A.    That's correct.

3         Q.    And you hand-delivered them to

4    Dr. Mjønes?

5         A.    Correct.

6         Q.    Did you meet with Dr. Mjønes at any

7    point after you hand-delivered that pathology to

8    her?

9         A.    I -- I was not involved in her

10   examination.

11        Q.    And I'm asking a little bit of a --

12        A.    We work -- we worked at the -- we work

13   at the same hospital.  I -- I probably saw her, but

14   not -- I -- I was never involved in her

15   examination, except for the emails that you saw.

16   But she -- but she did this evaluation by herself,

17   without me.

18        Q.    But you directed her to review the

19   pathology and prepare a report for you, correct?

20             MR. RESTAINO:  Objection to form.

21             THE WITNESS:  Yes.

22   BY MS. DU PONT:

23        Q.    And you were the one that directed her

24   to send an -- send an invoice to you, which you

25   passed along to the lawyers for Mr. Baudin,

Helge Waldum, M.D., Ph.D.

```
 1   correct?
 2         A.    I think she sent her invoice directly.
 3         Q.    Okay.  But you directed her to send the
 4   invoice?
 5         A.    I -- I gave her the information.
 6         Q.    Have you talked to Dr. Mjønes since she
 7   was deposed earlier this week?
 8         A.    No.
 9         Q.    Have you emailed or sent any text
10   messages to her since she was deposed earlier this
11   week?
12         A.    I sent an email yesterday about the
13   dinner, but she didn't answer.
14         Q.    You invited her to dinner, and she
15   didn't answer?
16         A.    It was a dinner with John and Michael,
17   and I shouldn't go there because Mjønes should be
18   there, and I told her that she should go.  I wasn't
19   there.  I didn't meet her.  I didn't meet her.
20         Q.    Okay.  Did you review a transcript of
21   Dr. Mjønes's deposition?
22         A.    No.
23         Q.    Did you review any summary or bullet
24   points regarding her deposition testimony prepared
25   by anyone?
```

1        A.    No.

2        Q.    Did you have any additional verbal

3   conversations with Dr. Mjønes about this case?

4        A.    I -- I would say no.  No.

5        Q.    And if we could just go back to the --

6   the deposition notice, I just want to confirm that

7   you don't have anything else that's responsive.

8              MS. DU PONT:  Exhibit 1.  Sorry.

9   BY MS. DU PONT:

10        Q.    So you told us that you don't -- you've

11   not done any prior expert witness work, so I assume

12   you do not have any materials related to

13   litigation; is that correct?

14        A.    Correct.

15        Q.    Any additional research -- and I'm

16   directing you to Item Number 14 -- that you've

17   conducted with respect to gastric cancer and PPIs

18   that are not mentioned in either your CV, your

19   report or your reliance list?

20        A.    No.

21        Q.    And I understand that you have not had

22   any prior expert work, but do you have any

23   affidavits, reports or sworn testimony that relate

24   to the subject matter of your testimony; in

25   particular, PPIs and gastric cancer?  That's the

```
 1   last --
 2          A.   I would say no.
 3          Q.   Okay.  And for the record, that's the
 4   last item, Number 15.
 5               MS. DU PONT:  Why don't we take a
 6   break.  I just need like five or ten minutes so we
 7   can get up and walk around.  Is that okay?  How
 8   long do you need, Dr. Waldum?
 9               THE WITNESS:  I need not more than five
10   minutes.  I hope we --
11               MS. DU PONT:  Okay.  Five minutes it
12   is.
13               THE WITNESS:  -- we go on -- maybe we
14   go on more discuss histology, pathology and some --
15               MS. DU PONT:  Yes, we're going to get
16   into the --
17               THE WITNESS:  I hope we come to that
18   question.
19               MS. DU PONT:  -- substance very
20   quickly.
21               THE WITNESS:  Yeah.
22               MS. DU PONT:  Okay.  Okay.  Let's go
23   off the record.
24               THE VIDEOGRAPHER:  The time is
25   7:18 a.m.  We are off the record.
```

```
 1                        * * *
 2              (Whereupon, there was a recess in the
 3   proceedings from 7:18 a.m. to 7:33 a.m.)
 4                        * * *
 5              THE VIDEOGRAPHER:  The time now is
 6   7:33 a.m.  We are back on.
 7   BY MS. DU PONT:
 8        Q.   Before the break, we looked at a number
 9   of emails between you and Dr. Mjønes, and I just
10   want to get a rough sense.  How many emails did you
11   provide to counsel for Mr. Baudin?
12        A.   You have seen them.  I don't know
13   exactly how many.
14        Q.   Can you give me an approximate amount?
15        A.   Five to ten.
16        Q.   Well, I know it was more than that
17   because we got more than that --
18        A.   You think so?
19        Q.   -- yesterday.
20              MS. DU PONT:  I'm just going to request
21   on the record, John and -- and Mike, that you
22   provide a privilege log, because there's an
23   indication that not all of the emails were turned
24   over.  To the extent you received emails from
25   Dr. Waldum, can you just provide a log as to why
```

Helge Waldum, M.D., Ph.D.

```
 1    they -- any were withheld from us?
 2              MR. RESTAINO:  Yes, we can -- we can
 3    provide the log.  If you look at your request, you
 4    specifically requested emails between Dr. Waldum
 5    and -- and Dr. Mjønes regarding the pathology here.
 6              There are emails, as you can well
 7    imagine, between the two of them having to do with
 8    articles they are coauthoring.  And in some of
 9    those articles, there's other coauthors that are
10    being sent out.  We did not provide those, as you
11    can well imagine.
12              So those emails having to do with the
13    pathology in this case as in the request to produce
14    were provided.
15              MS. DU PONT:  I think it also said "or
16    regarding the subject matter of this litigation."
17    I'm reading the -- the deposition notice
18    differently than you.
19              MR. RESTAINO:  Yes, which is why --
20              MS. DU PONT:  It was the pathology or
21    the subject matter of the litigation.
22              MR. RESTAINO:  Which is why we provided
23    the emails regarding her request or need for the
24    university to have a consent to send the documents
25    and the -- the billing.  So all that was provided.
```

1          Again, the only ones that were withheld

2  are the ones that did not have to do with this

3  litigation, but were emails between them having to

4  deal with other articles that they are working on

5  together.

6          MS. DU PONT:  Okay.  We can discuss

7  that off the record.  I don't want to eat up my

8  time.

9          MR. RESTAINO:  Understood.

10          MS. DU PONT:  We may still want a

11  privilege log, but -- but I'll talk to you about

12  that off the record.

13  BY MS. DU PONT:

14      Q.   Did anyone else, Dr. Waldum, assist you

15  with your report other than Dr. Mjønes?

16      A.   I wouldn't say that she assisted me.

17  She gave her report on pathology.  And I got

18  advice -- and I got advice -- some advice from

19  Restaino.  But otherwise, I have not.

20      Q.   I didn't understand what you just said.

21  I'm so sorry.  Can you repeat yourself?

22      A.   Yeah.  Patricia Mjønes made a report on

23  pathology, but she didn't participate in my expert

24  report at all.  So I would not say that anybody --

25      Q.   Let me ask a different question because

1    I understand what you're saying.  Did anyone assist

2    you with your report in this case?

3          A.    I got some information from John

4    Restaino; otherwise, not.

5          Q.    Okay.  Do you know any of AstraZeneca's

6    experts in this litigation?

7          A.    I know most of them.  Not in

8    litigation, but I know all the experts during --

9    for many, many years from AstraZeneca.  We are

10   living in close countries, and I know -- knew many

11   of them personal.

12         Q.    Do you --

13         A.    None -- none of these three.  Timothy

14   Wang, I know --

15              THE REPORTER:  I'm sorry.

16              THE WITNESS:  -- actually --

17              THE REPORTER:  I didn't hear that name.

18              THE WITNESS:  Timothy Wang.  Timothy

19   Wang.

20   BY MS. DU PONT:

21         Q.    Timothy Wang.  Oh, Timothy Wang.  Yes.

22              So you know Timothy Wang.  How do you

23   know Dr. Wang?

24         A.    Actually, he -- perhaps he -- he still

25   has it.  But he got a professorship for -- here in

Helge Wardum, M.D., Ph.D.

 1    Trondheim some years ago as a guest professor.

 2    And -- and he has been involved in gastrin

 3    research, as I.  So I know him.  But -- but I don't

 4    think we have a good relationship because we have

 5    different views on everything.

 6         Q.    Okay.

 7         A.    Yeah.

 8         Q.    But do you respect him --

 9         A.    Yes.

10         Q.    -- as a doctor?

11         A.    Yes.

12         Q.    And you agree he's one of the current

13    leading worldwide gastroenterologists, correct?

14              MR. RESTAINO:  Objection to form.

15              THE WITNESS:  Yes.  In a way, most

16    people would regard him as that.

17    BY MS. DU PONT:

18         Q.    Okay.  Would you regard him as a

19    worldwide gastroenterologist expert?

20              MR. RESTAINO:  Objection to form.

21              THE WITNESS:  I'm a little doubtful

22    after his report.

23    BY MS. DU PONT:

24         Q.    Okay.  Before -- in -- in your book,

25    you describe him as the current leading worldwide

1    gastroenterologist.

2         A.   Yeah, that is correct.  I -- I supposed

3    to -- did write that.  And --

4         Q.   Okay.

5         A.   -- he then -- he then -- it was a

6    leading article about following the many --

7              THE REPORTER:  About what?

8              THE WITNESS:  -- and the inference --

9    inference of many on the research, and I completely

10   agreed with him in that.

11   BY MS. DU PONT:

12        Q.   So when you wrote your book in -- or

13   when you published your book in 2020, you believed

14   that Dr. Wang was a current leading worldwide

15   gastroenterologist, correct?

16        A.   That's correct.

17        Q.   Do you consider --

18        A.   But -- but --

19        Q.   -- him a leader in the -- sorry.

20        A.   I -- I started to read -- to -- to

21   write this book many years before it was

22   published --

23        Q.   Okay.

24        A.   -- because -- yeah.  So, yes, 2015 I

25   think I started the book.

1       Q.   You started the book in 2015, and you

2  published it in 2020?

3       A.   Yeah, that's correct, because it was --

4  I -- I had an appointment with Bantam e-books, and

5  they accepted the manuscript.  And I had to read

6  the final proof, correction.  And then suddenly

7  they said they wouldn't publish it, and then -- and

8  that was after they had asked for -- for permission

9  to publish something from a journal.

10           So I suppose I had been influenced by

11  that.  So then I had to start the process again

12  with another publisher.  So it takes time.

13       Q.   Understood.

14           Do you believe Dr. Wang is a leader in

15  the field of gastrin?

16       A.   Not completely at this.  I -- I think

17  that there are many errors in his report.

18       Q.   In his expert report?

19       A.   Yeah.

20       Q.   Okay.  Do you know Dr. Miele?

21       A.   No.

22       Q.   Do you know Dr. Benjamin Musher?

23       A.   No.

24       Q.   Do you know Dr. Lysandra Voltaggio?

25       A.   No.

1    Q.    Do you know Dr. Laurel Fisher?

2    A.    No.

3    Q.    Do you know Dr. Janice Lansita?

4    A.    No.

5    Q.    Do you know Dr. Marianne Mann?

6    A.    No.

7    Q.    Do you know Dr. Sheila Weiss?

8    A.    No.

9    Q.    Do you know Dr. Robert Gibbons?

10   A.    By name, but I don't -- don't remember.

11   Q.    Have you ever met him before?

12   A.    I don't think so.

13   Q.    So when you said earlier that you knew

14   several of the --

15   A.    From AstraZeneca?

16   Q.    Yes.  You were talking about

17   AstraZeneca, not the experts that were disclosed in

18   this litigation?

19   A.    That's correct.

20   Q.    Okay.  Did you communicate with anyone

21   other than Mr. Baudin's attorneys or Dr. Mjønes

22   about this case and your opinions in this case?

23   A.    No.

24   Q.    Before we get into substance, I want to

25   just try to make sure we're on the same page with

1    terminology.  If I say "gastric cancer," can we

2    agree for the purpose of this deposition that it

3    means gastric adenocarcinoma?

4         A.   I should prefer that we use "gastric

5    cancer."

6         Q.   You'd prefer that I use "gastric

7    cancer"?

8         A.   Yes.

9         Q.   So when I say "gastric cancer," what I

10   am going to be referring to is gastric

11   adenocarcinoma.  Do you understand that?

12        A.   Yes.

13        Q.   And if I'm talking about a specific

14   type of gastric adenocarcinoma, such as cardia or

15   noncardia, I'll specify that, okay?

16        A.   Yes.  Okay.

17        Q.   And if I'm talking about neuroendocrine

18   tumors or carcinoids, I will specifically specify

19   that, okay?

20        A.   You should also include neuroendocrine

21   carcinomas.

22        Q.   And I will specify that as well, okay?

23        A.   Yes.  Yes.

24        Q.   And if I say "ECL cell hyperplasia,"

25   can we agree that means enterochromaffin-like cell

1    hyperplasia?

2         A.   Yes.

3         Q.   And if I say "GERD," can we agree that

4    means gastroesophageal reflux disease?

5         A.   Yes.

6         Q.   Now, Doctor, you're a medical doctor,

7    right?

8         A.   Yes.

9         Q.   You're trained in internal medicine and

10   gastroenterology, right?

11        A.   Yes.

12        Q.   And you're not licensed to practice

13   medicine in the United States, correct?

14        A.   Yes.  That's correct.

15        Q.   You never have been licensed to

16   practice medicine in the United States, correct?

17        A.   Correct.

18        Q.   And as I understand it, you're

19   currently retired?

20        A.   That's mainly correct, yes.

21        Q.   But you still hold a title of professor

22   of medicine in the department of clinical and

23   molecular medicine in the Norwegian University of

24   Science and Technology in Trondheim, Norway; is

25   that right?

 1          A.    That's correct.

 2          Q.    And you've held that position for 35

 3   years?

 4          A.    From '86.  1986.

 5          Q.    1986.

 6                And what are your current

 7   responsibilities as professor of medicine in

 8   that -- at the Norwegian University of Science and

 9   Technology?

10          A.    Nowadays, I have a little teaching, but

11   mainly they expect me to write papers.

12          Q.    So you're currently not treating

13   patients, correct?

14          A.    I -- I stopped treating patients one

15   year ago -- or one and a half year ago.

16          Q.    You said, one and a half years ago you

17   stopped treating patients?

18          A.    Correct.

19          Q.    Okay.  And besides your professorship

20   role and serving as an expert for Mr. Baudin, do

21   you have any other professional roles right now?

22          A.    I'm -- I'm -- as I said, I'm writing a

23   lot, that I hadn't time to write during -- when I

24   was occupied at the hospital.

25          Q.    So you were -- you used to be the head

```
 1    of the department of gastroenterology and

 2    hepatology at St. Olavs Hospital, right?

 3         A.    That's correct.

 4         Q.    And your CV -- and I'm happy to pull it

 5    up, if you want -- says that you stopped being the

 6    head of the department in 2013; is that right?

 7         A.    Yes.

 8         Q.    And then you were a senior consultant

 9    until 2018?

10         A.    Yes.  And afterwards, I have been doing

11    endoscopy in a private hospital.

12         Q.    What private hospital were you doing

13    endoscopy?

14         A.    Aleris.  It --

15         Q.    Can you spell that?

16         A.    A-L-E-R-I-S.

17         Q.    How many hours --

18         A.    It --

19         Q.    -- a week were you doing that?

20         A.    It varied, but four or five days a

21    month.

22         Q.    And you didn't include that on your CV,

23    correct?

24         A.    No, I didn't.

25         Q.    Why not?
```

Helge Waldum, M.D., Ph.D.

```
 1          A.    I didn't think it was import --

 2          Q.    Okay.

 3          A.    -- important.

 4          Q.    So other than the endoscopies that you

 5    were doing at the Aleris Hospital four to five days

 6    a month -- when -- when -- well, let me ask you

 7    this.  Let me withdraw my prior question.

 8                When was the last time you did an

 9    endoscopy at Aleris Hospital?

10          A.    It was the last day of June, one and a

11    half or two years ago.  It was 18 months ago.  No.

12          Q.    Okay.

13          A.    Yeah.

14          Q.    So in 2020?

15          A.    Yes.

16          Q.    And --

17          A.    June the -- June the 30th.

18          Q.    June the 30th of 2020.  That's helpful.

19                So when you -- when you became a senior

20    consultant at St. Olavs Hospital, how did your role

21    as a doctor change?

22          A.    When I stopped or when I became the

23    head of the department?

24          Q.    Let me -- let me ask a different

25    question.
```

Helge Waldum, M.D., Ph.D.

```
 1          A.   Yes.
 2          Q.   Let's start with when you were the head
 3    of the department.  Up until 2013, as the head of
 4    the department at St. Olavs --
 5          A.   Yes.
 6          Q.   -- describe your responsibilities there
 7    for me.
 8          A.   I evaluated all the applications for
 9    the unit.  I -- I looked at patients at other
10    departments.  I did endoscopy at least one day a
11    week.  I had ambulatory patients for five hours a
12    week.  And I was supervising one of the intern --
13    about -- a unit of about 15 patients -- 15 beds it
14    was divided by.
15               So I had a lot -- a lot to do there.
16    So that's what -- but I -- during this time, I
17    had -- and I had the research going on, and so I
18    had a lot to write.  And I stopped -- that I could
19    write on when stopping as a senior consultant,
20    because I got more time -- spare time.
21          Q.   Okay.  So in -- up until 2013, when you
22    were both a professor at Norwegian University and
23    also the head of the department at St. Olavs
24    Hospital, can you break down for me how much time
25    you spent on research and writing, how much time
```

1    you spent on administrative work versus teaching

2    and treating patients.  So break down your time

3    between those four areas.

4         A.   Yes.  I think I worked 60 hours a week.

5    I did administration 10 times a week -- 10 -- 10

6    hours a week; clinical work, including endoscopy,

7    25 hours a week; and what is left for research and

8    writing papers, 15 hours.

9         Q.   Another -- 15 hours?  So I think that

10   adds up to 50 hours, though.

11        A.   Yeah.

12        Q.   And how about teaching?

13        A.   5 hours a week.  Did you add it?

14        Q.   So I -- that adds up to, I think, 55

15   hours.  So I have administrative work, 10 hours;

16   clinical, including endoscopies, for 24 hours;

17   research and writing for 15 hours; and teaching for

18   5 hours.

19             MR. RESTAINO:  I -- I believe he said

20   25 hours for research.

21   BY MS. DU PONT:

22        Q.   Oh.

23        A.   Yes.  Yeah.

24        Q.   Sorry.  Misheard you.  So that's --

25   that adds up to 65 hours a week?

Helge Waldum, M.D., Ph.D.

```
 1          A.    That -- that is -- that is too much.
 2          Q.    Okay.
 3          A.    There should be about -- about --
 4          Q.    Where do you want to cut down on the
 5     time?
 6          A.    60 hours a week would -- would be
 7     enough, I think.  Of course, I did work in
 8     weekends.
 9          Q.    Right.
10          A.    It included that.  I did write --
11          Q.    Would you think you spent more time
12     research and writing or on your clinical work in a
13     given week?
14          A.    No.  I did more on the -- on the
15     clinical work.
16          Q.    Okay.  Once you retired from the head
17     of the department and you became a senior
18     consultant, how did your responsibilities change?
19          A.    I had no more administration at the
20     hospital.  And -- so I -- I probably also reduced
21     my clinical work.  I continued with the endoscopy
22     and the ambulatory patients.  So let us say -- say
23     15 hours' clinical work and the rest --
24          Q.    You said 15 hours of clinical work?
25          A.    Yes.
```

Helge Waldum, M.D., Ph.D.

1        Q.    Okay.

2        A.    And I reduced the total work from 60 to

3   50 hours a week, I suppose.

4        Q.    And then when --

5        A.    I continued -- and I continued the

6   teaching and the research.

7        Q.    Okay.  And when you stopped being a

8   senior consultant in 2018, your clinical work

9   stopped except for the four to five days a month

10  where you did endoscopy at Aleris --

11       A.    Yes.

12       Q.    -- is that accurate?

13       A.    Yes.

14       Q.    Did you perform any other GI

15  procedures, other than endoscopies, in your role as

16  the head of the department?

17       A.    At Aleris?

18       Q.    Yes.  No, no, no.

19       A.    It was --

20       Q.    Sorry.  At -- at St. Olavs?

21       A.    Procedure, it was only endoscopy --

22       Q.    Okay.

23       A.    -- because I had so many -- many things

24  to do.  I couldn't take part in much of the other

25  things.  But, of course, I knew what was going on

1    and the methods.

2         Q.   Did you, in your role at St. Olavs,

3    treat patients with erosive esophagitis?

4         A.   Of course.  Yes.  A prevalent disease

5    and particularly for old people doing endoscopy.

6         Q.   How did you treat erosive esophagitis?

7    What was your recommended treatment?

8         A.   It depend -- it depended.  It depends

9    on the severity.  Where in severe cases, I started

10   with PPIs.  Less severe cases, I start -- started

11   with histamine-2 blockers.  And -- and also advice

12   on lifestyle and so on.

13             THE REPORTER:  Say that last part

14   again.

15             THE WITNESS:  And, also, patients got

16   information how to change their lifestyle.

17   BY MS. DU PONT:

18        Q.   So you did prescribe PPIs for erosive

19   esophagitis or healing of erosive esophagitis in --

20   in some cases?

21        A.   Yes.  I -- I took care of the age of

22   the patients.  More often, PP -- more often, PPIs

23   to old people than to young people.

24        Q.   And why was that?

25        A.   Because cancer is a long-term event.

```
 1    So if you're old, you probably will not develop any

 2    cancer or erosion.  You have a risk for it by the

 3    treatment.

 4          Q.   When was --

 5          A.   You will die -- you will die before you

 6    get it.

 7          Q.   When was the last time you prescribed a

 8    PPI?

 9          A.   I suppose it must be on the last day at

10    Aleris.  I haven't prescribed anything else.

11          Q.   So you said it was the last day at

12    which hospital?

13          A.   Aleris, where -- where I did the

14    endoscopy.

15          Q.   So the last time you prescribed a PPI

16    was in 2020, when you stopped --

17          A.   Yes.

18          Q.   -- practicing medicine?

19          A.   Yeah.  Yes.

20          Q.   Did you prescribe PPIs to treat GERD?

21          A.   Yes.

22          Q.   And --

23          A.   I -- I said GERD with severe

24    esophagitis.  I would not -- if I didn't see

25    anything -- esophagitis, I would not go -- would
```

Helge Waldum, M.D., Ph.D.

1    not use PPIs.

2          Q.   What would you use in the less severe

3    cases?

4          A.   H2 blockers.

5          Q.   What if the H2 blockers were -- did not

6    work?  Would you prescribe a PPI for those cases?

7          A.   It would depend on the -- it would

8    depend on the age.  But, also, then I would send

9    the patients to -- to measure esophageal pH to see

10   if it was really related to reflux, because many

11   patients have symptoms from this area without

12   having reflux.  So I would secure a diagnosis.

13         Q.   So in those cases, you would send the

14   patient who was not --

15         A.   To 24 --

16         Q.   -- responding to --

17         A.   To 24 over --

18              MR. RESTAINO:  Let her finish her --

19   her question.

20   BY MS. DU PONT:

21         Q.   Yeah, let me -- let me just finish what

22   I'm asking.

23              So in cases where the patient didn't

24   respond to an H2-RA blocker, you would send them to

25   pH testing to see if they, in fact, had reflux?

1         A.    Yes.

2         Q.    Any other alternatives that you would

3   prescribe, other than H2-RAs and PPIs, to patients

4   with symptomatic GERD?

5         A.    If it was very seldom, perhaps I would

6   use antacids.

7         Q.    In what circumstances would you use

8   antacids?

9         A.    If -- if they had GERD episodes very

10  seldomly, I would prefer antacids as the first

11  treatment --

12        Q.    Okay.

13        A.    -- instead of continuous treatment.

14        Q.    Did you describe PPIs for gastric

15  ulcers associated with NSAIDs?

16        A.    No.

17        Q.    What would you prescribe for that

18  condition?

19        A.    It depends on -- on what type of --

20  whether it's antiplatelet agents or whether it is

21  anticoagulation drugs and so on.  And some, I would

22  not treat at all.  Some, I would treat with H2

23  blockers.

24        Q.    Okay.  Did you prescribe PPIs for

25  H. pylori eradication to reduce the risk of

Helge Waldum, M.D., Ph.D.

```
 1    duodenal ulcer recurrence?

 2         A.    Yes.

 3         Q.    And just as background, H. pylori

 4    occurs when the H. pylori -- sorry.  An H. pylori

 5    infection occurs when H. pylori bacteria infects

 6    one's stomach, right?

 7         A.    Yes.

 8         Q.    And that can cause peptic ulcers,

 9    correct?

10         A.    It's the main cause of peptic ulcer.

11         Q.    And it's also a cause of gastric

12    cancer, correct?

13         A.    Yes.

14         Q.    And it can cause inflammation in the

15    stomach, which is known as "gastritis," correct?

16    The H. pylori can cause inflammation?

17         A.    What?

18         Q.    The -- the H. pylori can cause

19    inflammation in the stomach and lead to gastritis,

20    right, or gastritis is the inflammation?

21         A.    Yes.

22         Q.    And H. pylori is a known carcinogen,

23    correct?

24         A.    Yes.

25         Q.    And PPIs are --
```

```
 1          A.   It is -- it is not a direct carcinogen,
 2   but it -- the inflammation predisposes to gastric
 3   ulcer.  But it is -- nobody has shown any factor in
 4   H. pylori that causes gastric cancer without having
 5   caused atrophic gastritis in the oxyntic mucosa.
 6               THE REPORTER:  Can you say that last
 7   part again, please.
 8               THE WITNESS:  Nobody has shown that
 9   H. pylori causes gastric cancer without having
10   caused atrophic oxyntic gastritis.  Did you catch
11   it?
12   BY MS. DU PONT:
13          Q.   Yes.
14               You would agree with me that PPIs are a
15   component of several first-line and salvage therapy
16   regimens for H. pylori infection, right?
17               MR. RESTAINO:  Objection to form.
18               THE WITNESS:  What did you say?
19   BY MS. DU PONT:
20          Q.   PPIs are a component of first-line
21   therapy for treating an H. pylori infection,
22   correct?
23          A.   Yes.  Yes.  Yeah.
24          Q.   And they are also a component of
25   salvage therapy regimens for H. pylori infection,
```

Helge Waldum, M.D., Ph.D.

```
 1   correct?

 2          A.    What do you mean with "salvage"?

 3          Q.    Not --

 4          A.    Do you mean --

 5          Q.    Second-line.

 6          A.    You mean -- you mean -- you mean

 7   ulcers?  You mean a peptic ulcer?

 8          Q.    I mean second-line.  Second-line

 9   therapy.

10          A.    Yeah.  I would say if you mean

11   different antibiotics combined with PPI, then I

12   would say yes.

13          Q.    Okay.  Okay.  When was the last time

14   you prescribed a PPI as part of treatment or

15   therapy for H. pylori?

16          A.    It must have been in the spring of

17   2020.

18          Q.    Have you used a PPI to treat

19   pathological hypersecretory conditions, including

20   Zollinger-Ellison syndrome?

21          A.    Yes.

22          Q.    When was the last time you prescribed a

23   PPI for this?

24          A.    I can't say exactly.  It's a seldom

25   disease.  Carcinoma is so seldom, so I can't say
```

Helge Waldum, M.D., Ph.D.

```
 1   which year.  But it's some years ago.
 2        Q.   Okay.  People with Zollinger-Ellison
 3   syndrome often have to take doses -- high doses of
 4   PPIs, right?  Yes?
 5        A.   Yes.
 6        Q.   And they often have to take PPIs long
 7   term, correct?
 8        A.   Yes.
 9        Q.   Are there any alternative treatments,
10   other than PPIs, that you'd prescribe to patients
11   with Zollinger-Ellison syndrome?
12        A.   With surgery and -- you know, there are
13   two types of gastrinomas, those connected to a
14   genetic error, multiple endocrine neoplasia --
15            THE REPORTER:  Can you say that again,
16   please.
17            THE WITNESS:  Multiple endocrine
18   neoplasia type 1.  And the other one is called
19   sporadic gastrinomas.  They are not connected to
20   any genetic disease, and these patients may be
21   cured by removing the gastrinoma.  So they need not
22   long-term PPI treatment because they get normal
23   gastrin and thus, therefore, no more
24   hypersecretion.  So -- and then -- yes.  Did you
25   catch it?
```

Helge Waldum, M.D., Ph.D.

```
 1    BY MS. DU PONT:
 2         Q.   Yes.  I -- I don't know if the -- the
 3    court reporter is nodding.  Okay.
 4              Doctor, you're familiar with Barrett's
 5    esophagus?
 6         A.   Yes.
 7         Q.   And that can be a complication of GERD,
 8    correct?
 9         A.   Yes.
10         Q.   Did you prescribe PPIs for patients
11    that were suffering from Barrett's esophagus?
12         A.    I did, but I was always a little
13    reluctant, because I was not sure that they had --
14    that they were effective in -- in preventing
15    cancer.  But I did use it because it was old --
16              THE REPORTER:  It was what?
17    BY MS. DU PONT:
18         Q.   Because it was what?
19         A.   Old -- it was a general treatment of
20    Barrett's esophagus.
21         Q.   What alternatives other than PPIs were
22    there for patients with Barrett's esophagus?
23         A.    It would be no other treatment, because
24    these patients, they do not have GERD symptoms
25    anymore because of the mucosa in the lower part of
```

1    the esophagus.  It's resistant towards acid.

2    It's -- so they often have no symptoms anymore when

3    they have developed Barrett's esophagus.

4         Q.   So there was no alternative to PPI to

5    treat a patient with Barrett's esophagus?

6         A.   It -- it could be surgery,

7    fundoplication.

8         Q.   Okay.  So -- let me change my question.

9    There was no other prescription therapy available

10   for patients with Barrett's esophagus, other than a

11   PPI?

12        A.   Correct.

13        Q.   Now, PPIs can prevent bleeding in

14   patients at high risk, such as those on blood

15   thinners, like antiplatelet medications; do you

16   agree?

17        A.   Yes.

18        Q.   Did you prescribe PPIs for bleed

19   prophylaxis?

20        A.   I was seldom involved in that.  But I

21   suppose that the -- the cardiologists, they

22   probably did it routinely when they had to put

23   patients on anticoagulation treatment.

24             THE REPORTER:  "Anti" what treatment?

25             THE WITNESS:  Anticoagulation.

```
 1              THE REPORTER:  Thank you.
 2    BY MS. DU PONT:
 3         Q.   But you agree that it's appropriate to
 4    prescribe PPIs for bleed prophylaxis in the correct
 5    patient -- in the appropriate patient, correct?
 6         A.   In -- in some patients.
 7         Q.   Now, we just talked about a number of
 8    conditions for which you were prescribing PPIs.  In
 9    prescribing PPIs to your patients, did you
10    regularly test their serum gastrin?
11         A.   No.
12         Q.   Did you do any other special testing on
13    patients that you put on PPIs?
14         A.   Serum gastrin and chromogranin A would
15    be appropriate, I think, in young people.  But most
16    of those people getting PPI for long term, they
17    are -- as I said, they are so old that they
18    probably will not get any cancer anyway, or that is
19    not indicated.
20              But I mean that chromogranin A should
21    be regularly determined in patients on long-term
22    PPI, because they -- a chromogranin A, reflux long
23    term, or 24-over gastrin indirectly, it -- they
24    can -- chromogranin A is released from ECL cells
25    and -- and reflecting the ECL cell number or
```

Helge Waldum, M.D., Ph.D.

```
 1    plasia -- hyperplasia.
 2          Q.    So if I'm understanding what you just
 3    said, you're suggesting that chromogranin A may be
 4    a test you could conduct in long-term PPI users,
 5    correct?
 6          A.    Yeah.
 7          Q.    But -- but you didn't conduct that test
 8    when you treated patients on PPIs, correct?
 9          A.    Young patients.
10          Q.    You conducted it in young patients?
11          A.    Yeah, but not old patients.
12          Q.    What percentage of your -- of your
13    patient population was young patients?
14          A.    Very few on PPIs because I -- I felt
15    that it was not correct to put young people on --
16    on long-term PPI treatment.
17          Q.    And when did you begin testing the very
18    few young people that were on long-term PPI
19    treatment for chromogranin A?
20          A.    The best way was to take a sample
21    before starting and then, for instance, six months
22    later.
23          Q.    Okay.  When you treated patients for
24    the various conditions we've been talking about,
25    did you ever counsel them on ways to prevent
```

Helge Waldum, M.D., Ph.D.

```
 1    gastric cancer?

 2         A.   I didn't say to them that they had an

 3    increase in gastric cancer.  I did not tell them

 4    that.

 5         Q.   I think my question is a little

 6    different.  Did you counsel them on ways they could

 7    prevent gastric cancer?  And let me give you an

 8    example.  By stopping smoking.

 9         A.   No.  I think that's the -- smoking has

10    such a minor influence on gastric cancers, so I

11    didn't do that.

12         Q.   Did you counsel them that they could

13    prevent gastric cancer by managing their underlying

14    health conditions, such as GERD?

15         A.   Yes, I -- I gave them advice how to --

16    to change life --

17         Q.   What advice would you give them?

18         A.   To sleep with the bed with the head

19    high and their chest high and avoid meals in the

20    evening before going to bed and alcohol in the

21    evening.  Such -- such lifestyle advices I gave.

22         Q.   And if you had a patient with

23    H. pylori, would you counsel them to eradicate the

24    H. pylori?

25         A.   Always.
```

Helge Waldum, M.D., Ph.D.

```
 1          Q.   Doctor, you're not an oncologist,
 2   correct?
 3          A.   That -- I'm not an oncologist, but I
 4   have expertise in carcinogenesis.
 5          Q.   But you're not formally trained in
 6   oncology, right?
 7          A.   No.
 8          Q.   And you would defer to an oncologist
 9   regarding the appropriate treatment for gastric
10   cancer, correct?
11               MR. RESTAINO:  Objection to form.
12               THE WITNESS:  Yeah, but it is -- I -- I
13   would send the patient to the surgeon if it could
14   be operated.
15   BY MS. DU PONT:
16          Q.   You wouldn't conduct the -- the surgery
17   to remove the gastric cancer, correct?
18          A.   Not I.
19          Q.   Okay.
20          A.   But we have surgeons.
21          Q.   Okay.  Doctor, do you belong to any
22   professional organizations in gastroenterology?
23          A.   Yes.
24          Q.   What do you -- what organizations do
25   you belong to?
```

 1          A.    The Norwegian association and the

 2    American association.

 3          Q.    The American Gastroenterology

 4    Society --

 5          A.    Yes.

 6          Q.    -- AGA?  You do belong to the AGA,

 7    correct?

 8          A.    Uh-huh.  Since 1983.

 9          Q.    And you agree this organization

10    provides guidance to doctors when it comes to

11    treating GI conditions, correct?

12          A.    Yes.

13          Q.    Now, we already talked a little bit

14    earlier about -- about the book you published in

15    2020 entitled "The Influence of the Pharmaceutical

16    Industry on Medicine, as Exemplified by Proton Pump

17    Inhibitors."

18          A.    Yes.

19          Q.    And as I understand your book, it -- it

20    basically explains how the medical and scientific

21    communities have consistently rejected your

22    theories on the ECL cell role in gastric

23    carcinogenesis; is that correct?

24                MR. RESTAINO:  Objection to form.

25                THE WITNESS:  In a way.

Helge Waldum, M.D., Ph.D.

```
 1    BY MS. DU PONT:
 2          Q.    In a way.
 3          A.    But it is changing.
 4          Q.    It's changing.
 5          A.    Yes.
 6          Q.    But in your book, you describe in great
 7    detail how your publications have been rejected by
 8    numerous journals throughout the year, correct?
 9    Through the years?
10          A.    Yes.
11          Q.    And in this book, you talk about
12    AstraZeneca, right?
13          A.    Yes.
14          Q.    And you said you started writing the
15    book in 2015, correct?
16          A.    Yes, about that time.
17          Q.    And you published it in 2020, correct?
18          A.    Yes.
19          Q.    Prior to publishing the book, did you
20    have any of the internal AstraZeneca documents that
21    you've accessed in this litigation available to
22    you?
23          A.    No.
24          Q.    Doctor, are you familiar with the term
25    "evidence-based medicine"?
```

Helge Waldum, M.D., Ph.D.

1          A.    Once more.

2          Q.    Are you familiar with the term

3    "evidence-based medicine"?

4          A.    Yes.

5          Q.    And are you aware that evidence-based

6    medicine is the prevailing way doctors and

7    scientists make clinical decisions?

8                MR. RESTAINO:  Object to form.

9                THE WITNESS:  History of medicine,

10   there are a lot of examples where the majority has

11   been wrong.

12   BY MS. DU PONT:

13         Q.    So you reject evidence-based medicine?

14         A.    I do -- do not reject it, but I say

15   that the majority has not always the correct

16   answer.

17         Q.    By -- so you're saying the majority or

18   the mainstream might have a blind faith in

19   evidence-based medicine?

20                MR. RESTAINO:  Objection to form.

21                THE WITNESS:  Yes.

22   BY MS. DU PONT:

23         Q.    Do you understand that in holding

24   that -- that view, you're outside of the scientific

25   and clinical mainstream?

```
 1              MR. RESTAINO:  Objection to form.
 2              THE WITNESS:  My publication tells --
 3    my publications tell for themselves.  I think
 4    nobody has shown that anything what I have written
 5    have -- have disapproved what I've written.
 6    Nobody.
 7    BY MS. DU PONT:
 8         Q.  Can you say that again, because I don't
 9    think I understood.
10         A.  Nobody has shown that all what I have
11    written, all I have done, that there are any errors
12    there.  It -- it would be quite easy, for
13    instance -- we were talking about -- perhaps I -- I
14    suppose we will be talking about what is sufficient
15    for tumor classification.  And the expert you
16    provided says that it is not indicated with any
17    eosin staining, except hematoxylin-eosin staining.
18    The method --
19              THE REPORTER:  Except what?  I'm sorry.
20    Except what?
21              THE WITNESS:  Hematoxylin-eosin
22    staining.  Hematoxylin-eosin staining, a method
23    that was developed in the 1880s.  And -- and I
24    think that it's time in a classification,
25    particularly in gastric carcinomas, to -- to
```

1    specific staining, and it is peculiar for me that

2    has not been done by others.

3              MS. DU PONT:  Okay, Doctor.  I'm -- I'm

4    going to just move to strike your answer as

5    nonresponsive.

6    BY MS. DU PONT:

7         Q.   Because my question was -- was merely

8    that -- do you agree that -- that your views are

9    outside of the scientific and clinical mainstream?

10             MR. RESTAINO:  Same objection.

11             THE WITNESS:  It -- it depends.  In

12   U.S., probably.  But it -- in Europe, it's more in

13   mainstream, I would say.

14   BY MS. DU PONT:

15        Q.   Okay.  Well, we'll -- we'll go through

16   some of your publications in a bit.  You've

17   published several articles since becoming an expert

18   for plaintiffs in this case, correct?

19        A.   Yes.

20        Q.   And those articles often discuss PPIs,

21   right?

22        A.   Yes.

23        Q.   And those articles often discuss your

24   mechanistic theories related to gastric cancer that

25   you are putting forth in this case, correct?

Helge Waldum, M.D., Ph.D.

1        A.    That is correct, because they are the

2   best theories.  For instance, Helicobacter pylori,

3   nobody can explain why Helicobacter pylori

4   continues to predispose to cancer after having

5   induced atrophic gastritis, and then you have no

6   more inflammation.

7              Wang claims that it is inflammation

8   that causes the cancer, but it continues after the

9   inflammation has stopped.

10       Q.    So I simply --

11             MS. DU PONT:  And I'm going to move to

12   strike your answer as nonresponsive.

13   BY MS. DU PONT:

14       Q.    But I just asked if the articles that

15   you've published since being retained as an expert

16   in this case -- or since serving as an expert in

17   this case often discuss your mechanistic theories

18   related to gastric cancer that you are putting

19   forth in this case.  A simple "yes" or "no" answer

20   is fine.

21             MR. RESTAINO:  Objection to form.

22             THE WITNESS:  Yes.

23   BY MS. DU PONT:

24       Q.    And in those articles, you have not

25   disclosed that you are working on behalf of

Helge Waldum, M.D., Ph.D.

1   plaintiff in this litigation in those publications?

2          A.   I -- I have not received any money

3   before in February of this year.  So I thought that

4   I should -- should not disclose it.

5          Q.   So you haven't disclosed it because you

6   weren't paid until February of 2022?

7          A.   Yes.

8          Q.   And so if you publish an article on

9   PPIs and gastric cancer going forward after

10  February of 2022, you will disclose --

11         A.   Yes.

12         Q.   -- your -- and let me just finish my

13  answer [sic].

14              -- you will disclose your -- your

15  involvement in the PPI litigation, correct?

16         A.   Yes.

17         Q.   And -- and your reasoning for not

18  disclosing -- so even though you worked and had

19  access to internal AstraZeneca documents and

20  reviewed medical records for plaintiff and had come

21  to the opinion that PPIs cause gastric cancer in

22  this litigation, you didn't disclose it just simply

23  because you had not been paid, correct?

24              MR. RESTAINO:  Objection to form.

25              THE WITNESS:  In a way.  But -- but my

1    opinion is much longer duration than this

2    litigation.  It -- it has been -- and I started in

3    gastrin also before PPIs came up.  So it's just

4    based upon what I have disclosed in the research.

5    It's nothing to do with AstraZeneca.

6              Actually, I invited Håkan Larsson in

7    the '80s to cooperate with me, and we had an

8    article published together in 1988.  And my second

9    candidate for Ph.D., Håkan Larsson was one of the

10   authors.

11             So I have nothing -- I have -- I am not

12   an enemy of AstraZeneca, but I -- so this is what I

13   came up to, and I think still it is the best that

14   exist concerning the theories of gastric

15   carcinogenesis.

16   BY MS. DU PONT:

17        Q.   Doctor, you're not formally trained in

18   pathology, correct?

19        A.   That's correct.

20        Q.   You don't work or you never worked in

21   the department of pathology at the Norwegian

22   University of Science and Technology, correct?

23        A.   We -- we -- I established a laboratory

24   in -- doing pathology in the NTNU laboratory.  And

25   I -- I will read what I said about pathology in my

1    report.

2         Q.   I just simply asked you -- I don't need

3    you to read what's in your report --

4         A.   Wait.  I will -- I will, nevertheless,

5    say that I have expertise in -- in evaluation of

6    stain and what sort of -- type of stain we should

7    use to disclose the real etiology and the real --

8    and the cellular comp of origin of the tumors.

9              And I think nobody has shown that

10   there's anything wrong with it.  But they have,

11   curiously, not repeated it.  That's strange.  That

12   would have been very easy to -- to say that this is

13   not the case.  It -- it would have -- if -- if

14   nobody can repeat the studies.  But they haven't,

15   in spite of all the studies we have published in

16   the area.

17        Q.   Okay.  Dr. Waldum, I understand that's

18   your opinion.  I -- I would like you, if you could,

19   please, just answer the questions that I'm asking.

20   I have limited time today.  So please try your

21   best.

22             And I -- I understand that we're doing

23   this remotely, and it might be difficult sometimes

24   to understand my questions.  But please try to

25   answer the question I'm asking so that we can get

Case 3:18-cv-01063-JWD-EWD   Document 99-12   04/27/23

1    through the material today and I don't have to

2    bring you back again, okay?

3         A.    Okay.

4         Q.    You -- you're not the person, though,

5    that looks under the microscope at a patient's

6    pathology and writes the pathology report, right?

7         A.    Correct.

8         Q.    And in this very case, you did not

9    review Mr. Baudin's pathology, correct?

10        A.    Correct.

11        Q.    You asked a pathologist, your

12   colleague, Dr. Mjønes -- Mjønes, to review

13   Mr. Baudin's pathology, correct?

14        A.    Correct.  Correct.

15        Q.    And you would defer to her about her

16   interpretation of the pathology, correct?

17        A.    Correct.

18        Q.    And in general, you would refer to a

19   clinical pathologist similar to Dr. Mjønes on their

20   interpretation of the pathology, correct?

21        A.    In all my publications, I have had one

22   clinical pathologist.

23        Q.    Okay.

24        A.    And I had cooperated with the best in

25   the world, Julia Polak from -- at Hammersmith,

1    Jun Soga from Japan.  And they have agreed, you

2    know, with my opinions and contributions.

3              THE REPORTER:  They have agreed with

4    what?

5    BY MS. DU PONT:

6         Q.   And the --

7         A.   So I'm not completely alone.

8         Q.   And you -- you asked them to consult

9    with you -- because you don't have enough

10   specialized training in pathology, you'd defer to

11   their expertise, correct?

12        A.   Yes, I think that is correct.

13        Q.   And you don't have a -- you don't have

14   formal training or a degree in cancer biology,

15   correct?

16        A.   That's correct.

17        Q.   You're not a biostatistician?

18        A.   Correct.

19        Q.   You're not a toxicologist?

20        A.   That's correct.

21        Q.   And you don't have -- you've never

22   worked for the FDA or any regulatory body, correct?

23        A.   I -- I was invited to FDA in 2000

24   about over-the-counter PPI.

25        Q.   And we'll talk about that in a bit, but

Helge Waldum, M.D., Ph.D.

1    you weren't -- you've never been an employee of the

2    Food and Drug Administration in the United States?

3         A.   No.  No.

4         Q.   Now, we talked a little earlier, and we

5    marked as Exhibit 4 your expert report in this

6    case.  And I know you -- you live in Norway, and

7    you've never been an expert in -- in U.S.

8    litigation before.  So I just want to make sure you

9    understand that the opinions that you put forth in

10   your expert report are the opinions that are

11   disclosed now and are the opinions that you will

12   offer at trial.  Do you -- do you understand that?

13        A.   Yes.

14        Q.   And you wrote a very lengthy report.

15   It was 143 pages before even we're talking about

16   the exhibits.  And you set that -- your opinions

17   forth and the support for it in that lengthy

18   report, right?

19        A.   Yes.

20        Q.   And this is my opportunity right now to

21   ask you questions about that report.  Do you

22   understand that?

23        A.   That's good.

24        Q.   You can't come up with new information

25   at the time of trial about Mr. Baudin's case and

 1   your opinions then, right?  This is my opportunity

 2   now.  Do you understand that?

 3        A.   If something new -- new, important

 4   information come up, if that must be -- and it is

 5   relevant for the -- for the case, that -- I -- I

 6   can take that with me.

 7        Q.   So what new information are you -- are

 8   you speaking about?

 9        A.   Articles in journals on these subjects,

10   not written by me, but by others.

11        Q.   Okay.

12             MR. RESTAINO:  Julie, this is John.  If

13   I may interject, he started that sentence with

14   "if."

15             MS. DU PONT:  Understood.

16   BY MS. DU PONT:

17        Q.   I understand what you're saying.

18   You're saying, if new information in the medical

19   literature comes out on PPIs and gastric cancer --

20        A.   I may use it.

21        Q.   -- you might respond to that at -- at

22   trial?

23             And -- and I think we can maybe

24   disagree about whether you'd be allowed to testify

25   about that new information, but I understand your

1    point.

2              Other than new medical literature that

3    might come out in the future, can you agree with me

4    that all of your opinions and the support for it

5    are set forth in your report?

6         A.   Yes.

7         Q.   So you're not offering an opinion about

8    the Nexium labeling or warnings that go out to

9    physicians and/or patients, correct?

10        A.   Yes.

11        Q.   And you're not offering an opinion --

12   and -- and I just want to make sure that the record

13   is clear.  Can you just confirm you're not offering

14   an opinion about the Nexium labeling or warnings --

15        A.   Is it about rebound --

16        Q.   -- is that correct?

17        A.   Is it about rebound acid hypersecretion

18   or gastric cancer --

19              THE REPORTER:  Say that again.  If it's

20   about what?

21              MS. DU PONT:  No.

22              THE WITNESS:  Is it about rebound acid

23   hypersecretion or gastric cancer or both?

24   BY MS. DU PONT:

25        Q.   I'm -- I'm -- let me ask a different

Helge Waldum, M.D., Ph.D.

```
 1    question.
 2              There is labeling or information that
 3    is provided to physicians in the United States and
 4    sometimes to patients as well about Nexium.  Do you
 5    understand that?
 6         A.   Yeah.  Yes.
 7         Q.   You're not offering an opinion here
 8    today about whether that labeling and the warnings
 9    in that labeling are correct; is that true?
10         A.   I -- I do not know what is the label,
11    no.
12         Q.   So the -- the information that is
13    provided to physicians when they prescribe a
14    medication in the United States is the labeling.
15    Do you understand that?
16         A.   Yes, I know -- yes.
17         Q.   And what I'm asking is whether or not
18    you're offering an opinion about whether that
19    labeling that's provided to physicians in the
20    United States is appropriate or not.
21              As I understand it, there are no
22    opinions in your report about the labeling that is
23    provided to physicians.
24         A.   Okay.
25         Q.   And I just want to confirm you're not
```

Helge Waldum, M.D., Ph.D.

```
 1    offering an opinion about that labeling.
 2         A.   Okay.
 3         Q.   You're not --
 4         A.   Correct.
 5         Q.   -- offering an opinion about the
 6    labeling, correct?
 7         A.   Yes.
 8         Q.   Correct?
 9         A.   Correct.
10         Q.   And you're not offering an opinion
11    about AstraZeneca's pharmacovigilant practice --
12    pharmacovigilance practices, correct?  Do you
13    understand my question?
14         A.   I understood the question.  That is
15    incorrect.
16         Q.   So I didn't see any information in your
17    report about AstraZeneca's pharmacovigilance
18    practices.  So --
19         A.   I didn't know that that was -- had
20    anything to do with this case.
21         Q.   So because it didn't have anything to
22    do with this case, you aren't offering an opinion
23    about AstraZeneca's pharmacovigilance practices,
24    correct?
25         A.   Correct.
```

Helge Waldum, M.D., Ph.D.

1     Q.   And you're not offering an opinion that
2   Nexium or any other PPIs should be taken off the
3   market, correct?
4     A.   That is correct.  But it should be --
5   but it should be used carefully.
6     Q.   The only -- you're offering opinions in
7   this case about the mechanism by which you believe
8   PPIs cause gastric cancer.  Do you understand that?
9     A.   Correct.
10     Q.   And as I understand it, your only
11   opinion that you're offering on the mechanism by
12   which you believe PPIs cause gastric cancer is
13   through hypogastrinemia [sic] and ECL cell
14   hyperplasia; is that correct?
15     A.   Yes.
16     Q.   And in this case, you are not offering
17   an opinion on the role, if any, of PPIs in gastric
18   cardia cancer, correct?
19     A.   That is a problematic question.  The
20   question of cardiac cancer is very difficult.
21   Somebody would say that -- and not only me -- that
22   cardiac cancers do not differ from cancers in the
23   stomach, at other places of the stomach, and that,
24   for instance, Barrett's esophagus, it -- it --
25             THE REPORTER:  What was that last word?

```
 1              THE WITNESS:  At Barrett's,

 2   B-R-R-R-E-T-T [sic].  Barrett's esophagus

 3   predisposes to esophageal cancer.  And because

 4   cardiac cancers and esophagus -- esophageal cancer

 5   in -- in distal or outer part of the esophagus

 6   are -- are lumped together, it is -- it is

 7   difficult to -- to be -- say yes or no or correct

 8   or incorrect in this case.

 9   BY MS. DU PONT:

10        Q.   Okay.

11        A.   Perhaps -- perhaps you know that the

12   question of cardiac cancer came up in the '90s, and

13   it was speculated that -- that these cancers are

14   due to PPIs.  Do you know that?

15        Q.   I'm asking the questions.

16        A.   Yeah, yeah.

17        Q.   And -- and let me just --

18        A.   Yeah.  So -- so I will not answer

19   correct or incorrect, because that question is --

20   is too complex to give yes or no answer.

21        Q.   Let me pull up, then, your report,

22   which is Exhibit 4, and go to Page 52 of the

23   report, which I believe is Page 53 of the PDF.

24        A.   Yes.

25        Q.   And do you see the last sentence in the
```

1    first paragraph under "Gastric Cancer"?

2              MS. DU PONT:  You need to scroll down a

3    little bit.

4              THE WITNESS:  Nevertheless, the role

5    of -- if any, of PPIs in cardiac

6    carcinogenesis will not --

7    BY MS. DU PONT:

8         Q.   -- will not be covered in this report.

9    Do you see that?

10        A.   Yeah.

11        Q.   So as I understood that sentence, I

12   understood that sentence to mean that -- "The role,

13   if any, of PPIs in cardiac carcinogenesis will not

14   be covered in this report" means that you will not

15   be talking about in this report or at trial the

16   role of PPIs for cardia adenocarcinoma, correct?

17        A.   Yes.  But you see, 2.8 percent of

18   gastric carcinomas we are discussing, it's a very

19   low number.  And -- and there are these carcinomas

20   that many say are cardiac cancers, they are

21   actually cancers of the esophagus; and, therefore,

22   they are of no interest.  PPIs do not cause cancers

23   in the esophagus.

24        Q.   If I understood what you're -- you're

25   saying correctly, you will not be addressing cardia

1    cancers in your report because you understand them

2    to be esophageal cancers, and esophageal cancers

3    are not caused by PPIs, correct?

4           A.   Cardia cancers in -- in the -- at the

5    stomach with -- surrounded by oxyntic mucosa

6    should, as I see it, not be classified as cardia

7    cancers, but as gastric cancers.

8           Q.   That's not what this says in your

9    report, Doctor.  This says that you're not going to

10   be talking about PPIs in cardiac carcinogenesis.

11          A.   That -- that is correct, but I mean

12   that these cancers belong to gastric cancers at

13   other places.  And -- and you have those cancers

14   developing from Barrett's esophagus.  They are

15   different.

16          Q.   Cardia --

17          A.   And --

18          Q.   -- cancers are different than noncardia

19   cancers, correct?

20          A.   Cardiac cancers are different from --

21   they -- they -- you have -- in this region, you

22   have esophageal cancers that many believe that they

23   are the same as cardiac cancers and -- although

24   they may develop from esophagus.  And -- and

25   when -- it is important to say whether this cancer

Helge Waldum, M.D., Ph.D.

1    is in the cardiac region or the oxyntic region.

2    And that is the reason why I wrote it like this.

3         Q.   So I'm just trying to understand.  You

4    are not offering an opinion about cardia gastric

5    adenocarcinoma, correct?

6              MR. RESTAINO:  Object to form.

7              THE WITNESS:  I'm saying that cancers

8    in -- at this location, there are different types.

9    And those being -- those developing in oxyntic

10   mucosa, they are -- that's -- they are like those

11   developing in the oxyntic mucosa other places.

12   Some -- some people would say that these are

13   cardiac cancers.  It's -- it's the definition.

14   BY MS. DU PONT:

15        Q.   I'm just trying to understand what your

16   opinion is here, because it seems pretty clear in

17   the report that you drafted that -- and what I

18   reviewed before to prepare for today, that you are

19   not offering an opinion on the role of -- if any,

20   of PPIs in cardia carcinogenesis.  That's what it

21   says here, right?

22        A.   Yes, but what is cardia cancers?

23        Q.   What do you define as cardia cancer?

24        A.   I would say that cancer developing in

25   the oxyntic mucosa is an ordinary gastric cancer.

1        Q.   Even if --

2             MS. DU PONT:  Can we just take a break

3   for a second?  Let's come back in ten minutes.

4             THE VIDEOGRAPHER:  The time now is

5   8:43 a.m.  We are off the record.

6                      *  *  *

7             (Whereupon, there was a recess in the

8   proceedings from 8:43 a.m. to 8:58 a.m.)

9                      *  *  *

10            THE VIDEOGRAPHER:  The time now is

11  8:58 a.m.  We are back on the record.

12            MS. DU PONT:  Okay.  Can we pull up

13  again Exhibit 4, which is his report, and go to

14  Page 26.  Scroll down just a little bit.

15  BY MS. DU PONT:

16       Q.   Doctor, I'm referring you to Page 26 of

17  your report, and in particular, Figure 1, which is

18  the anatomy of the stomach.  Do you see that?

19       A.   Yes.

20       Q.   And do you see that Number 6 has a

21  circle around a geographic location of the stomach

22  which you have termed "Cardia"?

23       A.   Yes.

24       Q.   And if we could go to Page 27 of your

25  report.

1          A.   But it's -- not all that is cardia

2    there.  It is only the tiny ring.  That's cardiac

3    mucosa.  You have --

4          Q.   Doctor -- Doctor, let's just answer the

5    questions I'm asking, okay?

6          A.   Okay.

7          Q.   You understand that there is a

8    geographic location of the stomach that on the

9    prior page -- and we can go back to Page 26 -- that

10   you yourself in this report put a circle around and

11   labeled "Cardia."  Do you see that?

12         A.   I see that.

13         Q.   Now, if we go to Page 27, or 28 of the

14   PDF, you write in your report, again:  In the

15   cardia, which has nothing to do with the heart but

16   is the top region of the stomach and pyloric

17   region.  Do you see that?

18         A.   Yes.

19         Q.   So you defined the cardia as the top

20   region of the stomach and pyloric region.  Do you

21   agree with me?

22         A.   Pyloric region is at the opposite part

23   of the stomach.  But you have mucous glands in the

24   cardia.  It -- it is -- it has been disputed

25   where -- where cardiac mucosa is at the metaplasia

1    or something normal --

2           Q.   Doctor, I'm talking about cardia as a

3    geographic location, which is how you depicted it

4    on the prior page in Figure 1.  Do you agree you

5    depicted the cardia as a geographic location?

6           A.   Perhaps I -- I did that, but I mean

7    that cardia is the tiny part of the upper stomach

8    with cardiac mucosa that is gastric -- that is

9    glands without oxyntic mucosa or the mucous glands.

10          Q.   Doctor, go back to -- let's go back to

11   Page 27.

12          A.   Yes.

13          Q.   Do you agree with me that you have put

14   a picture in this report that has a circle and a

15   Number 6 that you've labeled "Cardia" and is a

16   geographic region of the stomach?  Do you agree

17   with me?

18          A.   Yes.  Yes, I agree I did that.  But you

19   see the dark ring?  That is the cardiac mucosa.

20          Q.   I'm not asking what the cardiac mucosa

21   is.  I'm asking you what the cardia is, which is a

22   geographic area of the stomach.  Do you understand

23   that?

24               MR. RESTAINO:  Objection.  Asked and

25   answered.

```
 1                THE WITNESS:  I would say that the ring

 2    is -- shouldn't have been so large because --

 3    BY MS. DU PONT:

 4         Q.    So now you're amending your report?

 5                MR. RESTAINO:  Objection.

 6                THE WITNESS:  Yes.

 7    BY MS. DU PONT:

 8         Q.    You're saying that this ring is wrong?

 9         A.    Yes.

10         Q.    And go to the next page.  You're also

11    saying that when you say cardia as the top region

12    of the stomach, that's wrong, too?

13         A.    No.

14         Q.    So you agree with me that cardia is the

15    top region of the stomach?

16         A.    Yes.  But it doesn't include the

17    esophagus.

18         Q.    It's the top region of the stomach,

19    which is separate from the esophagus, correct?

20         A.    Yes.

21         Q.    And now let's go back to Page 52, where

22    you say:  Nevertheless, the role, if any, of PPIs

23    in cardia -- cardiac -- which you just defined for

24    me as the top region of the stomach -- will not be

25    covered in this report.
```

1          That is what you said, correct?

2      A.   Yes.

3      Q.   So you will not be covering in your

4  report or testifying at trial about the role, if

5  any, of PPIs in cardia, the top region of the

6  stomach, carcinogenesis in this report, correct?

7      A.   I -- I will come back to it --

8      Q.   There's -- there's not time to come

9  back to it.  I want to know if this statement in

10  the report is true or not.  Are you -- are you

11  taking it back now?

12          MR. RESTAINO:  Objection.

13          THE WITNESS:  I am -- I -- in this

14  report, I am -- I will not come back to it.

15  BY MS. DU PONT:

16      Q.   In this report, you will not come back

17  to the role of PPIs in cardiac carcinogenesis --

18      A.   That's correct.

19      Q.   -- and by "cardia," you mean the top

20  region of the stomach, correct?

21      A.   Correct.

22      Q.   And so you're not offering an opinion

23  in this report about the role, if any, of PPIs in

24  cardiac carcinogenesis, correct?

25          MR. RESTAINO:  Objection.

```
 1              THE WITNESS:  Yes.
 2   BY MS. DU PONT:
 3        Q.   And by "yes," you mean correct?
 4        A.   Yes.  Correct.
 5        Q.   Okay.  Doctor, earlier, we were talking
 6   about the circumstances under which you prescribed
 7   PPIs.  Do you recall that?
 8        A.   Yes.
 9        Q.   And you said that you -- you
10   prescribe -- you sometimes prescribe PPIs to young
11   people.  Do you recall that discussion?
12        A.   Yes.
13        Q.   What do you mean by "young people"?
14        A.   Below 50.
15        Q.   50?
16        A.   Yes.  Below --
17        Q.   50 and under?
18        A.   Yeah.
19        Q.   And -- I'm glad I'm not -- I'm not --
20   I'm still young.  Thank you.
21              MR. RESTAINO:  Let's not go there.
22   BY MS. DU PONT:
23        Q.   So when you said -- when you said you
24   sent young people who had failed H2-RAs to get pH
25   testing, if the pH testing comes back indicating
```

1    that GERD is actually happening, do you then

2    prescribe the PPI to those patients?

3         A.    Possibly.

4         Q.    In what circumstances do you prescribe

5    the PPI to a younger patient?  By that, you mean

6    someone under 50.

7         A.    Those having severe symptoms and their

8    pH measurements shows that -- that this -- a

9    synchrony between the symptoms and the reflux.

10        Q.    Okay.  Do you ever recommend

11   fundoplication surgery for -- for younger patients

12   with GERD?

13        A.    Yes.

14        Q.    What's the failure rate of that

15   surgery?

16        A.    What is?

17        Q.    The failure rate of that surgery?

18        A.    What is -- once more.  What is the --

19        Q.    What is the failure rate?

20        A.    Failure.  There are a problem with such

21   surgeries that more often have recurrence.  And

22   some of the patients have some symptoms in

23   swallowing.  They can throw up and so on.  So,

24   therefore, there are problems also with the

25   surgery.

Helge Waldum, M.D., Ph.D.

1        Q.    And --

2        A.    But -- yeah.

3        Q.    -- how often do those problems occur?

4    In what percentage of patients?

5        A.    10, 20 percent perhaps.

6        Q.    And when -- when that failure happens,

7    do you have to place the patient back on a PPI?

8        A.    Probably.

9        Q.    In most circumstances when it fails, do

10    you put them back on a PPI?

11        A.    Yes.

12        Q.    And when you're prescribing or when you

13    did prescribe PPIs to all of your patients, did you

14    warn them about the risk of gastric cancer?

15        A.    I warn them that gastric juice is an

16    important biological function, and taking away a

17    biological function is never -- it has its risk,

18    for instance, concerning infections in the gut and

19    infections via the gut affecting the possibility of

20    diseases at other places.  And I also mention that

21    there is a small risk of gastric cancer.

22        Q.    A small possible risk of gastric

23    cancer?

24        A.    Yes.

25              MS. DU PONT:  Okay.  You can take down

1    his report for now.

2    BY MS. DU PONT:

3         Q.    Doctor, you understand that PPIs have

4    been on the market since 1989, right?

5         A.    Yes.

6         Q.    The first PPI to be approved was

7    Prilosec or omeprazole in 1989, right?

8         A.    Yes.

9         Q.    And since --

10        A.    Correct.

11        Q.    And -- sorry.

12              And since then, there have been several

13   other PPIs approved and put on the market, correct?

14        A.    Correct.

15        Q.    Are you familiar with the World Health

16   Organization?

17        A.    Correct.  Yes.

18        Q.    And are you aware that omeprazole is on

19   the World Health Organization's Model List of

20   Essential Medicines?

21        A.    No.

22        Q.    Would it surprise you if it was on that

23   list?

24        A.    Yes.

25              MS. DU PONT:  Okay.  Why don't we pull

Helge Waldum, M.D., /Ph.D.

1    up Exhibit 7.

2              (WALDUM EXHIBIT 7, World Health

3    Organization Model List of Essential Medicines,

4    22nd List (2021), was marked for identification.)

5              MS. DU PONT:  And go to -- we'll mark

6    that for the record, and go to Page 3 of the PDF.

7    First of all, go back to the -- the cover page.

8    Sorry.

9    BY MS. DU PONT:

10        Q.   You see that this is the World Health

11   Organization Model List of Essential Medicines

12   dated 2021?

13        A.   Yes.

14        Q.   And if we go to the third page, you'll

15   note that this list presents a list of minimum

16   medicines needs for basic healthcare system,

17   listing the most efficacious, safe and

18   cost-effective medicines for priority conditions.

19   Do you see that?

20        A.   Yes.

21             MS. DU PONT:  And if we go to Page 44

22   of the PDF.

23             MR. GALLANT:  Julie, I'm sorry, can you

24   drop this into the chat, or somebody drop --

25             MS. DU PONT:  Oh, sure.  I didn't

```
 1   realize it hadn't been dropped.

 2              Is it dropped in the chat now?

 3              THE VIDEOGRAPHER:  I thought it was.

 4   Give me one moment.  I'm doing it now.

 5              MS. DU PONT:  Okay.

 6              THE VIDEOGRAPHER:  Sorry about that.

 7              MR. GALLANT:  Thank you.

 8              MS. DU PONT:  Okay.  It looks like it's

 9   in the chat now.

10              MR. GALLANT:  Yeah, I've got it.

11              MS. DU PONT:  Great.

12              Can we scroll down a little bit to the

13   bottom of the page.

14   BY MS. DU PONT:

15        Q.   Doctor, do you see where it says

16   "Gastrointestinal Medicines," and then 17.1 says

17   "Antiulcer medicines," and under that is listed

18   omeprazole?

19              MR. RESTAINO:  Sorry, Julie.  Is there

20   a question pending?

21   BY MS. DU PONT:

22        Q.   I'm asking:  Do you see, Doctor, that

23   omeprazole is listed here under "Gastrointestinal

24   Medicines"?

25        A.   Yes.
```

1     Q.    So omeprazole is on the list of WHO --

2     or the WHO Model List of Essential Medicines,

3     correct?

4     A.    Ranitidine also.

5     Q.    Right.  But omeprazole is also on the

6     list -- is on the list, correct?

7     A.    Yes.

8           MS. DU PONT:  Okay.  You can take that

9     down.

10    BY MS. DU PONT:

11    Q.    Now, you know that PPIs, and in

12    particular, Prilosec, was approved for

13    over-the-counter use in the United States in 2003,

14    correct?

15    A.    Yes.  I participated in the meeting in

16    FDA in 2000, and it was postponed one year, and

17    then it was accepted.

18    Q.    So Prilosec was approved for

19    over-the-counter use in the United States in 2003,

20    right?

21    A.    Okay.

22    Q.    Do you agree?

23    A.    I know it is accepted.

24    Q.    Okay.  And after that, FDA approved

25    other PPIs, including Nexium, for over-the-counter

1    use, right?

2           A.   Okay.   Correct.

3           Q.   And PPIs have been approved for

4    over-the-counter use in Norway by the Norwegian

5    Medicine Agency, correct?

6           A.   Yes.

7           Q.   And PPIs are approved for use in

8    children in the United States, correct?

9           A.   Yes.

10          Q.   And as we already discussed, PPIs are

11   approved for a variety of serious medical

12   conditions.   In fact, you've prescribed PPIs for

13   several of those medical conditions, correct?

14          A.   Correct.

15          Q.   And in some instances, PPIs are more

16   effective than the other available medications,

17   correct?

18               MR. RESTAINO:   Object to form.

19               THE WITNESS:   You mean -- you mean

20   GERD?   That is correct.

21   BY MS. DU PONT:

22          Q.   So let me just ask it.   PPIs are more

23   effective than other -- other available medications

24   to treat GERD, correct?

25          A.   Correct.

1        Q.   Would you agree with me that PPIs
2   should not be discontinued in patients with
3   complicated GERD, such as those with a history of
4   severe erosive esophagitis, esophageal ulcer or
5   peptic stricture?
6        A.   Yes.
7        Q.   And --
8        A.   Yeah, I -- I'll say yes.
9        Q.   Okay.  And PPIs should not be
10  discontinued in patients with Barrett's esophagus,
11  correct?
12       A.   There, I'm a little more reluctant.
13  But it seems to be -- have an effect on Barrett's
14  esophagus, so I'd say yes.
15       Q.   The -- the AGA has recognized that PPIs
16  should not be discontinued in patients with
17  Barrett's esophagus, correct?
18       A.   Yeah.  Correct.
19       Q.   And, in fact, there are studies that
20  show that PPI treatment significantly reduces the
21  risk of esophageal adenocarcinoma and/or high-grade
22  dysplasia in patients with Barrett's esophagus,
23  correct?
24       A.   There are two small studies -- two
25  studies indicating a faint effect on PPI

 1    treatment --

 2              THE REPORTER:  Indicating a what

 3    effect?

 4    BY MS. DU PONT:

 5         Q.   So there are two --

 6         A.   So it is -- so it is correct that there

 7    are not much -- there are only two studies and

 8    showing a slight reduction in gastric cancer.

 9         Q.   But there are two studies that show a

10    reduction in esophageal cancer --

11         A.   Esophageal cancer, yeah.

12         Q.   -- with a prescription of PPI --

13         A.   Yeah.

14              MR. RESTAINO:  Wait for her to finish

15    her question, if you would, Doctor.

16    BY MS. DU PONT:

17         Q.   So just so I have a clean record, there

18    are two studies that show a reduction in esophageal

19    cancer with the prescription of PPIs for Barrett's

20    esophagus, correct?

21         A.   Correct.

22         Q.   And one of those studies was the AspECT

23    trial, correct?

24         A.   Probably.  Correct.

25         Q.   And in that trial, high-dose PPI and

1    aspirin significantly and safely improved outcomes

2    in patients with Barrett's esophagus, correct?

3         A.   Yes.  Correct.

4         Q.   PPIs should not be stopped in patients

5    at high risk for upper GI bleeding, correct?

6         A.   It depends -- I -- I would not say it's

7    correct.  It depends on the cause of the bleeding

8    and not just gas -- upper gastrointestinal

9    bleeding.

10        Q.   I don't think I understood what you

11   said.  The -- it depends on what?

12        A.   It -- it depends on the cause of the

13   bleeding.

14        Q.   The course?

15        A.   The cause, what is causing the

16   bleeding.

17        Q.   Oh, what is causing the bleeding.  I

18   understand --

19        A.   Yeah.

20        Q.   -- what you're saying.

21             But for some patients at high risk for

22   upper GI bleeding, PPIs should not be stopped,

23   correct?

24        A.   For some patients, correct.

25        Q.   And for which patients?  In what --

```
 1   what patients should it not be stopped?

 2        A.   It -- it should not be stopped in

 3   patients with -- with bleeding from portal

 4   hypertension and so on.  But otherwise -- and

 5   having bled from the esophagus of esophagitis, I

 6   would say it should not be stopped.

 7             But for gastric -- chronic gastric

 8   ulcers fortunately does not exist anymore because

 9   of the Helicobacter pylori eradication, and then

10   you should eradicate Helicobacter pylori instead of

11   continuing the patients on long-term treatment.  So

12   it depends --

13        Q.   Okay.

14        A.   -- on the situation.

15        Q.   Would you agree with me that users of

16   PPIs tend to have more -- more comor -- let me

17   just --

18        A.   More --

19        Q.   -- comorbidities than people that don't

20   take PPIs?

21             MR. RESTAINO:  Objection to form.

22             THE WITNESS:  No, but I have never been

23   involved or never believed in all these side

24   effects outside the stomach.

25   BY MS. DU PONT:
```

1        Q.   Maybe -- I'm going to ask the question

2   a little differently because I'm not sure if you

3   understood what I asked.

4             Do users of PPIs tend to be sicker than

5   patients who don't use PPIs?

6             MR. RESTAINO:  Object to the form.

7             THE WITNESS:  No.  No.

8   BY MS. DU PONT:

9        Q.   No?  Okay.

10            MS. DU PONT:  Let's -- let's pull up

11   Exhibit 13.

12            (WALDUM EXHIBIT 13, Article titled

13   Hypergastrinemia and mortality in gastric

14   adenocarcinoma:  a population-based cohort study,

15   the HUNT study, was marked for identification.)

16   BY MS. DU PONT:

17       Q.   See that this is an article that you

18   wrote, Dr. Waldum --

19       A.   Yes.

20       Q.   -- in -- just this year, right?

21       A.   Yes.

22       Q.   It was published online in -- on

23   January 22nd, 2022?

24       A.   Yes.

25       Q.   Do you know if this will be published

1    in print eventually?

2         A.    What?

3         Q.    Do you know if this will eventually be

4    published in print, or is it only an online

5    journal?

6         A.    This -- this will be printed?

7         Q.    Yeah.  Will it be published in a

8    printed journal, or is it just going to be online?

9         A.    Yeah, a printed journal.  I will -- I

10   will say it is already journal for ten years.

11        Q.    Okay.  When will -- when will this come

12   out in print?

13        A.    I -- I suppose it would be printed in

14   these days.

15        Q.    Okay.  And when it comes out in print,

16   do you plan to disclose that you're an expert in

17   the PPI litigation?

18        A.    I would have no problem with that.

19   Because --

20        Q.    So you do intend to disclose it?

21        A.    Because this -- this manner -- this

22   paper just shows that gastric cancer induced by

23   hypergastrinemia is not more serious than gastric

24   carcinoma induced by other causes.

25        Q.    Okay.

1          A.    So it is -- it's -- it doesn't say

2     anything about the risk of hypergastrinemia.  It

3     is --

4                THE REPORTER:  It doesn't say anything

5     about what?

6                THE WITNESS:  It -- it -- the

7     hypergastrinemia causes cancer not more serious

8     than other -- gastric carcinomas caused by other

9     causes, like Helicobacter pylori.  That is how I

10    would interpret that.

11    BY MS. DU PONT:

12         Q.    So you're saying that this study showed

13    no association between hypergastrinemia and all --

14    all caused mortality in patients with gastric

15    adenocarcinoma?

16         A.    That's correct.

17         Q.    Okay.  And if we go to Page -- go

18    ahead.

19         A.    I'm sorry.  I -- and I drop it.

20                MS. DU PONT:  Okay.  If we go to Page 4

21    of the article.  It might be a different page.

22    Let's go to the next page.  There it is.  Sorry.

23    Go back up.  Go back up.  Sorry.

24    BY MS. DU PONT:

25         Q.    In the -- in the right-hand column

1  here, in the middle of the -- of the paragraph

2  where it says starts with "Hypergastrinemia"; do

3  you see that, where the pointer is?

4        A.   Yeah.

5        Q.   You write --

6        A.   Yeah.

7        Q.   -- Hypergastrinemia is associated with

8  use of PPIs and users tend to have more

9  comorbidities which could impact mortality.  Do you

10 see that?

11       A.   Yes.

12       Q.   So you agree with me that users of PPIs

13 tend to have more comorbidities, correct?

14       A.   Probably, yes.

15       Q.   Okay.  So when you said earlier that

16 you didn't think that users of PPIs had more --

17 more comorbidities, you misspoke?

18       A.   Due to PPI.  You asked me whether they

19 had -- had side effects due to PPI outside the

20 stomach.

21       Q.   I guess I was asking something a little

22 differently.  What I was asking is:  Are -- do

23 patients who take PPIs, do they tend to be sicker,

24 not do they get sick because of PPIs.  Do you

25 understand now?

1          A.    Okay.  I -- I answered differently

2    because I -- I thought that you meant that --

3          Q.    Okay.

4          A.    -- PPIs --

5          Q.    So just so we have a clear record, you

6    agree with me that people who take PPIs tend to

7    generally be sicker, not because they take PPIs,

8    but because they have more health conditions than

9    people who do not?

10         A.    I believe many doctors put them on PPIs

11   when they are at the frail condition and -- and

12   sicker.

13         Q.    Okay.  Thank you.

14               MS. DU PONT:  Okay.  You can pull that

15   down.  Let's pull back up his report and go to

16   Page 26.  It's Exhibit 4, if that helps.  I'm

17   sorry.  I didn't say that --

18   BY MS. DU PONT:

19         Q.    I just want to briefly talk through the

20   anatomy of the stomach more than we already have.

21               Now, I know, just looking at Figure 1

22   here, this doesn't really show much of the

23   esophagus, but we can see maybe a little bit of it

24   at the top of -- left-hand side of the picture.  Do

25   you see it?

Helge Waldum, M.D., Ph.D.

```
1          A.    Yes.

2          Q.    And does the esophagus generally have

3   squamous mucosa?

4          A.    Yes.

5          Q.    But when a person develops a condition

6   called "Barrett's esophagus," it's my understanding

7   that the squamous mucosa is replaced with tissue

8   that looks more similar to the intestines or the

9   stomach and that that's referred to as

10   "metaplasia"; is that right?

11          A.    That's correct.  Intestinal metaplasia,

12   because you have goblet cells there.

13          Q.    Right.  And this --

14                THE REPORTER:  I'm sorry.  Because you

15   have what?

16                MS. DU PONT:  Goblet cells.

17                THE WITNESS:  Goblets --

18                THE REPORTER:  Thank you.

19   BY MS. DU PONT:

20          Q.    And this typically happens in patients

21   with severe GERD, correct?

22          A.    Yes.

23          Q.    Now, the esophagus attaches to the

24   stomach via the esophagogastric junction or cardiac

25   orifice, correct?
```

```
1         A.    Yes.

2         Q.    And the cardia, which is Number 6 here

3    on the figure, has mucus-secreting cells, correct?

4         A.    There -- in the cardia, there are

5    mucous glands.  And the normal cardia is

6    5 millimeter, only 5 millimeter, and -- and then

7    you have oxyntic glands.

8         Q.    So if I just heard you correct, the --

9    the normal cardia in a patient is what?

10        A.    5 millimeter.  5 millimeter in

11   Caucasian.  Asian people have -- have been claimed

12   to have 15 millimeter of mucous glands there.

13        Q.    I'm sorry.  What type of people have

14   15 millimeter?

15        A.    People from Asia.

16        Q.    People from Asia?

17        A.    Yeah.

18        Q.    Now, you would agree with me that

19   "cardia" is sometimes used interchangeably with the

20   term "proximal stomach," correct?

21             MR. RESTAINO:  Objection.

22             THE WITNESS:  Yes.  In -- in a way, it

23   is.  But it is incorrect use.

24   BY MS. DU PONT:

25        Q.    It is a -- it is a correct use?
```

Helge Waldum, M.D., Ph.D.

```
 1          A.    No, not correct use.  Incorrect.
 2               MS. DU PONT:  Okay.  Let's -- let's
 3    pull up Exhibit 16, then.
 4               (WALDUM EXHIBIT 16, Article titled
 5    Gastritis, Gastric Polyps and Gastric Cancer, was
 6    marked for identification.)
 7    BY MS. DU PONT:
 8          Q.    So, Doctor, we've marked as Exhibit 16
 9    to this record an article by you and Dr. Fossmark
10    entitled "Gastritis, Gastric Polyps and Gastric
11    Cancer," published --
12          A.    Yes.
13          Q.    -- in the "International Journal of
14    Molecular Sciences."  Do you see that?
15          A.    Yes.
16               MS. DU PONT:  And if we could go to
17    Page 5 of that article.  Hold on one second.
18    Actually -- sorry.  Why don't we -- give me just
19    one second.  Okay.  Yeah, go back to Page 5.  And
20    if you can go a little bit further down, it's about
21    halfway.  Stop.
22    BY MS. DU PONT:
23          Q.    Do you see where it starts:  The
24    localisation of gastric carcinomas has been
25    classified into proximal --
```

```
 1           A.    Yeah.
 2           Q.    -- meaning those localised close to the
 3    cardia and distal as those localised to the rest of
 4    the stomach.  Do you see that?
 5           A.    Yes.
 6           Q.    That's what you wrote in an article --
 7           A.    You can -- you --
 8                 MR. RESTAINO:  Wait.
 9    BY MS. DU PONT:
10           Q.    Sorry.  Let me finish my question.
11                 That's what you wrote in an article
12    published last year, correct?
13           A.    It's correct, but you can continue and
14    read more.
15           Q.    But you agree with me, Doctor, that the
16    geographic region of the cardia is referred to as
17    the "proximal stomach," correct?
18           A.    Yes, but I disagree.  You'll see in the
19    next sentence.
20           Q.    I understand that you think it's
21    illogical, but you agree with me that the
22    geographic location of the gastric -- sorry -- the
23    geographic region of the cardia is referred to as
24    the "proximal stomach" in medicine?
25                 MR. RESTAINO:  Objection.
```

```
 1              THE WITNESS:  But this classification
 2    means both the cardia and the up part -- upper part
 3    of -- of the oxyntic mucosa, I would say.  I think
 4    that very few says that cardiac and -- and proximal
 5    gastric cancers, that many people would say that
 6    that's equally.
 7    BY MS. DU PONT:
 8         Q.   Can you repeat what you said?  Because
 9    I don't understand what you said.
10         A.   Yeah.  I -- I think that many people
11    saying about -- it's a lot of confusion related to
12    this, to say that proximal gastric carcinomas,
13    because some means that that is cancers occurring
14    in the oxyntic mucosa and esophagus and -- and
15    fundus, and others means that it's only the cardiac
16    mucosa.  So this is not clear.
17         Q.   So you weren't clear when you described
18    the proximal --
19         A.   I was clear.
20         Q.   What?
21         A.   I was clear.  But -- but I -- it has
22    been classified into proximal, meaning of those
23    localized close to the cardia, and distal is those
24    localized to the rest of the stomach.  But -- but I
25    would not agree, and it has -- you see, it has been
```

1   classified.

2          Q.   Right.  But you agree that it -- that

3   it has been classified --

4          A.   Yes.

5          Q.   -- by the medical community as --

6          A.   Yes.

7          Q.   -- cardia is the proximal stomach; you

8   agree with that?

9          A.   Yeah, but is illogical.

10         Q.   I understand you think it's illogical.

11  I'm just trying to understand.

12              Despite the fact that you think it's

13  illogical, you agree with me that the medical

14  community has classified the cardia as the proximal

15  stomach?

16              MR. RESTAINO:  Objection to form.

17              THE WITNESS:  I think -- I -- I think

18  it will differ.  It's not agreement.

19  BY MS. DU PONT:

20         Q.   I understand you don't agree with --

21         A.   I -- I do not agree, but I think many

22  would not agree.

23         Q.   Okay.  Understood.  Okay.

24              But you would agree with me that the

25  proximal stomach at least includes the cardia,

1    correct?

2         A.   Yes.

3         Q.   Now, if you -- let's go to Page 50 of

4    your report.

5              MS. DU PONT:  You can take this down.

6    There you go.  Is that Page 50?  Okay.

7    BY MS. DU PONT:

8         Q.   If we go to the second-to-the-last

9    paragraph, you write:  Concerning the etiology of

10   gastric cancer, the role of GERD should also be

11   mentioned.  In this context the entity of gastric

12   cardiac cancers is defined as those cancers located

13   between 3 centimeters below and 2 centimeters above

14   the gastroesophageal junction line is central.

15             Did I read that correctly?

16        A.   Yes.

17        Q.   And so as you've stated here in your

18   report, the -- the entity of gastric cardiac

19   cancers is defined as those cancers located between

20   3 centimeters below and 2 centimeters above the

21   gastroesophageal junction line, correct?

22        A.   Yes.

23        Q.   Now, if we go back to Page 26 again.

24   You also have on this Figure 1 the fundus.  Do you

25   see that?

```
 1          A.    Yes.

 2          Q.    And you also have the body, correct?

 3          A.    Yes.

 4          Q.    And those two regions contain most of

 5    the acid-secreting cells of the stomach, correct?

 6          A.    Correct.

 7          Q.    Then you have the antrum?

 8          A.    Yes.

 9          Q.    And where is that on this picture?

10    It's 8, right?  I don't see it on the picture.  Can

11    you tell me where 8 should be on the picture?

12          A.    It is the portion marked 10 --

13          Q.    Okay.

14          A.    -- I would say.  And you have a mix --

15    you have oxyntic glands deeper into the antrum, as

16    we previously thought.  It was also studied by

17    Goldenring group about five years ago that

18    described oxyntic glands deeper into the antrum

19    before.  But at least the area where 10 should be

20    completely antral mucosa.

21          Q.    So as I understand it, the antrum, what

22    you're saying is -- is 10 on the picture --

23          A.    Yes.

24          Q.    -- that's the part of the stomach which

25    grinds stomach contents and pushes digested food
```

1    into the small intestine, right?

2         A.    Correct.

3              MS. DU PONT:  Now, we can -- we can

4    pull down his report for a second.

5    BY MS. DU PONT:

6         Q.    GERD, which we've been talking about

7    already, occurs when stomach contents and gastric

8    juice reflux upwards to the esophagus, right?

9         A.    Correct.

10        Q.    And there are many risk factors for

11   GERD, correct?

12        A.    Correct.

13        Q.    And those include being obese or

14   overweight, right?

15        A.    Obesity predisposes to hiatal hernia, I

16   would say.

17        Q.    But obesity also predisposes you to

18   GERD, correct?

19        A.    Yeah, but it has a separate -- yes, I

20   would say so; although, hiatal hernia is an

21   important part of GERD.

22        Q.    Right.  And -- and that's a separate

23   risk factor for GERD, right, having a hiatal

24   hernia, correct?

25        A.    Yeah.  Yes.

Helge Waldum, M.D., Ph.D.

```
1          Q.    And the gastric juice can damage tissue
2    not designed to be exposed to acid, correct?
3          A.    Correct.
4          Q.    For example, it can damage the
5    esophageal mucosa, right?
6          A.    Correct.
7          Q.    And gastric juice can even damage areas
8    that are designed to be exposed -- that are
9    designed to be exposed to acid, right?
10         A.    Correct.  You have duodenal/gastric
11   ulcer.
12         Q.    And that occurs when there's increased
13   gastric acidity, right?
14         A.    Duodenal ulcer has increased gastric
15   ulcer.  It has not increased, but because of -- you
16   have gastritis with reduced ability to withstand
17   gastric juice, you -- you get ulcers.
18         Q.    And that's what --
19         A.    So --
20         Q.    -- you say in your -- I'm sorry.  I
21   didn't mean to cut you off.
22         A.    So duodenal ulcer increase acid
23   secretion.  Gastric ulcer often reduced acid
24   secretion.
25         Q.    And you say in your report it can
```

1    damage the tissue because there's a reduction in

2    defense mechanisms, right?

3            A.    Yeah.  Correct.

4            Q.    And GERD is a chronic health condition

5    for many people; would you agree?

6            A.    Yes.

7            Q.    And if left untreated, it can have

8    implications outside of the GI tract, correct?  And

9    by that, I mean it can cause you to have a cough or

10   worsen asthma.

11           A.    Yes, if -- if you have very severe

12   GERD.

13           Q.    Now, we were talking earlier about

14   Barrett's esophagus.  Would you agree with me that

15   untreated GERD can cause Barrett's esophagus?

16           A.    Correct.

17           Q.    And Barrett's esophagus is a

18   precancerous condition of the esophagus, right?

19           A.    Correct.

20           Q.    But it can eventually lead to

21   esophageal adenocarcinoma if it is left untreated,

22   correct?

23           A.    Correct.

24           Q.    And what are the risk factors for

25   Barrett's esophagus?

```
 1          A.    I think it's reflux.

 2          Q.    But would you agree with me that

 3   certain people are more likely to get Barrett's

 4   esophagus?  For example, if you have a family

 5   history of Barrett's esophagus or esophageal

 6   cancer, you may be at a higher risk of developing

 7   Barrett's esophagus, true?

 8          A.    It could be that you inherit some

 9   weakness in the diaphragm and -- and the lower

10   esophageal sphincter.  But otherwise, I -- I do not

11   know --

12          Q.    Okay.

13          A.    -- for that.

14          Q.    Men are more likely to develop

15   Barrett's esophagus than women, correct?

16          A.    That is correct.  Men is -- if obesity

17   plays any role, I think mens are more obese today

18   than women.

19          Q.    And if you are white or Caucasian,

20   you're more likely to develop Barrett's esophagus?

21          A.    I believe so.

22          Q.    And if you're over 50, are you more

23   likely to develop Barrett's esophagus?

24          A.    Yes, because of -- the muscle loses --

25   muscle loses its tone in the lower --
```

1          Q.   What reduces its toll?  What -- what --

2          A.   Tone.  Tone.  The muscular tone in the

3    lower esophageal sphincter.

4          Q.   Okay.

5          A.   Relaxation.

6          Q.   Okay.  And current or past smoking can

7    increase your chances of developing Barrett's

8    esophagus, true?

9          A.   It is possible.  I don't know.

10         Q.   And you -- I think you already

11   mentioned this.  Being overweight or obese can

12   increase your chances for Barrett's esophagus,

13   correct?

14         A.   Yes.

15         Q.   Now, GERD may predispose people to

16   polyps in the area of the GE junction, correct?

17         A.   It has been reported, yes.

18         Q.   We talked a little bit about hiatal

19   hernia.  Let's just talk about what that actually

20   means.  A hiatal hernia occurs when the upper part

21   of the stomach bulges through the diaphragm into

22   the chest cavity, correct?

23         A.   Yes.  Correct.

24         Q.   And we already mentioned it can

25   increase GERD, right?

1       A.   Correct.

2       Q.   And make it worse?

3       A.   Correct.

4       Q.   And basically, hernias interfere with

5  the esophageal emptying by causing a backflow of

6  stomach acid into the esophagus, right?

7       A.   Correct.

8       Q.   And hernias can trap acid in the hernia

9  sac, which are then refluxed back into the

10 esophagus during swallowing, right?

11      A.   Yeah.  Hiatal hernia sac, you -- you

12 have no sphincter at the top.  I don't see how

13 contents will be -- you have no sphincter at the

14 top and now at the bottom.  I think it's go up and

15 down, that -- that you haven't -- will not have it

16 constantly.  So I hesitate a little about that

17 question.  It's known that --

18      Q.   So --

19      A.   It's known that the hiatal hernia

20 provokes or makes reflux worse.  But whether you

21 have a pouch of acid constantly in the esophagus, I

22 doubt.

23      Q.   You don't know if there's more acid in

24 the esophagus; is that what you're saying?

25      A.   No.  It's -- it is more acidity in the

1    esophagus, but it's not the same acid that is

2    staying there for a long time.  I think it's going

3    up and down.

4          Q.    It's going up and down?

5          A.    Yeah.

6          Q.    There's more exposure of acid to the

7    esophagus?

8          A.    It's more exposure.  That's correct.

9          Q.    Okay.  So patients with a hiatal hernia

10   and an incompetent cardia have significantly more

11   esophageal acid exposure than those with no hiatal

12   hernia and an incompetent cardia, right?

13                MR. RESTAINO:  Object to form.

14                THE WITNESS:  Okay.  Yes.

15   BY MS. DU PONT:

16         Q.    And the only way to fix a hiatal --

17   hiatal hernia is surgery, right?

18         A.    Correct.

19         Q.    And antireflux surgery is sometimes

20   recommended for people with GERD and large hiatal

21   hernias, correct?

22         A.    Yes.  Correct.

23         Q.    I want to switch gears -- one last

24   question, actually.  Can a hiatal hernia be a risk

25   factor for cardia gastric cancer?

1        A.    Repeat it once more.

2        Q.    Can a hiatal hernia be a risk factor

3   for cardia gastric adenocarcinoma?

4        A.    I would say that there may develop

5   gastric carcinomas in hiatal hernia.  But whether

6   you should call it cardiac cancer, that is a

7   question.  That I would not generally agree.

8        Q.    Okay.  Let's switch gears just a little

9   bit and talk about cancer.  Would you agree with

10  me, Doctor, that cancer is a multistep process

11  which takes years, if not decades, in humans to

12  develop?

13       A.    Yes.

14       Q.    And would you agree with me that DNA

15  damage is a necessary step to tumorigenesis?

16       A.    Yes.

17       Q.    Would you also agree that chronic

18  inflammation is an important factor in

19  carcinogenesis, including gastric cancer

20  carcinogenesis?

21            MR. RESTAINO:  Object to form.

22            THE WITNESS:  I -- I wouldn't -- I

23  would -- wouldn't say generally that chronic

24  inflammation causes or predisposes to cancer.

25            But, for instance, Helicobacter pylori,

1    the most important cause of gastric cancer, induces

2    inflammation.  But it seems not that the

3    inflammation itself is of important, because you do

4    not get cancer before you have atrophic gastritis,

5    and then you have no inflammation.  So I will say

6    that in gastric cancer, inflammation indirectly

7    causes gastric cancer.

8    BY MS. DU PONT:

9         Q.   Okay.  Would you agree with me that

10   gastric cancer, like all cancers, requires a

11   multistep process which takes years, if not

12   decades, in humans?

13             MR. RESTAINO:  Object to form.

14             THE WITNESS:  Yes, I agree.

15   BY MS. DU PONT:

16        Q.   So gastric cancers don't develop in one

17   or two years, right?

18        A.   Correct.

19        Q.   Is there a minimum amount of time

20   necessary for gastric cancer to develop?

21        A.   You know, you have no minimum, but you

22   have normal distribution.  And -- and if you are --

23   have a bad chance and got a very important

24   mutation, you may develop cancer after a few years,

25   but that is seldom.  But in biology, you have no --

Helge Waldum, M.D., Ph.D.

1    no minimum and no maximum.  It is a distribution.

2          Q.   But in general, you said you won't see

3    gastric cancer develop in less than three years,

4    even in patients with mutations, correct?

5          A.   Yes.

6          Q.   And gastric cancer can occur in

7    patients who have never taken PPIs, correct?

8          A.   Yes.  Correct.

9          Q.   And there's no medical test to

10   determine whether a patient's gastric cancer of any

11   type was caused by a PPI, correct?

12         A.   No.  If you do -- you do proper

13   classification of a tumor, you can come with -- if

14   you find -- let me speak about a Spanish family.

15   Cousins married, and they've got ten children.

16   Five of them developed ECL cell carcinoids at the

17   age of 20s, and -- and one developed gastric

18   carcinoma at the age of 30s.

19              So then you have the -- the mean time

20   for ECL cell tumors to develop.  It's -- probably

21   would be about 20 years.

22              Does that answer the question?  It's

23   remarkable that none of your reports mention the

24   Spanish family that actually shows that this family

25   had a mutation in one of the genes of the proton

1    pump; and, therefore, their children did not

2    produce acid at all, and they developed ECL cell

3    tumors of different malignancy at the age of 20 or

4    30.

5        Q.    All of those family members developed

6    neuroendocrine tumors, correct?

7        A.    It was initially classified as

8    adenocarcinomas.  But when we got the preparation,

9    we did staining for neuroendocrine markers.  We

10   reclassified this as -- as a neuroendocrine

11   carcinomas.

12          And, therefore, I'm a little astonished

13   that one of your experts said that it is no need to

14   do classification due to specific staining.  But,

15   of course, it is if you know the condition in which

16   the tumor developed.

17          And also, for instance, for using PPI,

18   if you have used PPIs for a long time, you should

19   do staining for neuroendocrine cells or ECL cells

20   anyhow, because without doing that, you will --

21   you'll reclassify it as an adenocarcinoma with no

22   relation to PPIs.  So --

23       Q.    Okay.  Okay.  We'll come back to that.

24   We'll come back to that.

25          Let's talk about the risk factors for

1    gastric cancer.  Do you agree that age is a risk

2    factor for developing gastric cancer?

3           A.   For most of the cancers, including

4    gastric cancer.

5           Q.   Male gender is a risk factor for

6    gastric cancer, correct?

7           A.   It seems so.

8           Q.   It seems so, or is it -- is it a risk

9    factor?

10          A.   It -- it is correct, yeah.

11          Q.   And H. pylori, we've already talked

12   about, is a established cause of gastric cancer,

13   correct?

14          A.   It is -- it's probably about 90 percent

15   of gastric cancers are due to H. pylori.

16          Q.   And autoimmune gastritis is a risk

17   factor for gastric cancer?

18          A.   Yes.  Correct.

19          Q.   Diet can be a risk factor for gastric

20   cancer?

21          A.   Many claims that.  Many -- many claim

22   that, and -- but the data are scarce.

23          Q.   So when you say "Many claim that,"

24   would you agree with me that it is generally

25   accepted that eating food preserved by salting,

Helge Waldum, M.D., Ph.D.

1    such as salted fish and meat, increases the risk of

2    stomach cancer?

3         A.   There was a paper recently describing

4    that salted fish did not provoke cancer, but

5    salt -- salted meat did.

6         Q.   Okay.

7         A.   So it -- it is possible that not

8    exposing the food for -- the meat for heat is a

9    factor.  So it could be another infections in the

10   meat that causes the cancer.

11        Q.   But there is some literature out there

12   that associates certain diets with gastric cancer,

13   correct?

14        A.   Yes.

15        Q.   And alcohol use is a risk factor for

16   gastric cancer?

17        A.   Marginally.

18        Q.   But it is considered a risk factor for

19   gastric cancer?

20        A.   It is considered, but I -- I am not

21   sure.

22        Q.   Tobacco use is a risk factor for

23   gastric cancer, correct?

24        A.   Yes.  But nowadays, few smoke.

25        Q.   But what?

Helge Waldum, M.D., Ph.D.

1        A.    But nowadays, there are few smokers.

2        Q.    I think in the United States we may

3    still have more than a few smokers.

4              Epstein-Barr virus infection has been

5    linked to some gastric cancers, correct?

6        A.    Once more.

7        Q.    Epstein-Barr virus has been linked to

8    some gastric --

9        A.    Yeah.

10       Q.    -- cancers, correct?

11       A.    That's correct.  That's -- it is

12   claimed to be about 5 percent of the cancers --

13   gastric cancers due to Epstein-Barr virus.

14       Q.    And I think we've talked about this

15   already, but being overweight or obese has been

16   linked to gastric cancer, correct?

17       A.    Correct.

18       Q.    And chronic inflammation is an

19   important factor -- I think you called it an

20   indirect factor -- in carcinogenesis, including

21   gastric cancer, correct?

22       A.    For gastric cancer, I mean that is an

23   indirect factor.

24       Q.    And family history or genetics can be

25   factors in the development of gastric cancer,

1    correct?

2          A.    Correct.

3          Q.    And GERD, which we've talked a lot

4    about already, is an established cause of gastric

5    cancer, correct?

6          A.    Established cause of esophageal cancer?

7          Q.    As well as gastric cardia cancer,

8    correct?

9          A.    It depends on what you call -- whether

10   you're in -- whether you take esophageal -- distal

11   esophageal cancers in the same --

12               THE REPORTER:  Can you say that again?

13               THE WITNESS:  If you -- if you say that

14   distal esophageal cancer is a cardiac cancer, I

15   think there's no doubt.  Whether cardiac cancer

16   occurring in the stomach area, then it's more

17   uncertain.  Did you -- did you catch it?

18   BY MS. DU PONT:

19         Q.    Yeah.  I'm just trying to understand

20   what you said.

21               Are there some stomach cancers where

22   GERD is an established cause?  Did you hear my

23   question?

24         A.    Yeah, I -- I do.  I -- it's probable in

25   some cases.

1      Q.   And -- okay.  Let me -- I'll come back

2    to that.  I have to think about that more.

3           You can't cite for me any medical or

4    scientific organization that concludes that PPI use

5    causes gastric cancer of any type, right?

6      A.   Not any organization.  But I think that

7    there are -- you know the history by -- so many are

8    afraid of gastric cancer due to PPI use, because it

9    started with rats developing tumors and -- and

10   every -- and it has been claimed that the rats

11   are -- are different from all other species.

12          Now we have more species developing

13   cancer in -- due to PPI.  But all these rodents are

14   also said to be special, but taking into -- but --

15   but the rodents live 1 to 2 years, and man, 70

16   years.  So it's -- I think that in society there is

17   uncertainty on --

18     Q.   So -- understood.

19          MS. DU PONT:  And I -- I want to move

20   to strike your answer as nonresponsive.

21   BY MS. DU PONT:

22     Q.   I was -- I'm just focused on medical

23   organizations.  Sitting here --

24     A.   I --

25     Q.   -- today, do you --

```
 1          A.   I --
 2               MR. RESTAINO:  Wait for the question.
 3   BY MS. DU PONT:
 4          Q.   Let me -- let me finish.
 5               Sitting here today, you can't cite any
 6   medical or scientific organization that concludes
 7   PPI use causes gastric cancer of any type, correct?
 8          A.   Correct.
 9          Q.   And, in fact, the American -- in fact,
10   there are organizations that specifically say that
11   the existing data does not establish causation.
12   Are you aware of that?
13          A.   Yes.
14          Q.   There are different types of gastric
15   cancer, right?
16          A.   Correct.
17          Q.   And adenocarcinoma is the most common
18   type of gastric cancer, correct?
19          A.   Correct.
20          Q.   Those make up 90 to 95 percent of
21   cancers of the stomach?
22          A.   Probably, correct.
23          Q.   And there are two main histological
24   types of adenocarcinoma, intestinal and diffuse,
25   according to the Lauren classification, correct?
```

1      A.   Correct.

2      Q.   And diffuse is less common than the

3  intestinal type, right?

4      A.   No.  The diffuse type -- during the

5  last decades, the prevalence of intestinal type has

6  constantly declined; whereas, the diffuse, the

7  prevalence has stayed constant or even slight --

8  slight increase, for instance, in -- in young white

9  men in U.S.

10     Q.   But you understand that even with that

11  slight change recently, intestinal type is still

12  more common than the diffuse type, correct?

13     A.   It is more common, but not -- the

14  difference is much less than it was before.

15     Q.   I understand.

16          Intestinal is and remains the most

17  common histological subtype of adenocarcinoma,

18  correct?

19     A.   Correct.

20     Q.   Now, gastric adenocarcinoma has also

21  been categorized molecularly, right?

22     A.   Correct.

23     Q.   And it's been divided into four types

24  by The Cancer Genome Atlas program, right?

25     A.   Correct.

1          Q.    And those four types are Epstein-Barr

2    virus-positive tumors, microsatellite unstable

3    tumors, genomically stable tumors, and tumors with

4    chromosomal instability, right?

5          A.    Correct.

6          Q.    And that last category, tumors with

7    chromosomal instability, those tumors tend to show

8    aneuploidy, correct?

9          A.    Correct.

10         Q.    And the tumors with the chromosomal

11   instability are the most common type of all four of

12   those categories, right?

13         A.    I believe so.

14         Q.    And the modern classification system

15   that we just talked about says nothing about

16   neuroendocrine features, correct?

17         A.    Correct.

18         Q.    Now, neuroendocrine tumors are a

19   distinct type of stomach tumor, right?

20         A.    There is much more -- this type is much

21   more prevalent than realized because pathologists

22   do not do staining for them.  They are

23   underdiagnosed.

24         Q.    But it's a distinct -- a -- a

25   neuroendocrine tumor is a distinct type of stomach

```
 1   tumor separate and apart from adenocarcinoma,

 2   correct?

 3         A.   No, it is not correct, because as I

 4   told you, we -- we have reclassified

 5   adenocarcinomas to neuroendocrine carcinomas when

 6   we do specific staining.

 7         Q.   It's a separate diagnosis to have a

 8   neuroendocrine tumor versus an adenocarcinoma,

 9   right?

10         A.   It is a separate diagnosis, no,

11   that's -- is not correct.

12         Q.   It is, but it's incorrect?

13         A.   Misclassifications.

14         Q.   I understand that there may be

15   misclassifications of tumors, but there's a

16   different classification for a neuroendocrine tumor

17   versus an adenocarcinoma, correct?

18         A.   Correct.

19         Q.   We also can refer to neuroendocrine

20   tumors as "carcinoids," right?

21         A.   That is a more benign type of

22   neuroendocrine tumors.

23         Q.   What do you mean --

24         A.   You have --

25         Q.   -- by "more maligned"?
```

```
 1          A.   It is a rather benign type of tumors.
 2   Actually, gastric neuro -- the NETs that they are
 3   called are carcinoids.  They have increase in
 4   prevalence during -- in last decades.  Whether this
 5   is due to increased frequency of endoscop -- upper
 6   GI endoscopy or whether it's a real increase has
 7   been disputed.  But neuroendocrine NETs, that is a
 8   typical tumor that you would expect in patients on
 9   PPI, the first --
10          Q.   Okay.  I -- I think I'm following, but
11   let me ask some follow-up questions.
12               In your report, you refer to three
13   different types of neuroendocrine tumors; do you
14   recall that?
15          A.   I -- I think it's NETs and --
16          Q.   NETs?
17          A.   -- neuroendocrine.
18          Q.   Okay.
19          A.   Neuroendocrine tumors, also previously
20   called "carcinoids."  They have changed the name of
21   them.  And then you have neuroendocrine carcinomas.
22          Q.   Okay.  There are three different types
23   of NETs, which is a neuroendocrine tumor, correct?
24          A.   Oh, oh, okay, that -- that is NETs
25   caused by -- by atrophic autoimmune gastritis.
```

Helge Waldum, M.D., Ph.D.

```
 1        Q.    Okay.

 2        A.    NETs -- NETs caused by gastrinomas and

 3   NETs developed without hypergastrinemia, that is

 4   correct.

 5        Q.    Why don't we pull up Page 65 of your

 6   report so we can make sure you and I are following

 7   each other.

 8              MS. DU PONT:  It's Exhibit 4.

 9   BY MS. DU PONT:

10        Q.    Here in your report --

11        A.    Yes.

12        Q.    -- you -- you talk about gastric NETs,

13   which in parentheses you say are also referred to

14   as carcinoids, right?  Do you see that at the top

15   of the page?

16        A.    Yeah, I see that.  There is no

17   increasing pressure to -- to include a fourth type,

18   gastric NETs due to PPI use.  I would say that's a

19   natural thing, would be to -- to take them together

20   with gastric NETs due to gastrinoma.  Because there

21   is no inflammation related to this development of

22   these gastric NETs, except the -- the -- those of

23   the autoimmune type showing that -- Wang, for

24   instance, claiming that inflammation is so

25   important in tumorigenesis for --
```

1      Q.    Okay.  Let me just focus on the three

2  types of NETs, and then I can ask some follow-up

3  questions.  And try to listen to the questions I'm

4  asking, Doctor.

5            You list here three types of NETs:

6  Gastric carcinoid type 1, due to hypergastrinemia

7  secondary to atrophic gastritis.  Do you see that?

8      A.    Yes.

9      Q.    And that's the most common type of

10  gastric NET, right?

11      A.    Correct.

12      Q.    And it -- it arises in a chronic

13  hypochlorhydric state, right?

14      A.    Correct.

15      Q.    For example, with autoimmune atrophic

16  gastritis, right?

17      A.    Correct.

18      Q.    And these are typically -- I think you

19  told us this already -- low-grade tumors, right?

20      A.    Correct.

21      Q.    And their clinical behavior is usually

22  very indolent, right?

23      A.    Correct.

24      Q.    And these type 1 carcinoids or NETs

25  have a good prognosis with a 95 to a 100 percent

 1   five-year survival rate, right?

 2        A.   But people die of them.  Some people

 3   die of them.

 4        Q.   Right.  That's why there's a 95 to

 5   100 percent --

 6        A.   Yeah.

 7        Q.   -- right?

 8             Or, actually, I think you say in your

 9   report 96 to 100 percent; is that right?

10        A.   It could be.  But people die of them.

11        Q.   And as you note in your report,

12   treatment with PPIs is not included in this

13   classification, right?

14        A.   That's correct.

15        Q.   And --

16        A.   But -- but as I said, there are many --

17   many researcher asking for a new -- new type,

18   type 4, due to PPIs.

19        Q.   But currently, there is no type 4 for

20   PPIs, correct?

21        A.   In this classification, that's correct.

22   But nevertheless, there are many reports asking for

23   type 4 --

24        Q.   To date --

25        A.   -- due to --

1        Q.      -- there is no type 4 related to PPIs,

2   correct?

3        A.      Type 4 will be due to PPIs.

4        Q.      But there is no type 4 right now,

5   correct?

6        A.      That is correct.

7        Q.      Type 2 gastric NETs are also

8   well-differentiated NETs, correct?

9        A.      That is correct.  But I would say that

10  it's important to notice that there are two -- as I

11  said, there are two types of gastric -- of

12  gastrinomas.  Those are due to a genetic mutation

13  when -- one; and the other, sporadic.

14           And, for instance, Wang claims that

15  there is no development of gastric carcinomas of

16  patients with -- with gastrinomas, although they

17  are highly hypergastrinemic.  And the reason why is

18  that patients with sporadic gastrinoma, they either

19  become cured by surgery or they die early.  So they

20  would not have time to develop gastric carcinoma

21  secondary to hypergastrinemia.

22       Q.      Type 3 NETs are not associated with

23  elevated serum gastrin, correct?

24       A.      That is correct.  It is probably a

25  spontaneous mutation in an important gene.

Helge Waldum, M.D., Ph.D.

1        Q.    And these type 3 NETs are carcinoids?

2        A.    They are -- they are more higher grade,

3   more malignant than the other two.

4        Q.    Understood.  Okay.

5              Now, there's a type of gastric cancer

6   called "signet-ring cell carcinoma," and that is

7   another distinct type of gastric cancer, correct?

8        A.    It's a subgroup of the gastric

9   carcinomas of diffuse type.  But they -- they --

10  many of the cancer cells contain an amorphous

11  substance that has been believed to be mucin.  And

12  that is the reason why these cancers are -- mucin

13  is produced by the epithelial cells, exocrine

14  cells; so, therefore, these tumors are classified

15  as -- as adenocarcinomas.

16             But when we started to do specific

17  staining, both in -- both with immunohistochemistry

18  and also in situ hybridization, we could not find

19  any -- any signs of mucin, but we could detect

20  neuroendocrine markers in these amorphous

21  substance.

22             And it has to be remembered that --

23  that PAS-considered staining for mucin is not a

24  specific thing.  So the community has relied on an

25  unspecific staining method in the classification,

1    showing that it has every reason to not accept all

2    the classifications that are generally accepted.

3         Q.   Doctor, the prevalent theory to date

4    has been that signet-ring cell carcinomas originate

5    from stem cells in the glandular neck region,

6    right?

7         A.   If you say so.  And it could be.

8         Q.   I think you say so.

9         A.   But -- but --

10        Q.   On Page 82 of your report --

11        A.   But -- but --

12        Q.   -- you wrote that.

13        A.   -- Wang -- Wang --

14        Q.   Let's look --

15        A.   -- writes that --

16        Q.   -- at Page 82 of your report.  Sorry.

17   I think it's 83, yeah.

18        A.   Are we still on the signet-ring --

19   signet-ring?

20        Q.   Yes.  Here, you write:  The prevalent

21   theory to date has been that these carcinomas, like

22   other gastric carcinomas, originate from stem cells

23   in the glandular neck region.  Do you see that?

24        A.   Yes.

25        Q.   And you stand by that statement,

1  correct?

2         A.   Okay.  It was -- at that time, yes.

3         Q.   You stand by your statement here,

4  correct?

5         A.   Okay.  Correct.

6         Q.   Now --

7              MS. DU PONT:  We can -- we can pull

8  down the report for now.

9              THE WITNESS:  We shouldn't --

10  BY MS. DU PONT:

11         Q.   Do you need a break?

12         A.   No.

13         Q.   Okay.  Let's talk about fundic gland

14  polyps.  Fundic gland polyps can arise

15  sporadically, right?

16         A.   They -- they are interesting because

17  they develop -- they are -- most of them are due to

18  PPIs, and it is peculiar that Helicobacter pylori

19  infection protects from fundic gland polyps.

20         Q.   I asked you whether they can arise

21  sporadically.  Can they?

22         A.   Yes.

23         Q.   Fundic gland polyps can also arise in

24  patients with a condition called "familial

25  adenomatous polyposis," or "FAP," right?

Helge Waldum, M.D., Ph.D.

```
 1        A.    Okay.  Yes.

 2        Q.    And sporadic fundic gland polyps are

 3   usually considered benign, right?

 4        A.    It is not certain so now because it --

 5   it -- there are some reports that fundic gland

 6   polyps secondary to PPI use have become malignant,

 7   particularly so in the case of --

 8              THE REPORTER:  Particularly in the case

 9   of what?

10   BY MS. DU PONT:

11        Q.    I didn't hear it either.

12        A.    What?

13        Q.    What did you say?  We can't hear you.

14        A.    Case reports show that fundic gland

15   polyps that develop due to PPI treatment became

16   malignant, but there is no large study showing it.

17        Q.    Fundic gland polyps, though, are not

18   caused by hypergastrinemia, correct?

19        A.    Probably.  Yeah.

20        Q.    That's correct?

21        A.    Yeah.  I would say so.

22        Q.    And these fundic gland polyps are often

23   discovered incidentally on an endoscopy, right?

24        A.    Yes.

25        Q.    It's not recommended that you do
```

1  routine surveillance for fundic gland polyps,

2  right?

3       A.   Until now, it has been correct.

4       Q.   Until what?

5       A.   Until now, that is correct.

6       Q.   Okay.  Now, there's also a polyp called

7  a "hyperplastic polyps" -- "polyp," right?

8       A.   Correct.

9       Q.   And those are also typically benign,

10  right?

11       A.   Correct.  But they may become

12  malignant.

13       Q.   Understood.  But they're typically

14  benign, right?

15       A.   Correct.

16       Q.   Hyperplastic polyps typically occur in

17  the context of inflammation or gastritis and

18  atrophy, right?

19       A.   Correct.

20       Q.   And they can develop in the cardia of

21  patients with GERD, right?

22       A.   Seldom, but probably.  Correct.

23       Q.   You would agree with me that gastrin is

24  not the only factor involved in the development of

25  hyperplastic polyps, correct?

Helge Waldum, M.D., Ph.D.

```
 1        A.    Correct.
 2        Q.    And you're not offering the opinion
 3   that PPIs cause hyperplastic polyps, correct?
 4        A.    I will not say no, but it -- it may be
 5   a factor.
 6        Q.    So you're saying it's a possibility
 7   that PPIs can lead to hyperplastic polyps, correct?
 8        A.    Correct.   Correct.
 9        Q.    And just because a hyperplastic polyp
10   is incidentally found in a PPI user does not mean
11   that the PPI caused the hyperplastic polyp,
12   correct?
13        A.    Correct.
14        Q.    Now, adenomatous polyps occur in the
15   setting of chronic inflammation or atrophic
16   gastritis, true?
17        A.    Correct.
18        Q.    They're also seen in the setting of
19   hereditary disorders, correct?
20        A.    In the setting of hereditary.
21        Q.    Hereditary disorders?
22        A.    Yeah.   Correct.
23        Q.    And PPIs are not associated with ade --
24   how do you say it, Doctor, ade --
25        A.    Adenomatous.   Adenomatous.
```

1       Q.    -- adenomatous polyps, correct?

2       A.    Probably.

3       Q.    Let me just --

4       A.    Correct.

5       Q.    -- say it again --

6       A.    Correct.

7       Q.    -- because I messed that up.

8       A.    Correct.

9       Q.    PPIs are not associated with

10   adenomatous polyps, correct?

11      A.    Correct.  I know of no study telling

12   it.  I do not know of any study --

13      Q.    You don't know of any study showing an

14   association between PPIs and adenomatous polyps,

15   correct?

16      A.    Correct.

17            MS. DU PONT:  Why don't we take a break

18   because I'm about to move to a different topic.  I

19   think we've been going for a while now.

20            THE VIDEOGRAPHER:  The time now --

21            MS. DU PONT:  How long a break do you

22   need?

23            MR. RESTAINO:  Well, it's -- it's 3:22

24   here.  How about if we take a 15- to 20-minute

25   break and we can wolf down a sandwich at this time.

Helge Waldum, M.D., Ph.D.

1                  MS. DU PONT:  That's fine with me.

2                  MR. RESTAINO:  Is that all right?

3                  MS. DU PONT:  Yep.

4                  MR. RESTAINO:  So maybe we'll come back

5      about 20 minutes to 4:00 or -- so that will be

6      20 -- 20 minutes to 10:00 your time?  I'm not sure

7      where you are.

8                  MS. DU PONT:  10:40 our time.  10:40 --

9                  MR. RESTAINO:  Okay.

10                 MS. DU PONT:  -- Eastern.  Thank you.

11                 MR. RESTAINO:  All right.

12                 THE VIDEOGRAPHER:  The time is

13     10:23 a.m.  We are off the record.

14                              *  *  *

15                 (Whereupon, there was a luncheon recess

16     in the proceedings from 10:23 a.m. to 10:44 a.m.)

17                              *  *  *

18                 THE VIDEOGRAPHER:  The time now is

19     10:44 a.m.  We are back on the record.

20     BY MS. DU PONT:

21          Q.   We're back, Dr. Waldum.  Did you get a

22     chance to have some lunch?

23          A.   Yes.  You too?

24          Q.   No, not lunch yet, but I'll get there

25     eventually.

 1              So I want to switch gears a little bit
 2   and talk about your interactions with the Food and
 3   Drug Administration, and it came up a little bit
 4   earlier in the day.  Is it true, Doctor, that
 5   you've told the FDA on at least two occasions about
 6   your safety concerns with respect to PPIs and
 7   gastric cancer?
 8        A.    You mean the meeting in 2000?
 9        Q.    Yes, that would be one of the times
10   where you expressed your safety concerns regarding
11   PPIs.
12        A.    That's -- that's correct.
13        Q.    The first time you mentioned was in
14   2000 at the FDA's advisory committee on the
15   over-the-counter use of omeprazole, right?
16        A.    Correct.
17        Q.    And an FDA advisory committee is
18   organized by FDA where they invite experts to
19   provide their views and advice on scientific
20   matters; is that fair?
21        A.    Correct.
22        Q.    You attended as a nonvoting member of
23   the panel, correct?
24        A.    Correct.
25        Q.    And when you attended, you expressed

Helge Waldum, M.D., Ph.D.

1    safety concerns about the use of omeprazole based

2    on findings in rats, correct?

3            A.   And my own findings in man.

4            Q.   And you told the ad -- ad -- sorry --

5    advisory committee that you felt the risk over --

6    the risk of over-the-counter was dangerous; is that

7    fair?

8            A.   Yes.

9            Q.   And at that advisory committee, you

10   specifically expressed your concerns about the

11   biological effect of suppressing gastric acid; is

12   that right?

13           A.   Probably right, but I also expressed my

14   concern regarding gastric tumors.

15           Q.   And at that advisory committee meeting,

16   the medical officer in the division of

17   gastrointestinal and coagulation drug products,

18   Mark Avigan, presented for the FDA.  Do you

19   remember that?

20           A.   I don't remember him.

21           Q.   Do you recall someone from the FDA

22   speaking at the ad comm?

23           A.   I don't remember any name.

24           Q.   You don't remember the name, but you do

25   know someone at FDA spoke at the ad comm?

Helge Waldum, M.D., Ph.D.

```
 1        A.    Probably.
 2              MS. DU PONT:  Let's -- let's pull up --
 3              THE WITNESS:  In the -- in the
 4   committee, George Sachs was one of the experts, and
 5   he --
 6   BY MS. DU PONT:
 7        Q.    George Sachs?
 8        A.    Yeah.  He -- he was the man behind
 9   the -- the proton pump.  He explained the -- the
10   proton pump.  And -- and then Astra came with --
11   no, Hässle said that they had the drug that was
12   very efficient, and George Sachs collaborated with
13   Astra at that time.
14        Q.    Okay.  And -- and I'm focused not --
15   not on those people, but on the Food and Drug
16   Administration employees that spoke at -- at that
17   advisory committee.  And maybe just to remind you,
18   because I understand it was a while ago, let's pull
19   up Exhibit 39.  And go --
20              MS. DU PONT:  I'll let you pull that
21   up.
22              (WALDUM EXHIBIT 39, Joint Meeting of
23   the Nonprescription Drugs and Gastrointestinal
24   Drugs Advisory Committees dated 10/20/00, was
25   marked for identification.)
```

1    BY MS. DU PONT:

2          Q.   Do you see that this is the

3    October 20th, 2000, transcript of the joint meeting

4    of the nonprescription drugs and gastrointestinal

5    drugs advisory committee?

6          A.   Okay.

7               MS. DU PONT:  And if we go to Page 120.

8    Scroll down a little bit.

9    BY MS. DU PONT:

10         Q.   You see that Dr. Avigan introduces

11   himself and says he's the medical officer in the

12   division of gastrointestinal and coagulation drug

13   products.  Do you see that?

14         A.   Yes.

15         Q.   So do you now recall that Dr. Avigan

16   from the FDA spoke at this advisory committee

17   meeting?

18         A.   Yes.  It's -- faintly.  I remember it

19   faintly.

20              MS. DU PONT:  Okay.  And if we go to

21   Page 142 and scroll.

22   BY MS. DU PONT:

23         Q.   He -- he says:  Nonetheless, taking

24   these deficiencies into account, at present based

25   on the composite of the clinical studies, the

Helge Waldum, M.D., Ph.D.

1   SafeTNet data and the literature, the development

2   of omeprazole induced ECL cell hyperplasia in

3   humans, unlike rats, has not been linked to

4   progression of carcinoid tumors with the caveats

5   that I've mentioned.  Do you see that?

6       A.   Yes.

7       Q.   And he goes on to say:  There is no

8   apparent causal relationship between omeprazole and

9   carcinoid tumors, gastric adenocarcinoma,

10  colorectal adenocarcinoma, and other malignancies.

11  Do you see that?

12      A.   Yes.

13      Q.   So in 2000, at the advisory committee

14  meeting that was addressing the over-the-counter

15  use of Prilosec, the FDA was on record of saying

16  there was no apparent causal relationship between

17  omeprazole and carcinoid tumors, correct?

18      A.   They did.  But it is strange that they

19  could say something like that, because the rats

20  developed the tumors, and in man you had -- it

21  started as the same type of changes, ECL cell

22  hyperplasia in the rats.

23      Q.   And so I understand -- I understand,

24  Doctor, you disagreed with the conclusion of the

25  FDA in 2000 --

1      A.    Yes.

2      Q.    -- that there was no apparent causal

3  relationship between PPIs and gastric cancer, okay?

4      A.    I disagree.

5      Q.    Now, you wrote about your participation

6  in this advisory committee in your book, right?

7      A.    Yeah.

8      Q.    Do you remember that?  Yes?

9      A.    What did you -- what did you say?  I

10  wrote about --

11      Q.    I'm sorry.  You wrote about your

12  participation in this advisory committee meeting in

13  2000 in your book, right?  You wrote about it?

14      A.    I think I wrote -- wrote about my

15  cooperation with Citizen.

16      Q.    Well --

17      A.    Did I write about --

18      Q.    I think you actually wrote about both.

19      A.    Okay.

20      Q.    You're correct, you wrote about the

21  Public Citizen.  But let's -- let's take a look at

22  your book.  Your -- in your book, it's going to

23  be --

24          MS. DU PONT:  We'll mark this as

25  Exhibit 6.

```
 1                    (WALDUM EXHIBIT 6, Book titled

 2     The Influence of the Pharmaceutical Industry on

 3     Medicine, as Exemplified by Proton Pump Inhibitors,

 4     was marked for identification.)

 5     BY MS. DU PONT:

 6          Q.   And I just want to explain, Dr. Waldum.

 7     We've photocopied your book for the purpose of this

 8     deposition and -- so we can show it on the screen

 9     so people can see.  It's only for the purposes of

10     this deposition.

11               I don't want to be accused of

12     violating -- violating any copyright.  I would have

13     given the court reporter a copy of your book if

14     this were in person.  Do you understand that?

15          A.   No problem for me.  And no problem for

16     me.

17          Q.   Okay.

18          A.   You may give it to anybody.

19          Q.   Okay.  So this is -- what we've

20     marked as Exhibit 6 is your book, Dr. Waldum,

21     "The Influence of the Pharmaceutical Industry on

22     Medicine, as Exemplified by Proton Pump

23     Inhibitors"; do you see that?

24          A.   Yes.

25          Q.   And if we go to Page 100 of the book,
```

1    but I think it's 107 in the PDF, you talk about

2    over-the-counter PPIs --

3          A.    Okay.  Yeah, that's correct.

4          Q.    -- in the U.S. and Norway, right?

5                And if we look at the last two

6    sentences of this page -- there, perfect -- you

7    write:  Although PPIs apparently have few acute

8    side effects, I tried to focus on problems related

9    to rebound acid hypersecretion, the dangers of

10   infections by the oral route in patients lacking

11   gastric acid, and the possible carcinogenic effect

12   of long-term hypergastrinemia.  Do you see that?

13         A.    Yes.

14         Q.    And so after the ad comm, it was -- or

15   at the time of the ad comm, it was your belief that

16   there was a possible carcinogenic effect of

17   long-term hypogastrinemia [sic] caused by PPIs,

18   right?  That's what you write?

19         A.    It was what I pointed out in the year

20   2000.

21         Q.    Yep.

22         A.    And it was not what I meant in 2020.

23         Q.    Okay.  Now, after the ad comm in 2001,

24   you submitted a letter to FDA correcting the -- the

25   record and also submitting all of your concerns

1    about PPIs and gastric cancer, right?

2         A.    To -- together with the Citizen?

3         Q.    Not to the Citizen yet.  I'm just --

4    look at Pages -- the next --

5         A.    Yeah.

6         Q.    -- few pages of your book where you

7    talk about how you submitted further information to

8    the FDA.  Do you see that?  You wrote to the FDA

9    here on Page 101 --

10        A.    Yeah.

11        Q.    -- 102 and 103, right?

12        A.    Yep.

13        Q.    And despite you writing to the FDA

14   about your concerns over PPIs and gastric cancer,

15   ultimately, FDA approved omeprazole for

16   over-the-counter use in 2003, correct?

17        A.    Correct.

18        Q.    And later, the FDA would go on to

19   approve other over-the-counter PPIs, like Nexium,

20   correct?

21        A.    Correct.

22        Q.    And you're aware that the FDA defines

23   over-the-counter medications as drugs that are safe

24   and effective for use by the general public without

25   seeking treatment by a healthcare professional,

1    right?

2            A.    Correct.

3            Q.    Now, the second time that you told FDA

4    about your views on PPIs and gastric cancer was in

5    2011 in relationship to your work with Public

6    Citizen, correct?

7            A.    In relationship to the work with?

8            Q.    Public Citizen.

9            A.    Yes, I was --

10           Q.    Along with Public Citizen, I should

11   say.

12           A.    I was approached by Dr. -- by

13   Director Wolfe, and I wrote what I meant about the

14   risk of PPIs, but --

15           Q.    So you were -- okay.  Go ahead.  Sorry.

16   I didn't mean to cut you off.

17           A.    I -- I mean that I did not say anything

18   about fractures and something like that, that --

19   I -- we looked at this yesterday on this signature.

20   I had an attachment that I signed about gastric

21   cancer and rebound acid hypersecretion and probably

22   also on infections.  But I -- I have never been

23   writing anything about risk of fractures,

24   pneumonia, and something like that.  I --

25           Q.    Got it.  And -- and I wasn't asking

1    about fractures or the risk of pneumonia.  I'd like

2    to focus on the letter and what you said about PPIs

3    and gastric cancer as well as PPIs in rebound acid

4    hypersecretion, okay?  That's what I --

5         A.    Okay.

6         Q.    -- want to focus on.

7              MS. DU PONT:  So if we could pull up

8    your letter that you sent to Public Citizen as

9    Exhibit 37.

10             (WALDUM EXHIBIT 37, Letter dated

11   8/23/11 from Public Citizen to Margaret A. Hamburg,

12   M.D., was marked for identification.)

13             MS. DU PONT:  And if we go to

14   Page 15 -- well -- let's start on the first page

15   just so we orient ourselves.

16   BY MS. DU PONT:

17        Q.    So this is a letter sent to FDA on the

18   Public Citizen letterhead.  And then if we scroll

19   to the last page, I just want to establish that you

20   signed it.

21             MS. DU PONT:  Go up a little bit.

22   BY MS. DU PONT:

23        Q.    Okay.  So you see here the

24   certification?  One of the -- there's -- there's

25   several people here in the certification from

1    Public Citizen, but your name is also listed here,

2    correct?

3         A.    Yes.  Yes, I noticed that.  But I think

4    that I didn't sign that one.  I signed a separate

5    attachment.

6         Q.    Okay.  But you were one of the authors

7    of this letter to Public Citizen in --

8         A.    That is correct.

9         Q.    -- 2011?

10         MS. DU PONT:  Okay.  So let's now go to

11    Page 15, which it might be 16 of the PDF.

12    BY MS. DU PONT:

13         Q.    Okay.  This section is focused on PPIs

14    and the development of gastric cancer, right?  Do

15    you see that?

16         A.    Yes.

17         Q.    And under that header, you write:

18    Numerous animal studies have shown that PPIs may be

19    associated with the development of gastric

20    carcinoids and carcinomas, two types of stomach

21    cancer.  Do you see that?

22         A.    Yeah.

23         Q.    And on Page 15 through 18, you explain

24    in detail your theories about how PPIs cause both

25    gastric carcinoid tumors and gastric

1    adenocarcinoma; is that fair?

2          A.    Okay.

3          Q.    And you conclude on Page 18, if we

4    could go there, which is 19 of the PDF -- maybe

5    not.

6                MS. DU PONT:  Yeah, go up a little bit.

7    Sorry.  Go up.  So -- sorry.  Above the H on

8    Page 18.  It is actually Page 18.

9    BY MS. DU PONT:

10         Q.    You conclude here in the -- under the

11   heading "PPIs and gastric cancer:  a plausible

12   association?" --

13         A.    Yes.

14         Q.    -- that -- you conclude that PPI

15   therapy, by inducing chronically high levels of

16   gastrin, can potentially lead to carcinoid tumors

17   and, possibly, gastric adenocarcinoma.  Do you see

18   that?

19         A.    Yeah.  Yes.

20         Q.    So in 2011, you believed that PPI

21   therapy could possibly lead to gastric carcinoids

22   and gastric adenocarcinoma, true?

23         A.    Potentially to gastric carci --

24   possibly gastric adenocarcinomas.  I was quite

25   convinced that they -- they might induce carcinoid

1    tumors because AstraZeneca in -- Washington in

2    2000 -- Proctor --

3              THE REPORTER:  I'm sorry.  Can you

4    repeat that, please?

5              THE WITNESS:  At the meeting on the PPI

6    over the counter in Washington in 2000, Procter &

7    Gamble reported that they had seen tumors in

8    patients taking PPI.  But they were not afraid of

9    them because they disappeared when they stopped

10   treatment.  So already in the year 2000 AstraZeneca

11   knew that the PPIs induced carcinoids also in man.

12   BY MS. DU PONT:

13        Q.   Okay.

14        A.   So I --

15        Q.   So I just want to understand.  Let me

16   focus on -- on -- let me change my question a

17   little bit.

18              In 2011, you believed that PPI therapy

19   could possibly lead to gastric adenocarcinoma,

20   correct?

21        A.   Yeah.

22        Q.   Okay.  And your petition -- your

23   Citizens petition caught the attention of

24   "GI & Hepatology News" in 2011, didn't it?  Do you

25   recall that?

1      A.    Yeah.

2      Q.    And other experts in the field

3   commented on your petition, and they did not share

4   your views on PPIs and gastric cancer, did they?

5      A.    No, I don't suppose so.

6      Q.    In fact, they denied any neoplastic

7   risk related to PPIs, didn't they?

8      A.    I suppose so.

9      Q.    Now, in 2011, in the same petition that

10   we're talking about now, you also raised issues

11   about adding a black box warning on rebound acid

12   hypersecretion, correct?

13      A.    Correct.

14      Q.    Now --

15          MS. DU PONT:  We can take this -- this

16   letter down.  And let's mark as the next exhibit,

17   Exhibit 42.

18              (WALDUM EXHIBIT 42, Letter dated

19   10/31/14 from Department of Health & Human Services

20   to Eric Nellis, Drs. Almashar, Carome, Wolfe, and

21   Waldum, was marked for identification.)

22   BY MS. DU PONT:

23      Q.    And this is going to be FDA's response

24   to the Public Citizen petition letter in 2014.  So

25   do you see in front of you that there's -- this is

Case 3:18-cv-01063-JWD-EWD Document 99-12 04/27/23

1    a letter from the Food and Drug Administration to

2    both Public Citizen as well as you, Dr. Waldum --

3         A.   Yes.

4         Q.   -- on October 31st, 2014?

5         A.   I see it.

6         Q.   And if we go --

7              MS. DU PONT:  Just scroll down just a

8    little bit.

9    BY MS. DU PONT:

10        Q.   You see that this is a letter

11   responding to your Citizen petition dated

12   August 23rd, 2011.  Do you see that?

13        A.   Yes.

14        Q.   And if we go to Page 19, the FDA talks

15   about information about PPIs unrelated to requested

16   actions.  Do you see that?

17        A.   Once more.

18        Q.   Do you see -- I just want you to focus

19   on this section entitled "Information About PPIs

20   Unrelated to Requested Actions."  Do you see that?

21        A.   Okay.  Yes.

22        Q.   FDA notes here that your petition

23   states that there may be a potential link between

24   PPI use and gastric cancer.  Do you see that?

25        A.   Yeah.

Helge Waldum, M.D., Ph.D.

 1        Q.   And they further note:  Regarding the

 2   potential risk of cancer linked to PPI use, as you

 3   noted in your petition, there is insufficient

 4   evidence to -- to show such a link.  Do you see

 5   that?

 6        A.   Yes.

 7        Q.   And I read that correctly, correct?  I

 8   read it right?

 9        A.   Yes.

10        Q.   And FDA further notes that it would

11   continue to monitor this matter, and if data

12   becomes available establishing causal association

13   between PPIs and gastric cancer, FDA will consider

14   whether a labeling change or other regulatory

15   actions are warranted.  Did I read that correctly?

16        A.   Yes.

17        Q.   So in 2014, the FDA told you,

18   Dr. Waldum, that there was insufficient evidence to

19   show a link between PPI use and gastric cancer,

20   correct?

21        A.   Correct.

22        Q.   And, now, since this Public Citizen

23   correspondence between 2011 and 2014, have you

24   raised your concerns about PPIs and gastric cancer

25   to the FDA?

1          A.    No.

2          Q.    And as of today, FDA has not taken any

3    regulatory action on gastric cancer, correct?

4          A.    Correct.

5          Q.    To this day, FDA has not required a

6    gastric cancer warning in PPI labels, correct?

7          A.    Correct.

8          Q.    Now, FDA also responded to your

9    petition with respect to rebound acid

10   hypersecretion in 2014.

11              MS. DU PONT:  And if we go to Page 6 of

12   the document that's up on the screen.  Scroll down.

13

14   BY MS. DU PONT:

15         Q.    I just want to direct you to one

16   more -- sorry.  This is the FDA response.

17              MS. DU PONT:  And let's go to the next

18   page.  Stop there.

19   BY MS. DU PONT:

20         Q.    Do you see that the FDA responds here:

21   In sum, we have concluded that there is

22   insufficient evidence of a causal association

23   between the cessation of PPI therapy and the

24   emergence of clinically significant symptoms of

25   rebound acid hypersecretion in patients.

1    Therefore, warnings regarding rebound acid

2    hypersecretion in the labeling of PPI products,

3    including boxed warnings, are not warranted at this

4    time for either prescription or nonprescription

5    products.  Your petition is denied.  I read that

6    correctly, correct?

7           A.    You read it -- you read it correctly.

8    But this decision may result -- there are other

9    decisions, because rebound acid hypersecretion is a

10   consequence of normal physiology and regulation of

11   gastric acid secretion.  So it -- it occurs, and it

12   may be substantial.  And it has been known that

13   patients with gastrinoma and high acid secretion --

14   gastric acid secretion do develop GERD.

15          And so -- and -- and, also, Håkan

16   Larsson and Astra showed in rats in the late '80s

17   that the rats also developed rebound acid

18   hypersecretion.  So the reason why some haven't

19   found rebound acid secretion is that they didn't

20   understand how to examine to find it.

21          I -- I made, also, this -- for the

22   first time, I examined because I didn't take into

23   consideration the long-time acid inhibition you had

24   after stopping treatment with PPIs.  But when I let

25   it go, two weeks after stopping treatment, there

1    was an enormous increase in acid secretion.  And

2    Reimer in Copenhagen described in Gastroenterology

3    in 2009 that students having no dyspepsia, when

4    they were given PPIs, developed dyspepsia --

5         Q.   Okay.

6         A.   -- about 50 percent of them.

7              So -- so, of course, it has clinical

8    consequences.  And every clinician treating

9    patients with -- with PPIs due to accepted

10   indication, I have experienced that it is difficult

11   to stop treatment if started.  So -- so it is

12   obviously an incorrect --

13        Q.   Okay.

14        A.   -- decision.  But whether it should be

15   put on the label, I -- it doesn't matter for me

16   whether it's labeled or not that rebound --

17        Q.   Okay.

18        A.   -- acid hypersecretion be clinical

19   consequences.  It's no doubt about that.

20        Q.   So -- so, Doctor, you don't -- or you

21   agree with me, though, that FDA in 2014 told you

22   that there was insufficient evidence of causal

23   association between ceasing PPI therapy and the

24   emergence of clinically relevant symptoms of

25   rebound acid hypersecretion, correct?  You agree

1    with me that that happened?

2         A.   No.  No.

3         Q.   No -- you don't agree with me that

4    the -- you must not understand my question, Doctor.

5         A.   I -- I understood the question.  They

6    wrote that --

7         Q.   The FDA told you -- I -- I know you

8    disagree with the FDA.  I understand.  You disagree

9    with the FDA.

10        A.   But --

11             MR. RESTAINO:  Wait.  Wait.  There's no

12   question pending.  Let her ask her question.

13   BY MS. DU PONT:

14        Q.   You agree with me that the FDA told you

15   and Public Citizen in 2014 that they thought there

16   was insufficient evidence of a connection between

17   PPIs and clinically relevant rebound acid

18   hypersecretion, right?

19        A.   Yes.

20        Q.   They told you that?

21        A.   Yes.

22        Q.   Okay.  And I understand.  You disagree

23   with their conclusion, right?

24        A.   Yes.

25        Q.   Okay.  That's all.  I just wanted to

1    make sure the record was clear.

2              Now, you -- you note in your report, I

3    think on Page 92, that FDA addressed rebound acid

4    hypersecretion again in 2018 and 2019.  Do you

5    recall that?

6         A.   I -- I know that.

7         Q.   Okay.  So if you know that -- and in

8    2018 and 2019, the FDA reached the same conclusion

9    as it did in 2014, right?  Again, it didn't think

10   there was enough evidence to warrant a black box

11   warning, right?

12        A.   That is correct, but they concluded

13   that -- that RAHS can occur after cessation of

14   several weeks of PPI therapy.

15        Q.   Well, let's take a look at what the FDA

16   actually wrote.  And we can pull up Exhibit 139.

17             (WALDUM EXHIBIT 139, Office of

18   Surveillance and Epidemiology (OSE) Memorandum

19   dated 12/21/18, Subject:  Rebound Acid

20   Hypersecretion, was marked for identification.)

21   BY MS. DU PONT:

22        Q.   And this is a report by FDA dated

23   December 21st, 2018.  Do you see that?

24        A.   Yes.

25        Q.   And if we go to the conclusion section,

1  which I think is near the last page -- I think it's

2  Page 15.

3              THE VIDEOGRAPHER:  Is that correct?

4              MS. DU PONT:  Yeah, that's -- that's

5  exactly where we need to be.  Thank you, Melissa.

6  BY MS. DU PONT:

7       Q.   Do you see the conclusion here?  The

8  FDA reviewed 18 FAERS cases and 16 literature

9  publications, not previously reviewed by the agency

10  as part of the 2014 Citizen petition response.  Do

11  you see that?

12       A.   Yes.

13       Q.   And found no evidence to contradict the

14  agency's previous conclusions.  Do you see that?

15       A.   Yes.

16       Q.   No scientifically sound evidence that

17  directly associated the occurrence of rebound acid

18  hypersecretion with the occurrence of clinically

19  significant symptoms regarding this safety issue.

20  Do you see that?

21       A.   Yes.

22       Q.   And to this day, FDA has not added a

23  warning on rebound acid hypersecretion to the

24  labels for PPI, correct?

25       A.   That is correct.

Helge Waldum, M.D., Ph.D.

```
 1        Q.    Now --
 2              MS. DU PONT:  We can take this document
 3   down.
 4   BY MS. DU PONT:
 5        Q.    Doctor, you agree that the Norwegian
 6   Medicine Agency also had a hearing on whether PPIs
 7   should be sold over the counter in the 2000s,
 8   right?
 9        A.    Correct.
10        Q.    And you submitted a negative opinion on
11   behalf of your university, correct?
12        A.    Correct.
13        Q.    And the Norwegian Medicine Agency
14   rejected your views and approved PPIs for
15   over-the-counter use, right?
16        A.    Correct.  Their physiological knowledge
17   was not better then in the U.S.
18              MR. RESTAINO:  Wait for there to be a
19   question.
20              MS. DU PONT:  I'm just going to move to
21   strike everything after "yes."
22   BY MS. DU PONT:
23        Q.    Doctor, I'm going to switch gears a
24   little bit, and I want to talk to you about your
25   opinions on ECL cells, okay?
```

```
 1          A.   Okay.

 2          Q.   And I just want to make sure I'm

 3    getting your theory correct.  Your theory is that

 4    hypogastrinemia [sic], whether it's induced by PPIs

 5    or otherwise, can lead to the development of

 6    gastric cancer --

 7          A.   Yes.

 8          Q.   -- is that true?

 9               MR. RESTAINO:  Julie, so that the -- so

10    that the record is complete -- I'm sorry.  I didn't

11    hear.  Was it "hyper" or "hypo" that you said?

12               MS. DU PONT:  Hypergastrinemia.

13               MR. RESTAINO:  Okay.  Thank you.  Thank

14    you.

15    BY MS. DU PONT:

16          Q.   And you believe hypogastrinemia [sic]

17    itself is sufficient to cause carcinogenesis; is

18    that accurate?

19          A.   Yes.

20          Q.   And you're not offering the opinion

21    that gastrin directly causes DNA damage, correct?

22          A.   It is due to the proliferation or the

23    cell division.  Every cell division has the risk of

24    DNA mutation.  It is not direct --

25          Q.   But there's no --
```

1        A.   It is not directly carcinogenic, but

2   due to the stimulation of proliferation, it

3   increase the risk of gastric carcinoma.

4        Q.   Got it.  So there's -- so gastrin or

5   increased levels of gastrin do not cause direct DNA

6   damage; rather, they cause increased proliferation?

7        A.   Correct.

8        Q.   And as I understand it, your opinion is

9   that the ECL cell gives rise to low-grade gastric

10  neuroendocrine tumors, or NETs --

11       A.   Correct.

12       Q.   -- and high-grade malignancies,

13  including both neuroendocrine tumors and

14  adenocarcinomas; is that right?

15       A.   Correct.

16       Q.   And you believe this is true not just

17  for rats, but for humans as well?

18       A.   Correct.

19       Q.   You agree, though, that the currently

20  accepted theory of tumorigenesis is that neoplasia

21  originate from stem cells, right?

22       A.   That -- that is -- that is correct.

23  But you said it properly, the theory.  It's not a

24  fact.

25       Q.   Okay.  And you appreciate that your

1    theory that tumors can develop from all cell types,

2    not just stem cells, is not the currently accepted

3    theory of tumorigenesis, correct?

4         A.    Not the currently accepted --

5         Q.    Yours is the alternate view, right?

6         A.    Yeah.

7         Q.    So you've come to accept that your

8    theory or your hypothesis that ECL cell has a role

9    in carcinogenesis has not been accepted by your

10   peers, despite many publications by you on this

11   topic, right?

12              MR. RESTAINO:  Object to form.

13              THE WITNESS:  In a way, it is correct,

14   but it is increasingly more people accepting it.

15   And as I said to you -- as I said before, if you

16   don't accept that ECL cell developed into cancer in

17   the Spanish family, then it is very difficult to

18   understand of the -- the other people

19   understands -- understand physiology and

20   carcinogenesis.

21   BY MS. DU PONT:

22        Q.    But -- but you would agree with me that

23   most experts within gastric pathology and

24   gastroenterology, at least as of 2018, concluded

25   that the ECL cell did not play any appreciable role

1    in human gastric carcinogenesis, correct?

2                MR. RESTAINO:  Object -- object to

3    form.

4                THE WITNESS:  I -- I will -- will agree

5    in that.  But if you have such a biased reference

6    to papers, it is understandable.  For instance, as

7    Wang, he -- he has not even written anything about

8    hormonal carcinogenesis, although hormones is the

9    most important cause of cancer; for instance, in

10   cancer of the breast, cancer of -- cancer of the

11   prostate.  And -- and none of your experts --

12   experts here have included hormonal carcinogenesis.

13   It's peculiar.

14   BY MS. DU PONT:

15       Q.   I -- I understand what you're saying,

16   but my question is not really focused on other

17   hormones.  My question is really just focused on

18   your theory of ECL carcinogenesis.

19                You would agree with me that most

20   experts within gastric pathology and

21   gastroenterology at present conclude that the ECL

22   cell does not play any appreciable role in human

23   gastric carcinogenesis?

24       A.   I --

25                MR. RESTAINO:  Object.

Helge Waldum, M.D., Ph.D.

```
 1               THE WITNESS:  I agree.  I -- I agree on
 2    that.
 3    BY MS. DU PONT:
 4          Q.   You acknowledge in your book that your
 5    opinions on the ECL cell's role in human gastric
 6    carcinogenesis have not been widely accepted,
 7    right?
 8          A.   Yes.
 9          Q.   In fact, you and your research group
10    are largely the only researchers putting forth this
11    theory, right?
12          A.   Yes.
13          Q.   And you've been publishing on this
14    theory for years, if not decades, right?
15          A.   Decades.
16          Q.   And it's still not widely accepted,
17    correct?
18          A.   Nobody has made the studies I have
19    done.  If they -- if they did, they could say, is
20    this correct, or is it not correct.  It's easy to.
21    But it's difficult to me -- for me to do any more
22    than to publish papers on it --
23          Q.   I understand.
24               Now, you have acknowledged in your own
25    publications that the ECL cell has been
```

1    acknowledged to give rise to neuroendocrine tumors,

2    or NETs, but not to play any role in carcinogenesis

3    of gastric adenocarcinomas, right?

4         A.   It's more accepted that the ECL cell is

5    the origin of -- of gastric NETs than gastric

6    carcinomas.  That is correct.

7              But nevertheless, we -- I have

8    published examples of how gastric NETs develop into

9    gastric carcinomas; for instance, in the Spanish

10   family, and also a patient with autoimmune

11   gastritis, which we could follow during five years'

12   disease.  Starting each year, she had atrophic

13   gastritis, pernicious anemia, and a carcinoid was

14   removed from the stomach, ECL cell carcinoids.  And

15   during -- during five years, the tumor become

16   highly malignant, and the patient died of it, and

17   it -- it was an EC -- ECL cell carcinoma --

18        Q.   I understand -- I understand you've

19   published on the topic, but I'm not really focused

20   on your publications.

21             What I'm trying to understand is, I

22   think, what you've acknowledged in your own

23   publications, which is that the ECL cell does not

24   play any role in the carcinogenesis of gastric

25   adenocarcinomas.  That's what the mainstream

1    thinking is, correct?

2         A.   I -- I make another example.  Wang, in

3    his expert report, says that gastric carcinomas of

4    diffuse type, they lack E-cadherin.  That is the

5    same molecule that patients with hereditary gastric

6    cancer lacks.  And we showed in 2013 that ECL cell

7    does not express E-cadherin.  And that is an

8    explanation why these cells can spread much more

9    greater than by the other cells types.

10             So they are in a way starting at the

11   point where they already has -- they already have

12   properties that make them more prone to develop

13   tumor.  And that was not either referred.

14        Q.   Let's -- maybe it'll help if we pull up

15   one of your recent articles.  I'll get the right

16   exhibit number.  It's Exhibit Number 32.

17             (WALDUM EXHIBIT 32, Article titled

18   Towards Understanding of Gastric Cancer Based upon

19   Physiological Role of Gastrin and ECL Cells, was

20   marked for identification.)

21   BY MS. DU PONT:

22        Q.   And you see that this is an article

23   published by you, Dr. Waldum, and Patricia Mjønes,

24   right?

25        A.   That's correct.

Helge Waldum, M.D., Ph.D.

1          Q.   And it was published in November of

2     2020, correct?

3          A.   Yes.

4          Q.   And the title is "Towards Understanding

5     of Gastric Cancer Cell [sic] Based upon

6     Physiological Role of Gastrin and ECL Cells,"

7     right?

8          A.   Correct.

9          Q.   And on Page 1, if we scroll down just a

10    little bit to the abstract.  It's about halfway

11    through the abstract, you write:  The ECL cell has

12    long been acknowledged to give rise to

13    neuroendocrine tumours, or NETs, but not to play

14    any role in carcinogenesis of gastric

15    adenocarcinomas.  Do you see that?

16         A.   Yes.

17         Q.   And you stand by that statement, that

18    you wrote in 2020, today, correct?

19         A.   It -- it was not my meaning, but -- but

20    it was what was accepted generally.

21         Q.   And if we go to Page 3 of your article.

22              MS. DU PONT:  Scroll down a little bit.

23    Keep scrolling.  Stop.  Stop.  Stop.

24    BY MS. DU PONT:

25         Q.   Do you see where it starts after

1    Footnote 57, "However"?

2         A.   Yes.

3         Q.   However -- so in -- in this article,

4    you and Dr. Mjønes are noting:  Another -- However,

5    another Italian central in neuroendocrine

6    pathology, Solcia --

7         A.   Solcia.

8         Q.   -- Solcia, together with coauthors,

9    concluded that gastrin can promote the

10   proliferation of ECL cells but is per se apparently

11   unable to induce ECL cell transformation.

12        A.   Yes.  That is a correct citation.

13        Q.   And -- and then that view was supported

14   by another recent review from the group of

15   Robert T. Jensen.  Do you see that?

16        A.   Yes.

17        Q.   So --

18        A.   I -- I try to be correct when I refer

19   to papers.

20        Q.   I -- I understand that, and that's why

21   you note at least -- sorry.  That's why you note

22   here that gastrin has been claimed not to play any

23   role in the development of gastric cancer, correct?

24        A.   Yes.  I will say something about

25   Solcia.  He -- he was a leading pathologist in

1    neuroendocrinology from the early '70s.  And in the

2    late '70s, he was very interested in gastric

3    carcinoids and gastric -- and gastric

4    neuroendocrine carcinomas.

5              At -- after the middle of the '80s, he

6    came to this conclusion that gastrin and ECL cell

7    could not develop into gastric carcinomas because

8    they didn't transform as they claimed.

9         Q.   And he wasn't alone.  Robert Jensen

10   confirmed that, correct?

11        A.   Robert Jensen supported that view, I

12   think, and supported Solcia.  But he hasn't done

13   any studies related to it, I would say.

14             But as Wang, Solcia also claimed

15   species differences, because it's know -- note that

16   ECL cell does transform in many rodents.  And the

17   genetic similarities between rats and man is more

18   than 90 percent.  So it's more likely than less

19   that if you find it in a rat, it also is the same

20   for man.

21        Q.   So let me just get back to the paper

22   that we're looking at, though.

23             In this article published in 2020, you

24   acknowledge that you and Dr. Mjønes or your group

25   are alone in your view about the role of ECL -- the

1    ECL cell in gastric cancer, correct?

2              MR. RESTAINO:  Object to form.

3              THE WITNESS:  There are more, but not

4    many.

5    BY MS. DU PONT:

6         Q.   Who -- who else has shared your view

7    about the ECL cell in gastric cancer?

8         A.   Well, it's a Chinese paper in 2019.  I

9    cannot remember it now, but I --

10        Q.   Okay.

11        A.   -- do support it.

12        Q.   Are you referring to the publication by

13   Joo, J-O-O?

14        A.   I don't remember.  It could be.

15             MS. DU PONT:  Why don't we pull up that

16   publication, which I believe is Exhibit 46.

17             (WALDUM EXHIBIT 46, Article titled

18   Proton pump inhibitor:  The dual role in gastric

19   cancer, was marked for identification.)

20   BY MS. DU PONT:

21        Q.   And this is an article from 2019.

22   First author, Joo, entitled "Proton pump inhibitor:

23   The dual role in gastric cancer."  Do you see that?

24        A.   Yes.

25        Q.   Is this the -- the article you were --

```
 1          A.   Can I --

 2          Q.   -- referring to?

 3          A.   Can I see the abstract?  Can I -- can

 4   you --

 5          Q.   Sure.

 6          A.   -- show me the abstract?

 7               At least -- However, a number of

 8   physicians have raised concern about the serious

 9   side effects of long-term use of PPIs -- so I'm not

10   completely alone -- including the development of

11   gastric cancer.

12          Q.   And that's --

13          A.   And then he --

14          Q.   Okay.

15          A.   And then he's -- he's referring to

16   epidemiological studies.  And so we are not

17   completely alone.

18          Q.   Well, let's -- I -- I want to take a

19   look at -- on Page 9 of this article what exactly

20   the conclusion was of these authors.  Do you see

21   here --

22               MS. DU PONT:  You can stop.

23   BY MS. DU PONT:

24          Q.   They write:  Many physicians have

25   raised concerns that long-term PPI use may be a
```

```
 1   significant risk factor for GI tract neoplasia,
 2   including gastric cancer, and data from recent
 3   clinical studies supports this hypothesis.
 4   However, from a methodological point of view,
 5   application of the results from observational
 6   clinical studies is limited until solid evidence is
 7   available to establish the long-term use of PPI and
 8   its association with gastric cancer.  However, in
 9   patients with premalignant lesions such as atrophic
10   gastritis or intestinal metaplasia, it may be
11   necessary to restrict long-term PPI administration,
12   even after H. pylori eradication, to prevent
13   gastric cancer.  By contrast, theoretical
14   investigations and experimental findings suggest
15   that PPIs may play a role -- an adjunct role of
16   improving the efficacy of chemotherapy for
17   malignant tumors including stomach cancer.  Do you
18   see that?
19        A.   Yes, but I would say that I agree
20   completely in this statement, that it is necessary
21   to restrict long-term PPI administration, even
22   after H. pylori eradication, to prevent gastric
23   cancer.
24             It is -- it is what -- and that is the
25   reason why you have such studies showing that
```

1    gastric cancer is increased much earlier than

2    expected when starting PPIs.  Because these

3    patients had a tumor that had started, and then you

4    added PPIs, then that speed of growth increased --

5    increased.  So --

6         Q.   But, Doctor, I -- I just want to focus,

7    though, on -- on what the -- the authors here

8    concluded.  What they're saying is that PPIs may

9    actually be preventive for stomach cancer, correct?

10   That's what they say in the second-to-last --

11        A.   What do they say exactly?  By contrast?

12        Q.   Yes.  By contrast, PPIs may play an

13   adjunct role of improving the efficacy of

14   chemotherapy for malignant tumors including stomach

15   cancer.

16        A.   Did you see:  By contrast, theoretical

17   investigations.  That -- and also:  Experimental

18   findings suggest that PPIs may play a role --

19   adjunct role.

20             It is probably that they have found

21   some protease factors that has been known to

22   inhibit carcinogenesis, but they -- they will not

23   show that it actually does inhibit gastric

24   carcinogenesis.  So I -- I would say that this

25   paper support -- this support our view that we are

1    not completely alone.

2          Q.   I think what the authors are saying --

3    and I think you should -- I think you'll agree with

4    me -- is that it may be possible it causes gastric

5    cancer; it may be possible it actually helps treat

6    gastric cancer.  That's what they're saying, right?

7                MR. RESTAINO:  Objection.

8                THE WITNESS:  In a way, that is

9    correct.  But if -- if you have got gastric cancer,

10   I think we -- that is the important thing and

11   not -- how to treat it.  You have -- you have a

12   better chance if you have that.

13               MS. DU PONT:  Okay.  Let's take this

14   down.

15   BY MS. DU PONT:

16         Q.   Doctor, you don't cite any U.S.

17   gastroenterology guidelines in your report, do you?

18         A.   I don't think so.

19         Q.   Did you review any U.S.

20   gastroenterology guidelines in forming your

21   opinions in this case?

22         A.   No.

23         Q.   And you would agree with me that no

24   U.S. gastroenterology guidelines specifically

25   recommend testing or monitoring serum gastrin

```
 1    levels for PPI users, correct?
 2         A.   Correct.
 3         Q.   And no U.S. guidelines recommend
 4    testing or monitoring serum gastrin levels to
 5    identify anyone at risk, regardless of reason for
 6    developing gastric adenocarcinoma, correct?
 7         A.   Correct.
 8         Q.   And no USG -- sorry.  No U.S.
 9    gastroenterology guidelines recommend monitoring
10    anyone on PPIs or otherwise for CgA levels to
11    predict gastric adenocarcinoma, correct?
12         A.   Correct.
13         Q.   That's never been the standard of care
14    anywhere, right?
15         A.   In U.S., not.
16         Q.   It's not been the standard --
17         A.   I -- I --
18         Q.   -- of care in Norway either?
19         A.   I suppose that -- I suppose that that
20    is a reason that so few papers on this have
21    appeared from U.S., because everybody think that
22    this is no matter; and, therefore, they will not
23    find anything.  You -- you must -- you must search
24    for something to find it and not say that it is not
25    actual.
```

1          Q.   But no U.S. oncology guidelines

2     recommend testing or monitoring serum gastrin

3     levels of PPI users, correct?

4          A.   Oncologists, they are mainly concerned

5     in the treatment of cancer and not -- they are not

6     so interested in the causation.

7          Q.   But you -- you are not aware of any

8     U.S. oncology guidelines that recommend testing or

9     monitoring serum gastrin levels of PPI users --

10         A.   No.

11         Q.   -- are you?

12         A.   That's correct.

13         Q.   Nor are you aware of any guidelines in

14    the United States that recommend monitoring of CgA

15    levels for gastric carcinoma, correct?

16         A.   Correct.

17         Q.   And no medical organization in the

18    United States lists ECL cell hyperplasia or

19    hypogastrinemia [sic] as a risk factor or cause of

20    gastric adenocarcinoma, does it?  I think you're on

21    mute.

22              MS. ALTHOFF:  And I think you meant

23    "hyper" --

24              THE WITNESS:  Correct.

25              MS. ALTHOFF:  -- Julie.

```
 1              THE WITNESS:  Unmute.
 2   BY MS. DU PONT:
 3        Q.   Sorry.  Let me just rephrase my
 4   question, because there was not a clear record,
 5   because I think I misspoke and you were on mute.
 6              In your report, you don't cite any
 7   American medical organization that lists ECL cell
 8   hyperplasia or hypergastrinemia as risk factors for
 9   or causes of gastric adenocarcinoma, correct?
10        A.   Correct.
11        Q.   Can you point me to any medical
12   organization anywhere in the world that tells
13   doctors or patients that ECL cell hyperplasia or
14   hypergastrinemia are risk factors for gastric
15   adenocarcinoma?
16        A.   No.
17        Q.   And there have not been any randomized
18   controlled trials in human beings that have
19   confirmed your theory that hypergastrinemia or
20   elevated serum gastrin causes gastric
21   adenocarcinoma, correct?
22        A.   Thank you for the -- for the question.
23   How would we -- we agreed upon that gastric cancer
24   takes years to develop.  It will be impossible to
25   do any study on that in man.  We must rely on
```

Helge Waldum, M.D., Ph.D.

1  animal studies.  And that is the point here.  When

2  omeprazole was accepted for clinical use, it was

3  the first time that the drug causing a malignant

4  disease in an animal that was accepted for clinical

5  use.

6           And that is the reason why that during

7  all these years afterwards that I've been concerned

8  about this.  For instance, in gastroenterology,

9  there are some years between, but nevertheless,

10 there are -- there are leading articles reflecting

11 on this problem.  And they all would say there --

12 there is no risk, but there are.  In the deep of --

13 many doctors haven't thought about it.  And,

14 therefore, animal studies have to be relied on.

15      Q.   I -- I understand what you're saying

16 about the clinical studies, but to date, no

17 clinical trial, no randomized controlled trial has

18 confirmed your theory that hypergastrinemia causes

19 gastric adenocarcinoma, has it?

20      A.   In my report, I show that every

21 condition with hypergastrinemia uses gastric tumors

22 in rats, in different other rodents and also in

23 man.

24      Q.   But there is no randomized controlled

25 clinical trial that has confirmed your theory that

Helge Waldum, M.D., Ph.D.

1    hypergastrinemia causes gastric adenocarcinoma, has

2    there?

3         A.   No.  It depends on what you would --

4    how you -- you will find that hypergastrinemia

5    predisposes to gastric cancer.  For instance, there

6    are two studies, one from Finland, a combination of

7    a U.S./Finnish study showing that patients that had

8    high gastrin 20, 30 years before had an increased

9    risk of gastric cancer.

10           And they have this epidemiological

11   study from Norway where I took the study to that

12   study where patients with higher gastrin values

13   developed gastric cancer in the oxyntic mucosa more

14   often than those with lower gastric -- lower

15   gastrin values.  That is the best that exists.

16        Q.   Doctor, the answer to my question of

17   whether there's been a randomized controlled

18   clinical trial that has shown hypergastrinemia

19   leads to gastric cancer is "no," isn't it?

20        A.   It depends on how you evaluate it.

21   Patients with autoimmune gastritis, one would say

22   they have high gastrin values, and they have both

23   ECL cell NETs and gastric carcinomas.  One would

24   say that -- that they develop -- develop this

25   because of the inflammation.  I would say that they

Helge Waldum, M.D., Ph.D.

1    develop it because of gastrin.  So it is difficult

2    to come around with.

3         Q.   Okay.  We'll move on.

4              Doctor, your own research has confirmed

5    that hypergastrinemia is not associated with

6    increased mortality, right?

7         A.   Yeah.  That -- that -- patients with --

8    with gastric cancer are not -- have not increased

9    mortality when they have hypergastrinemia.  And I

10   think that is quite easy to explain.  Because the

11   cancers in this situation develop slowly.  And you

12   need not to have such deep mutation affecting the

13   cell so much, and nevertheless, it develop into a

14   cancer.  So at a certain stage, it will not be more

15   malignant than other gastric cancers.

16             So we talked about this gastric NETs or

17   carcinoids.  They were more benign in the -- when

18   they were developed in hypergastrinemic state than

19   spontaneously.  That is the same for gastric

20   cancer, I would say.

21        Q.   Okay.  We talked a little earlier about

22   Zollinger-Ellison syndrome; do you remember that?

23        A.   Zollinger-Ellison syndrome?

24        Q.   Yes.

25        A.   Yeah.

Helge Waldum, M.D., Ph.D.

```
 1          Q.   That's a condition characterized by
 2   high levels of gastrin, correct?
 3          A.   Yes.
 4          Q.   And Zollinger-Ellison syndrome patients
 5   often have ten times the upper limit of normal
 6   gastrin levels, correct?
 7          A.   Yes.  Correct.
 8          Q.   And I'm just going to refer to it as
 9   "ZES"; is that okay?
10          A.   Okay.
11          Q.   ZES patients reportedly have much
12   higher levels of gastrin than people taking PPIs,
13   right?
14          A.   Yes.
15          Q.   But --
16          A.   But -- but -- but --
17               MR. RESTAINO:  There's no question.
18               THE WITNESS:  Okay.
19   BY MS. DU PONT:
20          Q.   Let's -- let me just keep asking --
21          A.   Yeah.
22          Q.   -- my question.
23               But Zollinger -- but ZES patients do
24   not have a higher risk of gastric adenocarcinoma
25   compared to the general population, do they?
```

Helge Waldum, M.D., Ph.D.

```
 1          A.    That is correct.

 2          Q.    And can you point me to any data

 3    showing that ZES patients have higher rates of

 4    gastric adenocarcinoma than the general population?

 5          A.    We are talking about Zollinger-Ellison

 6    syndrome --

 7          Q.    Yes.

 8          A.    -- patients.  And as I said, you have

 9    two types of Zollinger-Ellison's syndrome.  It is a

10    malignant disease.  Half of them, you have the type

11    connected to multiple endocrine neoplasia.

12                THE REPORTER:  To what?

13                THE WITNESS:  They develop --

14                THE REPORTER:  Connected to what?

15                THE WITNESS:  Multiple endocrine

16    neoplasia type 1.  They develop carcinoids,

17    ECL cell carcinoids more often than those having

18    carcinomas of sporadic type.

19                But patients with sporadic-type

20    gastrinoma, they have -- they have more malignant

21    disease.  If they are operated before metastasis,

22    they recover, and they will have normal gastrin.

23    If they -- if you can't or -- or -- do surgery and

24    radically remove all the carcinoma, then they will

25    die after a shorter time.  So these patients will
```

1    not have a long period with hypergastrinemia, and

2    of course, they will not develop adenocarcinoma

3    that we agreed upon takes time to develop.

4    BY MS. DU PONT:

5         Q.   But my question was not about the

6    different types of ZES.  My question was:  Is there

7    any data that you can point me to that ZES patients

8    have higher rates of gastric adenocarcinoma than

9    the general population?  You can't point me to any

10   data showing that, correct?

11        A.   I gave you an explanation why they --

12   they don't live long enough and -- with

13   hypergastrinemia.

14        Q.   But there is no data showing ZES

15   patients have higher rates of gastric cancer than

16   the general population, is there?

17        A.   That's correct, because they do not --

18        Q.   Got it.

19        A.   -- live long enough.

20        Q.   Are you aware of research, including

21   research in animal models, that suggest gastrin may

22   actually suppress certain types of gastric

23   adenocarcinoma?

24        A.   It could be that the PPIs have, you

25   know -- it's whether the gastrin receptor mediates

1    a positive trophic effect or a negative trophic

2    effect.

3              It could be that you -- in the G-cells

4    in the antrum could have a negative -- that gastrin

5    could have a negative atrophic effect on the antral

6    G-cells, and thus have a negative effect on the

7    development of gastric cancer there opposite to

8    what is found in the -- in the oxyntic area where

9    it is a positive effect related to growth.

10        Q.   So there is evidence out there that

11   gastrin may actually suppress certain types of

12   gastric adenocarcinomas?

13        A.   In the antrum, but there is at -- it's

14   at least a suggestion.  There are very few studies,

15   but I -- I have seen it.

16        Q.   Let me switch gears -- gears just a

17   little bit and talk again about gastroenterology

18   guidelines.  There's no U.S. gastroenterology

19   guidelines that recommends taking biopsies from

20   patients on PPIs and performing neuroendocrine

21   stains on the tissue to look for ECL hyperplasia,

22   is there?

23        A.   I know that because you will not detect

24   what is going on.

25        Q.   So the answer is no, there are no

Helge Waldum, M.D., Ph.D.

1    guidelines that recommend that?

2           A.    Correct.

3           Q.    And there are no U.S. guidelines that

4    say that doctors should take a biopsy to stain for

5    ECL hyperplasia -- cell hyperplasia to identify

6    people at an increased risk of gastric

7    adenocarcinoma, correct?

8           A.    Correct.

9           Q.    And no U.S. guideline says to test for

10   chromogranin A levels to see if a patient may have

11   an ECL mass to identify people at risk for gastric

12   adenocarcinoma, correct?

13          A.    Correct.  Correct.

14          Q.    And no U.S. gastroenterology guidelines

15   tells doctors that ECL cell hyperplasia is an

16   established marker for an increased risk of any

17   type of gastric adenocarcinoma, correct?

18          A.    Correct.  Correct.

19          Q.    And similarly, no U.S. oncology

20   guideline recommends looking for ECL hyperplasia to

21   identify people at risk of developing gastric

22   adenocarcinomas, correct?

23          A.    Correct.

24          Q.    And no regulatory agency has identified

25   ECL cell hyperplasia as a marker for gastric

1    adenocarcinoma risk, correct?

2         A.   Correct.

3         Q.   Would you agree with me that ECL cells

4    proliferate slowly?

5         A.   Correct.  It was doubted whether they

6    did divide at all.  I had a dispute in the '90s

7    about that with a pathologist that claimed they --

8    they did not proliferate.  That has become clear

9    later, that they do proliferate.

10        Q.   They do proliferate, albeit very

11   slowly, correct?

12        A.   It's very slowly.  And, for instance,

13   when you -- when you treat patients having been

14   treated for 10 weeks with PPI in an acceptable

15   dose, it took 20 weeks until after cessation of

16   treatment until you had normal ECL cell density,

17   showing how long the time it takes and --

18        Q.   Let me ask you a different question.

19        A.   That was a Austria study.  That was a

20   study from Austria --

21        Q.   Austria?

22        A.   -- in there, yeah.

23        Q.   Have you shown in your research how

24   long ECL cells last for before they die?

25        A.   They have a long longevity.  I can't

1    say how long.

2             Q.    Is it a few weeks?

3             A.    More -- some months.

4             Q.    Some months.

5                   And have you shown how often they

6    divide?

7             A.    They have -- without hypergastrinemia,

8    they have a very slow proliferation.  But, for

9    instance, one study in -- in mice, published in

10   2020, he showed that they -- a very rapid

11   proliferation.  And he then made -- he -- he

12   claimed that mature ECL cell proliferated much

13   slower than young or progenitor ECL cells, that

14   there was a brief proliferation in that model --

15   mice model.

16            Q.    Have you shown in your research how ECL

17   cells acquire mutations that lead to cancer?

18            A.    I -- I have not studied which type of

19   mutation ECL cell gains before developing into

20   cancer, and I don't know anybody -- I do not know

21   any study of that.

22            Q.    So just so the record is clear, you

23   have not shown in your research how ECL cells

24   acquire mutations, and no one else has either,

25   correct?

1          A.   Correct.  But it is -- every cell
2     division will lead to a mutation -- it leads to a
3     mutation.  And that will be by chance which
4     mutation that occurs.  And if you have bad chance,
5     that is a mutation that affects an important part
6     of the regulation of the ECL cell proliferation or
7     properties.  That is the usual way.
8          Q.   But you haven't shown a specific way in
9     any of your research, correct?
10         A.   I have not examined that because I
11    think that that would differ from case to case.
12         Q.   You don't have any evidence that ECL
13    cells can self-renew, do you?
14         A.   That ECL cell can --
15         Q.   Can self-renew?
16              MR. RESTAINO:  Object to form.
17              THE WITNESS:  What did -- can --
18    BY MS. DU PONT:
19         Q.   Can self- -- you don't have any
20    evidence that ECL cells can self-renew, do you?
21         A.   Yes, it has been shown that they --
22    they proliferate and that you have Ki-67 in ECL
23    cell NETs showing that they proliferate.
24         Q.   I didn't ask if they proliferate.  Let
25    me just ask a different question.

Helge Waldum, M.D., Ph.D.

1          Have you shown that you can grow ECL

2   cells in culture?

3          A.   No.  You know, these hormonal cells,

4   they are very differentiated, even when they cause

5   malignancy.  It is a special trait with these

6   tumors, that they look very like the normal cells,

7   but nevertheless, they behave malignant and --

8          So they will not grow easily, at least

9   from ECL cell NETs.  It could be that if you tried

10  to -- ECL cell neuroendocrine carcinomas, you may

11  perhaps succeed.

12         Q.   Okay.  I want to talk a little bit

13  about the diffuse type of adenocarcinoma and your

14  theory about that, okay?

15         A.   Yes.

16         Q.   You believe that the ECL cell is the

17  cell of origin for diffuse-type gastric

18  adenocarcinoma, in particular, the signet-ring

19  subtype of diffuse adenocarcinoma; is that right?

20         A.   Correct.

21         Q.   And your research has primarily focused

22  on ECL cells and adenocarcinoma of the diffuse

23  type, right?

24         A.   Correct.

25         Q.   And on Page 67 of your report, which is

1    Exhibit 4 -- and let's just see if you -- I'm going
2    to have to pull it up.  You write:  The presence --
3                MS. DU PONT:  Oh, here she comes.  I
4    think it'll be Page 68 on the PF -- PDF.  Stop.  Go
5    back up.  Go back up.  No, not -- go -- yeah.
6    There we go.  Stop.
7    BY MS. DU PONT:
8         Q.   Do you see here on Page 67 of your
9    report, you write:  The presence of neuroendocrine
10   tumour cells in adenocarcinomas has been a problem
11   in cancer classification for a long time?
12        A.   That is correct.
13        Q.   However, it is more likely than not
14   that the ECL cell is a cell of origin for gastric
15   carcinomas of the diffuse type.  Do you see that?
16        A.   Yes.
17        Q.   So your opinion is that the ECL cell is
18   the cell of origin for diffuse-type adenocarcinoma,
19   right?
20        A.   Correct.
21        Q.   And the basis for that opinion is that
22   diffuse-type adenocarcinomas have been shown to
23   exhibit neuroendocrine features or markers based on
24   immuno -- immunohistochemistry staining, right?
25        A.   Not only immunohistochemistry, but I

1    think in situ hybridization, too --

2         Q.   Understood.

3         A.   -- and in electron microscopy -- in

4    electron microscopic examination.

5         Q.   Now, you believe that neuroendocrine

6    markers are compatible with ECL cell origin,

7    correct?

8         A.   Correct.

9         Q.   But they're not definitive proof of ECL

10   cell origin, correct?

11        A.   I would say that it's the best way to

12   determine the origin.

13        Q.   Okay.  But excluding your own

14   publications, are you aware of any scientific

15   literature that says that if an adenocarcinoma

16   displays neuroendocrine markers, then it must have

17   originated from an ECL cell?

18        A.   For instance, signet-ring cell

19   carcinomas, there are more papers showing

20   neuroendocrine differentiation, possibly not -- not

21   necessarily ECL cell differentiation, but

22   neuroendocrine differentiation.  So I think that's

23   for signet-ring cells.  Signet-ring cell

24   carcinomas, the probability -- probability is

25   great.

Helge Waldum, M.D., Ph.D.

1      Q.   So there are publications -- I just
2  want to understand -- I understood what you said.
3  There are publications on signet-ring cell
4  adenocarcinomas that report that the presence of
5  neuroendocrine markers means that the ECL cell is
6  the cell of origin for that cancer?
7      A.   I -- I said that there are
8  neuroendocrine markers and -- but I don't remember
9  whether they concluded that they -- they were ECL
10 cell origin.
11     Q.   So that's where I'm focused.  I
12 understand there might be publications that talk
13 about neuroendocrine markers in signet cells.  But
14 there aren't any that discuss that those
15 neuroendocrine markers mean that the ECL cell was
16 the cell of origin, correct?
17     A.   It -- it depends on the markers,
18 whether they are specific for -- for ECL cells or
19 whether they are general neuroendocrine markers.
20     Q.   What's the process, then?  Maybe
21 it's -- I'm just confused.  What's the process for
22 definitively determining the cell of origin of a
23 tumor?
24     A.   If -- if you know the cell origin of a
25 tumor, you know by the regulation of its growth,

1   you will know how it develops.

2          Q.   But how do you determine the cell of

3   origin of a tumor?  What research do you need to do

4   to determine that?

5          A.   If you so -- if you show that the

6   cancer cells obtain fresh markers, then you can

7   reasonably -- be reasonably sure that -- of its

8   origin.

9          Q.   Have you done any genetic or epigenetic

10   testing to determine whether the ECL cell is the

11   cell of origin for diffuse gastric carcinomas?

12          A.   You touched upon previously.  It's

13   genetic classification of tumors.  It has not been

14   very successful, and it has not been adopted by

15   many.  And I think it has not been very useful for

16   treatment of cancers either.

17              That's -- this -- that classification,

18   mixed cause of gastric cancer and the Epstein-Barr

19   virus and mixed factors in the pathogenesis, that

20   is the genetic changes.  So I think that, then, to

21   do such a study, you must compare the -- the

22   genetic expression of normal ECL cell with the

23   cancer cells.  And that can be done.  And -- and I

24   have not done that -- that yet.

25          Q.   You have not compared the genetic

1   origin using --

2          A.   You -- you must compare with a

3   normal -- genetic expression in the normal cell and

4   compare it with a gastric cell.  You cannot say

5   from just doing a genetic examination of the

6   expression of a cancer cell, where it comes from,

7   if you don't know the possible cells of origin.

8          Q.   So you have not done that testing to

9   compare --

10         A.   I haven't done that.

11         Q.   Let me just finish my question.

12              You haven't done that testing to

13  compare the normal cell to the cancer cell to

14  determine the cell of origin, correct?

15         A.   No, I haven't.

16         Q.   And you haven't shown in any research

17  that ECL cells transform into stem cells, correct?

18         A.   That ECL cells --

19         Q.   -- transform into stem cells?

20         A.   No.

21         Q.   And let's switch to intestinal-type

22  adenocarcinoma, okay?

23         A.   It is --

24         Q.   I'm going to focus now on

25  intestinal-type adenocarcinoma, okay?

Helge Waldum, M.D., Ph.D.

```
 1          A.   Okay.  Okay.  Yeah.  Let -- let me --
 2   before we --
 3          Q.   Do you want to take a break?
 4          A.   -- stop -- stop -- no.
 5               Before we stop on the diffuse type, I
 6   think Wang had no hypothesis or idea how they
 7   developed, just --
 8          Q.   I did not understand what you said.
 9   There was no question --
10          A.   Tim --
11               MR. RESTAINO:  Let's just -- there's --
12   BY MS. DU PONT:
13          Q.   -- pending.
14               MR. RESTAINO:  Yeah's, there's no
15   answer -- no question pending.  So just --
16               THE WITNESS:  Okay.
17               MR. RESTAINO:  -- wait for her
18   question.
19               MS. DU PONT:  We'll just strike that.
20   BY MS. DU PONT:
21          Q.   Mr. Restaino will have an opportunity
22   at the end of the deposition to ask you questions.
23   So if you feel like you didn't get to explain
24   anything, he can ask you questions about that,
25   okay, Dr. Waldum?
```

1        A.    Okay.  Okay.

2        Q.    Dr. Waldum, the scientifically accepted

3   way by which intestinal-type gastric adenocarcinoma

4   develops is through the Correa pathway, right?

5        A.    Yes, yes.

6        Q.    Increased serum gastrin is not a factor

7   in the Correa pathway, correct?

8        A.    Correct.

9        Q.    And ECL cells are not a factor in the

10   Correa pathway, correct?

11        A.    That is correct.

12        Q.    And the intestinal-type gastric

13   adenocarcinoma originates from the stem cell,

14   correct?

15        A.    Probably correct.

16        Q.    And you believe the ECL cell plays a

17   role in the development of intestinal-type

18   adenocarcinoma; however, you acknowledge it is not

19   known whether this is due to a direct or indirect

20   effect on the stem cell, correct?

21        A.    It -- it is concerning gastrin.  I do

22   not know whether it is a direct or indirect effect

23   concerning ECL cell.

24        Q.    I -- I understand what you're saying.

25        A.    Yeah.  It is --

Helge Waldum, M.D., Ph.D.

1    Q.   You're saying it's not known whether

2  there's a direct effect upon the gastrin receptor

3  that is indirect -- sorry.  Let me -- let me

4  withdraw that question.

5    A.   That is correct.

6    Q.   Let me just ask the question so it's

7  clear.  You're saying you don't know whether it's a

8  direct effect on the gastrin receptor or an

9  indirect effect on the gastrin receptor that

10 influences the stem cell, correct?

11   A.   Yes.  That is correct.

12   Q.   So how can you conclude that the

13 gastric carcinomas of intestinal type most probably

14 originate from the stem cells secondary to

15 continuous overstimulation by, for instance, Reg

16 protein continuously overreleased by an increased

17 ECL cell mass due to hypergastrinemia?  How can you

18 conclude that if you don't know whether it's

19 indirect or direct?

20   A.   There has been found no gastrin

21 receptor on the stem cell.  That was -- but we know

22 that the stem cell must be include -- must be

23 included in the trophic effect of gastrin by

24 oxyntic mucosa, because all the cell types do

25 increase in -- in number, except the ECL cell that

1    increases much more than the other cells.

2            And Timothy Wang has not found any

3    gastrin receptor on the stem cell either.  But

4    hypergastrinemia induces ECL cell hyperplasia.  And

5    the ECL cells produces some substance like Reg

6    protein, having a trophic effect on the stem cell.

7    They produce basic fibroblast growth factor,

8    inducing --

9            THE REPORTER:  They produce what

10   factor?

11           THE WITNESS:  Basic fibro -- fibroblast

12   growth factor and then -- and also histamine, all

13   playing a role in the spread of cancers and causing

14   fibrosis.

15           And -- so if it's -- we must remember

16   that Helicobacter pylori, the main cause of gastric

17   cancer, do not cause cancer without having induced

18   oxyntic atrophy.  And concerning Correa cascade, it

19   is recently disputed whether the metaplasia

20   actually plays any role in that carcinogenesis or

21   whether it's just a marker of cancer.

22           Now, many, even American, publications

23   on that talk -- again, you have this gastric

24   atrophy, and -- and does it have a direct effect on

25   the stem cell, or is it via gastrin, ECL cell and

Helge Waldum, M.D., Ph.D.

1    Reg protein.  You have -- you have a cascade there

2    that is difficult to say what is correct.

3    BY MS. DU PONT:

4          Q.   So if I'm understanding you correctly,

5    Doctor, this theory that the ECL cell may somehow

6    be stimulating the stem cell, that's just a

7    hypothesis on your part, correct?

8          A.   Yeah.

9          Q.   You agree that the role of the Reg

10   protein, if any, in gastric cancer has not been

11   established as an accepted way by which

12   intestinal-type adenocarcinoma develops?

13         A.   Correct.

14         Q.   Are you aware of any literature that

15   Reg proteins may be markers of inflammation?

16         A.   No.  Not -- not all Reg proteins, at

17   least.  There's four different Reg proteins.

18              MS. DU PONT:  Why don't we take a break

19   at this point.  I know we've been going for a

20   while.

21              THE VIDEOGRAPHER:  The time now is

22   12:15 p.m.  We are off the record.

23                          *  *  *

24              (Whereupon, there was a recess in the

25   proceedings from 12:15 p.m. to 12:31 p.m.)

Helge Waldum, M.D., Ph.D.

```
 1                        * * *

 2              THE VIDEOGRAPHER:  The time now is

 3   12:31 p.m.  We are back on the record.

 4   BY MS. DU PONT:

 5        Q.   Okay, Dr. Waldum.  I'm switching gears

 6   a little bit, and I want to just talk about gastric

 7   cancer and PPIs.

 8              If a patient takes PPIs and develops

 9   gastric cancer, regardless of type, location, how

10   long they were taking the PPI, will you always say

11   that PPIs were the cause or contributor to their

12   gastric cancer?

13        A.   No.

14        Q.   So under what circumstances would PPIs

15   not be a cause of gastric cancer?

16        A.   Short-term use.

17        Q.   What is short term?

18        A.   A few months.

19        Q.   How long does a patient have to take

20   PPIs for you to consider it a cause of gastric

21   cancer?

22              MR. RESTAINO:  Object to form.

23              THE WITNESS:  As we were discussing

24   before, it depends when the patient have any

25   condition that predisposes to gastric cancer
```

Helge Waldum, M.D., Ph.D.

1  before; for instance, that they had Helicobacter

2  pylori.  Whether eradicated or whether he still has

3  Helicobacter pylori infection, the times will --

4  the time will be shorter until the tumor develop.

5  BY MS. DU PONT:

6      Q.   How about -- so if they do have

7  H. pylori infection, how long do they have to take

8  a PPI for you to consider it a cause of their

9  gastric cancer?

10      A.   We have the Cheung study from Hong Kong

11  showing increase to this during the first -- I

12  think increasing risk with time from Year 1 or 2

13  until Year 7 in that study, and that is probably

14  the correct answer.

15      Q.   So the patient has to have taken a PPI

16  for at least a year if they've had an H. pylori

17  infection for you to consider it a cause of their

18  gastric cancer?

19      A.   It is no absolute limits, you know.  It

20  is -- but the longer you take it, the higher the

21  risk.  And the -- the shorter you use it, the lower

22  the risk.  But it's probably a continuous spectrum.

23      Q.   I understand there's no absolutes in

24  medicine.  But in your -- in your experience as a

25  gastroenterologist, and given your knowledge about

1    PPIs and cancer, would you agree with me that
2    less-than-one-year use is not enough to say that
3    PPIs cause cancer -- or cause gastric cancer in a
4    patient with an H. pylori infection?
5         A.   As I said, it -- it could have speeded
6    up the growth.  So it's apparently caused it, but I
7    wouldn't say that it caused it.  It just made it
8    grow faster.
9         Q.   Are there locations -- so -- so -- hold
10   on one second.
11        Other -- in -- in patients that don't
12   have H. pylori infection, how long do they have to
13   take a PPI before you would consider it a cause of
14   their gastric cancer?
15        A.   Again, no absolute limits, but I would
16   say that -- eight, ten years.
17        Q.   Okay.  Are there locations of gastric
18   cancer -- locations in the stomach where gastric
19   cancer occurs where you would say PPIs were not a
20   cause of their cancer?
21        A.   If you are sure that the tumor appeared
22   in the antral mucosa, I would say that it didn't
23   cause it.  But as I said previously, the oxyntic
24   glands are deeper into the antral area than
25   previously realized.  But neopylorus, I wouldn't

1    say that PPIs could play any role.

2         Q.   So if a cancer -- gastric cancer

3    occurred at the esophageal junction, would you say

4    that PPIs were the cause?

5         A.   If it originated in the esophagus, I

6    wouldn't say.

7         Q.   If it originated where?

8         A.   In the esophageal mucosa, Barrett's, I

9    would say not.

10        Q.   If the cancer -- so just so the court

11   reporter heard and I understand for the record, if

12   the cancer originated in the esophagus, you would

13   not say PPIs caused that cancer?

14        A.   Correct.

15        Q.   If the -- would you rule out that PPIs

16   don't cause lymphomas?

17        A.   I -- I do not believe they cause

18   lymphomas.

19        Q.   Is there any other type of

20   adenocarcinoma that you would say PPIs do not

21   cause?

22        A.   In the stomach or everywhere?

23        Q.   Sorry.  Let me rephrase my question.

24             Are there any other locations in the

25   stomach for -- that you would say PPI -- stop

1    again.  Let me withdraw that.

2              If we're talking about gastric

3    adenocarcinoma --

4         A.   Yes.

5         Q.   -- are there any locations in the

6    stomach where you would rule out PPIs as a

7    potential cause, other than in the antral mucosa?

8         A.   No.

9         Q.   Okay.  I'm going to direct you to your

10   report at Page 111.

11             MS. DU PONT:  Can you scroll down?

12   BY MS. DU PONT:

13        Q.   Here at the last sentence, you write:

14   It is beyond the scope of this expert report to

15   discuss the epidemiology in detail.  Do you see

16   that?

17        A.   Yes.

18        Q.   And the reason why you're not going to

19   discuss the epidemiology in detail is because

20   you're not an epidemiologist, correct?

21        A.   Correct.

22        Q.   You don't consider yourself to be an

23   expert in epidemiology, correct?

24        A.    I will not say expert, but I can

25   evaluate papers when they appear.  But I would not.

 1    We have an epidemiologist, and he invests the

 2    resource.

 3         Q.   You'll -- you'll leave the

 4    determination about the value of the epidemiology

 5    to the epidemiologists, correct?

 6         A.   Yes --

 7         Q.   And --

 8         A.   -- as I leave the pathology to the

 9    pathologists.

10         Q.   Right.

11              And you believed -- even before there

12    were observational studies reporting an association

13    between gastric cancer and PPIs, you believed that

14    PPIs could possibly cause gastric cancer, correct?

15         A.   Correct.

16         Q.   And regardless of the -- of the

17    epidemiology, whether it said it -- whether it

18    reported an association or not, would you still

19    conclude that PPIs are a possible cause of gastric

20    cancer?

21         A.   I -- well, I -- I will adapt according

22    to the facts that appear, but presently, it's too

23    short a time to change this idea.

24         Q.   So --

25         A.   Because -- because cancer is such a

1   long-term process, cancer development, it's far too

2   early to say that they do not cause cancer.

3         Q.   So the observational studies that

4   discuss the association between PPIs and gastric

5   cancer are too short to inform your opinion on

6   whether PPIs cause gastric cancer?

7              MR. RESTAINO:  Object to form.

8              THE WITNESS:  Especially the -- the

9   study by Moayyedi on the large study, the

10  randomized study.  It was such a short time that I

11  would not rely much on that study, because I think

12  the minimum time was about three years, and that is

13  far too short to exclude that PPIs cause gastric

14  cancer.

15  BY MS. DU PONT:

16        Q.   So is your opinion about -- so is your

17  opinion that PPIs cause gastric cancer based solely

18  on the animal studies?

19        A.   No.

20             MR. RESTAINO:  Object to form.

21             THE WITNESS:  No.

22  BY MS. DU PONT:

23        Q.   Okay.

24        A.   They are on the studies in man, and

25  especially, I talked about the Spanish family.

1    Anyway, that should be sufficient alone to say that

2    PPIs cause gastric cancer.

3         Q.   But going back to my question on the

4    observational studies, I'm not asking about the

5    randomized controlled clinical trials.  I'm asking

6    about the observational studies.

7         A.   Yes.

8         Q.   Are those observational studies too

9    short to assess whether or not PPIs cause gastric

10   cancer?

11             MR. RESTAINO:  Object to form.

12             THE WITNESS:  I missed information

13   about the dose of PPIs, for instance.  And, also,

14   there are confounding factors in some of these

15   studies that make that conclusion difficult to

16   accept.

17   BY MS. DU PONT:

18        Q.   I think -- I think I just lost you

19   there.  Can you repeat your answer?

20        A.   And there are confounding factors in

21   many of these studies that make the conclusion

22   uncertain.

23        Q.   So would you agree with me that the

24   observational studies that look at PPIs and gastric

25   cancer show an association but are insufficient to

1    show causation?

2              MR. RESTAINO:  Objection.

3              THE WITNESS:  They suggest a causation,

4    but most of them do not prove it.

5    BY MS. DU PONT:

6         Q.   I want to turn to Mr. Baudin for a

7    second here.  You write in your report that you

8    reviewed the germane records for Mr. Baudin.  What

9    do you mean by "germane"?

10        A.   Where did you --

11        Q.   If we look at Page --

12             MS. DU PONT:  Why don't we go to his

13   report -- it's still up on the screen -- to

14   Page 141, which is 142 of the PDF.

15   BY MS. DU PONT:

16        Q.   The first sentence says:  I have

17   reviewed the germane medical records pertaining to

18   the patient, Stanley Baudin.

19        A.   Yes.

20        Q.   What does -- what do you mean by

21   "germane"?

22        A.   The most important.

23        Q.   So you did not review all of the

24   medical records for Mr. Baudin?

25        A.   I didn't get all of them.

1      Q.   How do you know you didn't get all of

2  them?

3      A.   I recognized when I saw Wang's and --

4  report that -- records that I hadn't got.

5      Q.   So you understood when you saw

6  Dr. Wang's report that he had reviewed more medical

7  records for Mr. Baudin than you had?

8      A.   Yes.

9      Q.   So it's your -- is -- did you review

10 all of the medical records that the plaintiff's

11 counsel for Mr. Baudin provided to you?

12     A.   I looked at all what I could.

13     Q.   All that was provided to you, you

14 reviewed?

15     A.   Yes.  Yeah.

16     Q.   But it's your understanding, from

17 reviewing Dr. Wang's report, that there are

18 additional medical records for Mr. Baudin that you

19 have not reviewed, correct?

20     A.   Correct.

21     Q.   And have you asked to see those

22 records?

23     A.   I have not asked for them --

24     Q.   Okay.

25     A.   -- though I -- but I think the

```
 1    important records I have seen.
 2         Q.   When did you first receive the records
 3    for Mr. Baudin?
 4         A.   In -- I think in November '21.
 5         Q.   And did you review them shortly after
 6    receiving them?
 7         A.   Yes.
 8         Q.   Did you -- when you finished your
 9    review for Mr. Baudin's case, did you think there
10    was any medical record that was missing that you
11    would have liked to have seen?
12         A.   It wasn't obvious to me that I hadn't
13    got everything, but I think that there were some
14    uncertainties about what has happened about his
15    records.  I had some difficulties with them.  But,
16    no, I think that after I've seen the other records,
17    I feel quite confident that I haven't missed
18    anything of importance.
19         Q.   Did you ever meet Mr. Baudin?
20         A.   Never.
21         Q.   And I assume you haven't met his wife,
22    Pamela, either?
23         A.   What?
24         Q.   And you haven't met his wife, Pamela,
25    either, correct?
```

```
 1          A.    No.  No.
 2          Q.    Have you talked to any of Mr. Baudin's
 3   healthcare providers?
 4          A.    No.
 5          Q.    And you reviewed the report of
 6   Dr. Mjønes, who reviewed Mr. Baudin's pathology at
 7   your request, correct?
 8          A.    Yes.
 9          Q.    You did not review his pathology
10   yourself, correct?
11          A.    Correct.
12          Q.    Can we agree that Mr. Baudin had GERD?
13          A.    Yes.  But -- but at the time of
14   operation, he had very minor esophagitis, and he
15   had no Barrett's esophagus.  Although, during
16   endoscopy, it was claimed that the -- that the
17   endoscopist saw Barrett's esophagus.  But he did
18   not describe any sharp border between squamous
19   epithelium --
20               THE REPORTER:  I'm sorry.  He did not
21   describe --
22               THE WITNESS:  -- and --
23               THE REPORTER:  -- any what?
24               THE WITNESS:  He -- he didn't find any
25   sharp border between squamous epithelium and
```

1    columnar epithelium that is the usual finding in

2    Barrett's esophagus.  And in the pathological --

3    report of pathology, nobody mentioned Barrett's

4    esophagus findings.

5              So I would say he had no Barrett's

6    esophagus presently.  Perhaps it could be due to

7    the effect of PPIs.

8    BY MS. DU PONT:

9         Q.   So let's get to the Barrett's esophagus

10   in a little bit.  I'm just -- I just want to focus

11   on whether or not he had GERD in the first place,

12   okay?  Do you know when his GERD first started?

13        A.   It was diagnosed in 2002, but he had --

14   had symptoms some years before.

15        Q.   Do you understand that he himself

16   indicated that he first started experiencing

17   symptoms in the late 1990s?

18        A.   Yes.

19        Q.   And initially, he took over-the-counter

20   medications to treat it, such as Tums and Rolaids?

21        A.   Yes.

22        Q.   Do you know if he saw a doctor prior to

23   2002 for his GERD?

24        A.   I don't know.

25        Q.   Did you receive the -- the records from

1    a Dr. Traxler?

2         A.    No.

3         Q.    So you don't know that Dr. Traxler

4    diagnosed him with GERD in 2000, as I understand?

5         A.    No.  But he had symptoms, so I'm not

6    surprised.

7         Q.    But you do know that in 2002 he saw a

8    gastroenterologist, Dr. McClelland, who performed

9    an upper GI endoscopy for Mr. Baudin?

10        A.    Yes, I have seen that record.

11        Q.    And in that record, Dr. McClelland

12   found definite evidence of gastroesophageal reflux

13   disease.  Do you know that?

14        A.    Yes.

15        Q.    And you agree that Mr. Baudin had

16   definite evidence of gastroesophageal reflux

17   disease, correct?

18        A.    Yes.

19        Q.    And that you actually specifically note

20   in your report that he had two strips of erythema

21   in the distal esophagus?

22        A.    Yes.

23        Q.    And you also note in your report that

24   he identified -- or Dr. McClelland identified a

25   hiatal hernia of approximately 3 to 4 centimeters

Helge Waldum, M.D., Ph.D.

1    in 2002, right?

2          A.   Yes.  Yes.

3          Q.   And even though the hernia was only

4    diagnosed in 2002, would you agree with me that

5    Mr. Baudin likely had that hernia prior to 2002?

6          A.   Some years longer before.

7          Q.   And in 2002, Dr. McClelland actually

8    suggested that Mr. Baudin was a candidate for

9    hernia repair.  Do you know that?

10         A.   Yes.

11         Q.   Why didn't you note that in your expert

12   report?

13         A.   I thought that it was not relevant to

14   this case because he didn't have any operations or

15   surgery.

16         Q.   But you would agree with me -- I mean,

17   we talked about this earlier -- that studies show

18   that patients with hiatal hernia tend to have more

19   serious GERD than patients that do not have hiatal

20   hernias, right?

21         A.   Right.

22         Q.   So the hiatal hernia here in

23   Mr. Baudin's place -- case played a significant

24   role in his ongoing GERD, right?

25         A.   Correct.

1    Q.   Now, your report then skips from 2002

2  to 2017.  Did you consider anything between 2002 to

3  2017 relevant?

4    A.   The question -- he used Nexium most of

5  the time.  I think he tried to change medication

6  once or twice, but it appears that Nexium was the

7  most efficient and use -- made the conclusion that

8  he used it all the time.

9    Q.   And you would agree with me that

10  between 2002 and 2017 Mr. Baudin's doctors

11  consistently determined that staying on a PPI was

12  appropriate for Mr. Baudin because of his chronic

13  reflux, correct?

14    A.   I suppose that is correct.

15    Q.   Why do you say you suppose?

16    A.   I don't know what every doctor had said

17  to him.  But as I can see from -- I haven't any

18  information that it is not correct.

19    Q.   So you have no reason to disagree that

20  his doctors thought it was appropriate for him to

21  stay on a PPI, correct?

22    A.   That's correct.  That's correct.

23    Q.   And are you aware that at least two of

24  Dr. Baudin's doctors recommended or discussed

25  antireflux surgery with him?

Helge Waldum, M.D., Ph.D.

```
1            A.    Once more.

2            Q.    Were you aware that two of Dr. Baudin's

3      doctors discussed antireflux surgery with him?

4            A.    No.

5            Q.    No, you were not aware of that?

6            A.    No.

7            Q.    Well, we know that Dr. McClelland

8      discussed antireflux surgery with him.  Did you

9      review the -- the records for Dr. McClelland?

10           A.    No.  No.

11           Q.    You did not review the records from

12     Dr. McClelland?

13           A.    No.  I don't remember that.

14           Q.    And did you review the records for

15     Dr. Chauvin?

16           A.    No.  I don't remember.

17           Q.    Do you know that -- that Dr. Baudin --

18     sorry -- that Mr. Baudin never had GERD surgery?

19           A.    I -- I know he had never GERD surgery.

20     That's correct.

21           Q.    Would you agree with me that it was --

22     that PPIs were an appropriate treatment for

23     Mr. Baudin's long-standing GERD?

24                 MR. RESTAINO:  Objection.

25                 THE WITNESS:  Yes.
```

1    BY MS. DU PONT:

2         Q.    Now, you note in your report that

3    Mr. Baudin saw a Dr. Tabor in 2017?

4         A.    Yes.

5         Q.    And do you know if Dr. Tabor is

6    actually a gastroenterologist?

7         A.    I thought he was a surgeon.

8         Q.    Yes, he is a surgeon.

9               And you're aware that in August of 2017

10   Dr. Tabor was told by Mr. Baudin that he had a

11   hiatal hernia and had severe GERD symptoms?  Do you

12   know that?

13        A.    Yes.

14        Q.    And do you know how much Mr. Baudin

15   weighed in August of 2017?

16        A.    I have difficulties with that.  We are

17   not using kilo.

18        Q.    Ah.  Do you know whether he was obese

19   at the time of -- in -- in August of 2017?

20        A.    I think he was a little overweight, at

21   least.

22        Q.    BMI was over 30.  Would that make him

23   obese?

24        A.    Yes.

25        Q.    So if the medical records show that he

```
 1   was -- had a BMI of over 30 in August of 2017, you

 2   would consider him obese, correct?

 3        A.   Uh-huh.

 4        Q.   Yes?

 5        A.   Yes.

 6        Q.   Now, you understand that on

 7   September 12th, 2017, Dr. Tabor performed an

 8   endoscopy, and during that procedure he

 9   confirmed -- and let's just pull up the endoscopy

10   report to make it easier.

11             MS. DU PONT:  It's Exhibit 210, and

12   we'll mark that -- sorry -- 110, and we'll mark

13   that for the record.

14             (WALDUM EXHIBIT 110, Medical record,

15   FMOL Health System, dated 9/12/17, Bates

16   Defendants000487-488, was marked for

17   identification.)

18             MS. DU PONT:  Please scroll down a

19   little bit.

20   BY MS. DU PONT:

21        Q.   Do you see here that the preoperative

22   diagnosis from this September 12th, 2017, procedure

23   was gastroesophageal reflux and hiatal hernia?  Do

24   you see that that was the indication for the

25   endoscopy?
```

```
 1        A.    Yes.

 2        Q.    And the first postoperative diagnosis

 3   states:  Gastroesophageal reflux with changes at

 4   the gastroesophageal junction consistent with

 5   Barrett's and mild esophagitis.  Do you see that?

 6        A.    I see that.  And I commented on that

 7   before, that he -- he made a diagnosis of Barrett's

 8   esophagus made just on the color of the distal

 9   esophagus mucosa.  And he did not say anything

10   about a sharp border between esophageal squamous

11   epithelium and this so-called Barrett's esophagus

12   metaplasia.  That was strange to me.  And as I --

13   at the operation, Barrett's esophagus was not found

14   or at least described.  So that is -- I don't think

15   he had Barrett's esophagus.

16        Q.    So you're saying, despite Dr. Tabor

17   saying that he saw in the -- while doing the

18   procedure a -- something that looked consistent

19   with Barrett's, you disagree with his -- his

20   statement, that there was not something consistent

21   with Barrett's here?

22        A.    I mean that it should have been -- it

23   should have been described a sharp border between

24   metaplastic mucosa and squamous epithelium.  He

25   didn't say anything about that.  He just say --
```

1    said that the color could indicate Barrett's

2    esophagus.

3              And, also, Barrett's esophagus should

4    be -- should have been diagnosed histologically.

5    And I haven't found any indications that there was

6    any Barrett's esophagus in what was taken out at

7    the operation.

8         Q.   You've performed -- well, first of all,

9    the -- the report says that -- that the changes

10   were consistent with Barrett's esophagus.  It

11   doesn't say that the changes were not

12   significant [sic] with Barrett's esophagus,

13   correct?

14        A.   But -- but --

15        Q.   Is that yes or no?

16        A.   Barrett's esophagus should be -- here,

17   it should have been easily shown what they did --

18   esophageal (indiscernible) removed the proximate

19   part of the stomach.  It must --

20        Q.   So --

21        A.   -- contain the -- the area of Barrett's

22   esophagus.  But I haven't found any description of

23   it in the histological evaluation.

24        Q.   But he -- Dr. Tabor, all he wrote was

25   that it was consistent with Barrett's.  He didn't

```
 1    say one way or another -- describe how it wasn't
 2    consistent with Barrett's, did he?
 3        A.    I think that it's difficult to accept
 4    this description that is not quite clear, and you
 5    haven't -- histology is what matters here, I would
 6    say.
 7        Q.    But in -- in your report, Dr. Waldum --
 8        A.    Yes.
 9        Q.    -- all you said about the pathology at
10    the time of the endoscopy was that:  Mild
11    esophagitis with macroscopically visits [sic]
12    Barrett's intestinal metaplasia was found.
13            That's all you said in your report,
14    right?
15        A.    Yes.  It may be, but I will say now
16    that it should have been found in -- in the tissue
17    examination after operation.
18        Q.    So you have a new opinion here today
19    for the first time that it should have been found
20    endoscopically -- or sorry -- pathologically --
21        A.    By histology.
22    BY MS. DU PONT:
23        Q.    -- by --
24            MR. RESTAINO:  Let her -- let her ask
25    her question.
```

```
 1                    THE WITNESS:  It should have been --
 2   BY MS. DU PONT:
 3        Q.   That's a new opinion today, right?
 4                    MR. RESTAINO:  Objection.
 5                    THE WITNESS:  It should have been found
 6   in the histological preparations.
 7   BY MS. DU PONT:
 8        Q.   You know, you -- you told me -- you
 9   told me earlier that you didn't have any new
10   opinions to offer today, and now I'm in the last
11   hour of my deposition, and you're telling me a new
12   opinion about histology.
13        A.   Okay.
14                    MR. RESTAINO:  Objection.
15   BY MS. DU PONT:
16        Q.   So let's -- let's go back to the
17   record.  He, meaning Dr. Tabor, noted a 4- to
18   5-centimeter hiatal hernia --
19        A.   Correct.
20        Q.   -- with wide-open gastroesophageal
21   junction and virtually no valve remaining.
22        A.   Correct.
23        Q.   Do you see that?
24        A.   Yeah.
25        Q.   Which means he had a very large and
```

```
 1    severe hiatal hernia, correct?

 2         A.    Correct.

 3         Q.    And during the endoscopy, at the bottom

 4    of the page, Dr. Tabor identified three polyps

 5    inside of the hiatal hernia, correct?

 6         A.    That is correct.

 7         Q.    And he specifically writes:  We

 8    immediate --

 9               MS. DU PONT:  Stop for a second.

10    BY MS. DU PONT:

11         Q.    We immediately noticed a moderate to

12    large hiatal hernia with a significant part of the

13    stomach above the diagram -- diaphragm.  Do you see

14    that?

15         A.    Correct.  Correct.

16         Q.    And upon entering the intrathoracic

17    portion of the stomach -- what is that?

18         A.    What -- what did you ask me?

19         Q.    What is the intrathoracic portion of

20    the stomach he's referring to above the diaphragm?

21         A.    That -- that is just a hiatal hernia.

22         Q.    No.  I'm asking, what does he mean by

23    "the intrathoracic portion of the stomach that was

24    above the diaphragm"?  What is he describing?

25         A.    He's describing the hiatal hernia.
```

Helge Waldum, M.D., Ph.D.

```
 1        Q.   The location of the hiatal hernia,
 2   correct?
 3        A.   Yeah.
 4        Q.   Which was in the -- the highest part of
 5   the stomach, right at the -- at the junction,
 6   correct?
 7        A.   It was -- the hernia is at the high
 8   part of the stomach, and it was in the thorax and
 9   not in the abdomen.
10        Q.   And immediately upon entering the
11   stomach, he noticed three 1-centimeter polyps,
12   correct?
13        A.   He is writing that, but I have seen
14   records that three polyps were recognized -- were
15   found in the hiatal hernia about 3 centimeter
16   distal to the gastroesophageal junction.
17        Q.   But this record here states that:  Upon
18   entering the intrathoracic portion of the stomach
19   that was above the diaphragm, he immediately
20   noticed three 1-centimeter polyps.  Correct?
21        A.   That's correct.  But before the
22   operation, he -- he said that -- he -- he wrote
23   that the polyps were about 3 centimeter distal.
24        Q.   And we'll get to that one.  That's --
25        A.   Yeah.
```

 1          Q.   That's a different report.  We're

 2    getting there.

 3          A.   Yeah.  Okay.

 4               MS. DU PONT:  Let's pull up

 5    Exhibit 111, which is the pathology report from the

 6    endoscopy.

 7               (WALDUM EXHIBIT 111, Surgical Pathology

 8    Report dated 9/12/17, Pathology Group of Louisiana,

 9    Bates Defendants000024-026, was marked for

10    identification.)

11               MR. GALLANT:  Julie, was the -- before

12    you get into this one, I don't think the last

13    exhibit was put into the chat.

14               MS. DU PONT:  Oh, okay.

15               Can you put Exhibit 110 into the

16    chat --

17               MR. GALLANT:  It's there now.

18               MS. DU PONT:  -- along with

19    Exhibit 111.

20               THE VIDEOGRAPHER:  I just added them

21    both.

22               MS. DU PONT:  Thank you.

23               MR. GALLANT:  Thank you.

24    BY MS. DU PONT:

25          Q.   Do you recognize this surgical

1   pathology report for -- for Mr. Baudin?

2        A.   Yes.

3        Q.   And it's dated September 12th, 2017; do

4   you see that?

5        A.   What --

6        Q.   Date collected and received,

7   September 12th, 2017, which is the date of the

8   endoscopy?

9        A.   Yeah.  Date collected, 12th of

10  September.

11       Q.   Okay.

12       A.   Yeah.

13            MS. DU PONT:  And if we scroll down to

14  the final pathologic diagnosis.  Stop.

15  BY MS. DU PONT:

16       Q.   Do you see that the final diagnosis

17  based on the pathology was focal intramucosal

18  adenocarcinoma arising from high-grade gastric

19  adenomatous dysplasia?

20       A.   Yes.

21       Q.   And nothing in this pathology report

22  discusses ECL cell hyperplasia, correct?

23       A.   They -- they didn't look for it.

24       Q.   But there's nothing in the report about

25  it, right?

```
 1          A.    No.   They can't find it if they -- they
 2    don't look for it.
 3          Q.    And nothing in the report by
 4    Mr. Baudin's treating pathologists refers to
 5    neuroendocrine features, correct?
 6          A.    The same; that if you don't look for
 7    it, you don't find it.
 8          Q.    And they didn't find it, and they
 9    didn't write about it in their report, correct?
10          A.    Correct.
11          Q.    And are you aware that the treating
12    pathologist determined that doing additional
13    staining to look for neuroendocrine markers was not
14    clinically indicated?
15          A.    Yes.
16          Q.    And you're aware that your colleague --
17    or are you aware that your colleague, Dr. Mjønes,
18    has testified that she agreed that looking for
19    neuroendocrine markers was not clinically
20    indicated?
21          A.    What that Mjønes said?
22          Q.    She said -- she agreed with the
23    treating pathologist, that doing additional
24    staining to look for endocrine -- neuroendocrine
25    markers was not clinically indicated here.
```

```
 1                    MR. RESTAINO:  Objection.
 2                    THE WITNESS:  If -- if you know that
 3      the patients have been on PPIs for such a long
 4      time, it is clinically indicated.
 5      BY MS. DU PONT:
 6           Q.   So you disagree with both the treating
 7      pathologist and Dr. Mjønes?
 8           A.   Yes.
 9           Q.   And this states that the polyp --
10                    MS. DU PONT:  If we can -- oh, no, you
11      don't have to scroll down.  I'll just withdraw that
12      question.
13      BY MS. DU PONT:
14           Q.   This states that the polyp with the
15      cancer arose in an adenoma, right?
16           A.   Yes.
17           Q.   And as discussed, Dr. Mjønes, who you
18      asked to review Mr. Baudin's pathology, confirmed
19      that the cancer arose in the adenoma polyp --
20           A.   Yes.
21           Q.   -- correct?
22           A.   Yes.
23           Q.   Now, turning back to the pathology
24      report, a set of genetic tests were performed.  Do
25      you see that?
```

```
 1                MS. DU PONT:  Oops.  Sorry.  Yeah.
 2    BY MS. DU PONT:
 3        Q.   Do you see how cytogenetic tests were
 4    performed?
 5        A.   Yes.
 6        Q.   And the comments said there was
 7    aneuploidy and increased copies of Number 17
 8    chromosome and increased copies of HER2/neu.  Do
 9    you see that?
10        A.   Yes.
11        Q.   Is this consistent with -- like, the
12    type of gastric cancer we talked about earlier, the
13    chromosomal and stable gastric cancer?
14        A.   It could be.
15        Q.   Is there anything in this report that
16    indicates it's any other type of gastric cancer
17    based on its molecular subtype -- molecular
18    testing?
19        A.   As I said, molecular changes in
20    cancers, they occur, and it's difficult to go from
21    them back to the cell origin.
22                MS. DU PONT:  Let's -- let's pull up
23    Exhibit 113.
24                (WALDUM EXHIBIT 113, Medical record,
25    FMOL Health System, dated 9/21/17, Bates
```

1  Defendants000447-462, was marked for

2  identification.)

3  BY MS. DU PONT:

4       Q.   This is an office visit that Mr. Baudin

5  had with Dr. John Tabor.  Do you see that?

6       A.   Yes.  What is the date?

7       Q.   It's dated September 21st, 2017.  Do

8  you see that at the top of the page?

9       A.   Uh-huh.

10           MS. DU PONT:  And if we -- yeah, thank

11  you.

12           THE WITNESS:  Yes.

13  BY MS. DU PONT:

14       Q.   Have you seen this before?

15       A.   I think so.

16       Q.   And if we go to the next page and

17  scroll down, do you see the "Subjective Patient ID:

18  Stanley Baudin is a 52-year-old male"?  Do you see

19  where I'm reading from?  Do you see?

20       A.   Yes.

21       Q.   And under that, it says:  He returns

22  today to discuss the results of his recent CT scan

23  and biopsy results from his recent upper endoscopy.

24  He has a biopsy-proven adenocarcinoma in the very

25  proximal stomach.

Helge Waldum, M.D., Ph.D.

1         A.    Yes.

2         Q.    Do you see that?

3         A.    Yes.

4         Q.    So Dr. Tabor is again noting that the

5   location of Mr. Baudin's tumor was in the very

6   proximal stomach, agree?

7         A.    But that doesn't say anything about was

8   it 1 centimeter, 3 centimeter.  It would be the

9   same, I think, unless you can see:  There were

10  three separate 1-centimeter polyps, all within

11  approximately 3 to 4 centimeter of one -- of one

12  another.

13        Q.    Yes.

14        A.    We do not know which of these polyps

15  that the carcinoma was situated.  So it is a little

16  difficult to say the exact place of the adenomatous

17  polyp because he -- the surgeon couldn't complete

18  his endoscopy because of the problems breathing.

19        Q.    Okay.

20        A.    And that is -- that is a pity.

21        Q.    All I was asking is if Mr. -- if

22  Dr. Tabor in this note describes the -- the

23  adenocarcinoma was in the very proximal stomach.

24  You agree that that's what he writes, correct?

25        A.    Yes, I agree with that.

Helge Waldum, M.D., Ph.D.

1      Q.   And you know that following this

2  endoscopy Mr. Baudin then had a surgery where his

3  distal esophagus, proximal stomach and greater

4  omentum were removed, correct?

5      A.   Yes.

6           MS. DU PONT:  And let's pull up the

7  surgical pathology report from that surgery.  It's

8  Exhibit 115.

9           (WALDUM EXHIBIT 115, Surgical Pathology

10  Report dated 10/7/17, Pathology Group of Louisiana,

11  Bates Defendants000021-023, was marked for

12  identification.)

13  BY MS. DU PONT:

14      Q.   And this is the surgical pathology

15  report from October 7th, 2017.  Do you recognize

16  this document?

17      A.   Yes, I have seen it many times.

18      Q.   And you noted in your report that this

19  pathology report noted a focal residual

20  intramucosal adenocarcinoma, correct?

21      A.   Yes.

22      Q.   And this was most likely at the site of

23  one previous removed polyp localized to the hernia,

24  correct?

25      A.   Yes.

Helge Waldum, M.D., Ph.D.

```
 1          Q.   And a biopsy of one of the three polyps

 2    detected gastric adenocarcinoma, correct?

 3          A.   Before surgery, yes.

 4               MS. DU PONT:  And let's pull up

 5    Exhibit, actually, 114.

 6               THE WITNESS:  Did you find anything

 7    about the esophagus or Barrett's in this

 8    particular --

 9    BY MS. DU PONT:

10          Q.   Hold on.  We're not -- we're going to

11    come back to the pathology report.  Let me just ask

12    something else first.

13               (WALDUM EXHIBIT 114, Medical record,

14    FMOL Health System, dated 10/5/17, Bates

15    Defendants000978-980, was marked for

16    identification.)

17    BY MS. DU PONT:

18          Q.   This is Dr. Tabor's operative note from

19    October 5th, 2017.  Do you see that?

20          A.   Yes.

21          Q.   And if we scroll down a little bit

22    further on the page, under "Indications" --

23          A.   Yes.

24          Q.   -- it says, the second sentence:  At

25    the time of endoscopy, he was found to have an
```

1   adenocarcinoma of the proximal stomach within 3

2   polyps approximately 3 centimeters distal to the GE

3   junction.

4           A.   Yeah.  It is -- 3 centimeter is

5   important, isn't it?

6           Q.   And it is.  Because according to your

7   own definition, this qualifies as a gastric cardia

8   cancer, correct?

9               MR. RESTAINO:  Objection.

10              THE WITNESS:  He had 2 centimeter.

11  BY MS. DU PONT:

12          Q.   Well, let's go back to your report,

13  Page 51.

14              MS. DU PONT:  Keep scrolling down.

15  Hold on.  I'm going to -- scroll up again.  Scroll

16  up a little further.  I think it's at the top of

17  the page.  We missed it.  Hold on one second.  Oh,

18  sorry.  It's -- it's Page 51 of the PDF, not 52.

19  BY MS. DU PONT:

20          Q.   See where it starts --

21              MS. DU PONT:  Scroll back.  Sorry.

22  Scroll back.

23  BY MS. DU PONT:

24          Q.   So we talked about this earlier,

25  Dr. Waldum.

1        A.    Okay.

2        Q.    At the bottom here, the -- the last

3    sentence that's -- that we can see, you wrote:  In

4    this context --

5        A.    Yeah, I -- I wrote --

6        Q.    Let me just -- let me just ask my

7    question, okay?

8              In this context, the entity of gastric

9    cardia cancers is defined as those cancers located

10   between 3 centimeters below and 2 centimeters above

11   the gastroesophageal junction line.

12             That's what you defined as the cardia

13   in your report, correct?

14       A.    It seems so.  Yes.

15       Q.    And so the fact that the cancer was

16   found approximately 3 centimeters distal to the GE

17   junction is consistent with your definition of a

18   cardia cancer, correct?

19             MR. RESTAINO:  Objection.

20             THE WITNESS:  It depends -- it depends

21   on whether -- this is the borderline.  Is it

22   3 centimeter?  Is it less than 3 centimeter?  Or is

23   3 centimeter included in the definition?

24   BY MS. DU PONT:

25       Q.    Your definition says 3 centimeters

Helge Waldum, M.D., Ph.D.

1    below is part of the cardia, correct?

2                MR. RESTAINO:  Objection.

3                THE WITNESS:  Between 3 centimeter

4    below and 2 centimeter.  Between is --

5    BY MS. DU PONT:

6        Q.   Above?

7        A.   Between is above.

8        Q.   So the record's clear, you're saying

9    that the cardia region is defined as 3 centimeters

10   below as well as 2 centimeters above the

11   gastroesophageal junction line, correct?

12               MR. RESTAINO:  Objection.

13               THE WITNESS:  I didn't say whether

14   3 centimeter is included or less than 3 centimeter.

15   Between should be less.

16   BY MS. DU PONT:

17       Q.   You say -- okay.

18               What your report states and what you've

19   already agreed to earlier today is that the entity

20   of gastric cardia cancer is defined as those

21   cancers located between 3 centimeters below and

22   2 centimeters above the esophageal junction line,

23   correct?  That's what you state in your report?

24       A.   It -- it is referring to the paper.

25       Q.   Okay.  That's what you state in your

1    report, though?

2         A.   Okay.

3         Q.   Now, we talked earlier about how

4    Dr. Mjønes reviewed the pathology for Mr. Baudin.

5    And let's go back to your discussion of Mr. Baudin

6    in your report.  Page 142.  It's probably 143 of

7    the PDF.

8              So on Page 142, this -- this represents

9    your interpretation of the pathology report that

10   you received from Dr. Mjønes, correct?  You state:

11   The --

12        A.   Yes.  Yes.

13        Q.   Yeah.  Okay.  You state:  The

14   histological material was examined by

15   Senior Consultant, Ph.D. Dr. Mjønes.  She agreed in

16   the final diagnosis of fundic gland polyps and

17   intramucosal adenocarcinoma, and in parentheses,

18   (high-grade dysplasia).  Correct?

19        A.   Yes.

20        Q.   And we talked earlier that the final

21   diagnosis of fundic gland polyps, those polyps are

22   benign polyps, right?

23        A.   They can become malignant --

24        Q.   They can be, but -- but in this case,

25   they were --

1      A.    They are -- they are benign now --

2      Q.    Okay.

3      A.    -- in this case.

4      Q.    And you state here that Dr. Mjønes

5    agreed with the final diagnosis of intramucosal

6    adenocarcinoma, correct?

7      A.    Yes.

8      Q.    And this means that Mr. Baudin had a

9    very early cancer, right?

10     A.    Correct.

11     Q.    And nobody, including Dr. Mjønes, said

12   Mr. Baudin had a carcinoid tumor, correct?

13     A.    Correct.

14     Q.    And nobody, including Dr. Mjønes, said

15   Mr. Baudin had a neuroendocrine tumor, correct?

16     A.    Correct.

17     Q.    And Dr. Mjønes identified Mr. Baudin's

18   pathology as intestinal type, according to the

19   Lauren's classification, right?

20     A.    Right.

21     Q.    And she was in agreement with the

22   treating pathologist on that point?

23     A.    Yes.

24     Q.    Next, you write in your report:  Of

25   interest, in her description are the findings of

1    the polyps consistent with hyperplastic polyps.

2              Do you see that?  It's the next

3    sentence after "high-grade dysplasia."

4         A.    Intestinal metaplasia?

5         Q.    So the next sentence after that says:

6    Of interest, in her description are the findings of

7    polyps --

8         A.    Yeah.

9         Q.    -- consistent with hyperplastic polyps.

10        A.    Yes, I see --

11        Q.    And are you aware that hyperplastic

12   polyps can develop in the cardia of patients with

13   GERD?

14        A.    I think they can, although seldom.

15        Q.    They can seldomly develop there?

16        A.    I believe that.

17        Q.    You then say:  Of importance is the

18   finding of parietal cells in the area of the tumor,

19   which, accordingly, started in the oxyntic mucosa.

20   Do you see that?

21        A.    Yeah.

22              MS. DU PONT:  And if we go to the next

23   page of the report.  Stop.

24   BY MS. DU PONT:

25        Q.    You -- you note that:  The tumor --

1    this is at the top of the page.

2          A.   Yes.

3          Q.   -- developed in the oxyntic mucosa

4    (the presence of parietal cells in the tissue

5    surrounding the tumor indicates that it's not a

6    cardiac cancer and, thus, not related to reflux

7    disease).  Do you see that?

8          A.   Yes.

9          Q.   But you would defer to Dr. Mjønes on

10   the significance or nonsignificance of the finding

11   of parietal cells in the tumor area to the

12   determination of the location of the tumor,

13   correct?

14         A.   Yes.

15              MS. DU PONT:  Now, if we go back --

16   back up to Page 142 for a second.  Stop.  Okay.

17   BY MS. DU PONT:

18         Q.   You state:  Moreover -- do you see

19   where I'm reading from?  Do you see --

20         A.   Yes.

21         Q.   -- where I'm reading from, "Moreover"?

22         A.   Yes.

23         Q.   Okay.  Moreover, she -- meaning

24   Dr. Mjønes -- described that some of the cells in

25   the intramucosal adenocarcinoma had a flattened

1    nucleus and a large cytoplasmic vacuole,

2    suggested -- suggestive of a signet-ring cell like.

3    Do you see that?

4          A.   Yes.

5          Q.   Now, are you -- are you aware that

6    Dr. Mjønes has actually ruled out the presence of

7    signet-ring cells in the EGD biopsy?

8          A.   Yes, I wrote here "suggestive."

9          Q.   So "suggestive."  But you understand

10   that she specifically wrote in her pathology report

11   the changes are not consistent with signet-ring

12   cell carcinoma in situ, correct?

13         A.   Okay.  Okay.

14         Q.   Do you agree with that, that's what she

15   wrote in her report or --

16         A.   I rely on her.

17         Q.   Okay.  And you're not suggesting that

18   Mr. Baudin was diagnosed with a signet-ring

19   cell-type carcinoma, are you?

20         A.   Once more.

21         Q.   You're not -- you're not trying to

22   suggest that Mr. Baudin was diagnosed with a

23   signet-ring cell-type carcinoma of the stomach --

24         A.   No.

25         Q.   -- correct?

```
 1          A.    No.  Correct.

 2          Q.    And none of Mr. Baudin's pathology

 3    reports by the Louisiana treating pathologists say

 4    anything about signet-ring cell-like morphology,

 5    correct?

 6          A.    I believe so.  Correct.

 7          Q.    Now, you next say here, the next

 8    sentence:  There was linear ECL cell hyperplasia.

 9    Do you see that?

10          A.    Yes.

11          Q.    And you reached that conclusion based

12    on Dr. Mjønes's pathology report, correct?

13          A.    Yes.

14          Q.    But you would agree with me that

15    Dr. Mjønes did not find any ECL cell hyperplasia in

16    the tumor sample, correct?

17          A.    Yes.  The ECL cell hyperplasia suggests

18    that the patient had -- had been exposed to

19    hypergastrinemia and, actually, will tell you meant

20    that the hyperplasia was antral nodular, a level

21    higher.

22          Q.    I didn't ask a question about what you

23    were just talking about.

24                MS. DU PONT:  I'm going to move to

25    strike that -- that commentary.
```

1    BY MS. DU PONT:

2         Q.   I want to just take a look at what

3    Dr. Mjønes actually wrote in her pathology report.

4              MS. DU PONT:  Let me figure out what

5    page -- it's part of his actual report.  Probably

6    around 150.  It's actually --

7              MS. PODSIADLO:  I think it's PDF, like,

8    163.

9              MS. DU PONT:  Yeah.

10   BY MS. DU PONT:

11        Q.   And this is the pathology report,

12   Doctor, that you received from Dr. Mjønes about

13   Mr. Baudin's pathology, correct?

14        A.   Okay.  Yes.

15        Q.   And on the second page of this

16   report --

17        A.   Yes.

18        Q.   Hold on one second.  I just want to get

19   the right -- the top line of the report states:

20   The neuroendocrine markers did not show convincing

21   evidence of hyperplasia of neuroendocrine cells.

22   Do you see that?

23        A.   Yes.

24        Q.   So Dr. Mjønes, in her pathology report,

25   saw no evidence of hyperplasia of neuroendocrine

1    cells in this specimen from Mr. Baudin's

2    September 2017 pathology that contained the actual

3    adenocarcinoma that arose from the adenoma polyp,

4    correct?

5              MR. RESTAINO:  Objection.  That's not

6    what the record states.

7    BY MS. DU PONT:

8        Q.   You can answer, Dr. Waldum.

9        A.   Once more.  I was reading.  Please.

10       Q.   So Dr. Mjønes, in this section of her

11   report -- and we can go back to the prior page.

12       A.   Okay.

13             MS. DU PONT:  And go to the bottom of

14   that.

15   BY MS. DU PONT:

16       Q.   A tissue block -- she notes a tissue

17   block was received March 9th, 2021.  From the

18   tissue block, colleagues at the department of

19   pathology stained one slide for -- with H and E and

20   two slides with neuroendocrine markers

21   synaptophysin and chromogranin A.

22             And her conclusion was:  The

23   neuroendocrine markers did not show convincing

24   evidence of hyperplasia of neuroendocrine cells.

25   Correct?

1          A.   Okay.

2          Q.   And Dr. Mjønes's conclusion was that

3     there was no evidence of ECL hyperplasia in the

4     cancer specimen, correct?

5          A.   Yes.

6               MR. RESTAINO:   There's no question

7     pending.

8     BY MS. DU PONT:

9          Q.   No, yeah.   I -- I want to talk a little

10    bit about the -- the gastrin level that you talked

11    about in your report, okay?

12         A.   Yes.

13         Q.   And we can go back to your report.

14              MS. DU PONT:   It should be around

15    Page 143, I think.   Maybe up a little higher.

16    There.   Stop.

17    BY MS. DU PONT:

18         Q.   You write just above the section on

19    specific causation conclusion:   Gastrin in blood

20    taken after the operation while taking Nexium 40

21    milligrams daily were 213 pg/mL.   And then you put

22    in parentheses (Normal is less than 100 pg/ml).   Do

23    you see that?

24         A.   Yes.

25         Q.   And this serum gastrin level that

1    you're talking about was actually taken in

2    October of 2020, correct, Dr. Waldum?

3         A.   Yes.

4         Q.   That's three years after Mr. Baudin's

5    gastric cancer was diagnosed, correct?

6         A.   Correct.

7         Q.   You did not review any serum gastrin

8    levels before Mr. Baudin's gastric adenocarcinoma

9    diagnosis in September 2017, correct?

10        A.   Correct.

11        Q.   And that's because there weren't any

12   that were taken, right?

13        A.   Never taken.

14        Q.   None of Mr. Baudin's doctors diagnosed

15   him with hypergastrinemia or elevated serum gastrin

16   before his cancer diagnosis, correct?

17        A.   Correct.

18        Q.   None of his doctors told him

19   hypogastrinemia [sic] caused his gastric

20   adenocarcinoma, correct?

21             MR. RESTAINO:  Objection.

22             THE WITNESS:  Correct, I think.

23   BY MS. DU PONT:

24        Q.   You -- you don't know what Mr. Baudin's

25   baseline gastrin level was at any time, right?

1        A.    Correct.

2        Q.    You don't know what his gastrin level

3    was before he took PPIs, correct?

4        A.    Correct.

5        Q.    You don't know what his gastrin level

6    was while he was on PPIs but before he developed

7    cancer, correct?

8        A.    Correct.

9        Q.    And you don't know what his PPIs --

10   what his gastrin level was after he developed the

11   cancer but is before his surgery, correct?

12       A.    Correct.

13       Q.    And Mr. Baudin actually ordered his

14   gastrin level test from personalabs.com.  Did you

15   know that?

16       A.    I didn't know that.

17       Q.    Did you tell Mr. Baudin to order a

18   gastrin test?

19       A.    Oh, I think I suggested to John he

20   should -- that gastrin could be very important.

21       Q.    But you're -- are you aware that none

22   of his treating doctors ordered the serum gastrin

23   test for him?

24       A.    They -- the doctors in U.S. are told

25   not to do it --

1      Q.   So none of his treating doctors ordered

2  the serum gastrin test, correct?

3      A.   Probably that's correct.

4      Q.   Do you know one way or the other?

5      A.   I don't know.

6      Q.   There's no information that you've seen

7  that any of his treating doctors directed him to

8  order the serum gastrin test, correct?

9      A.   That is correct.

10          MS. DU PONT:  Can we just pause and go

11  off the record for a second.

12          THE VIDEOGRAPHER:  Time now is

13  1:38 p.m.  We are off the record.

14                    * * *

15          (Whereupon, there was a recess in the

16  proceedings from 1:38 p.m. to 2:01 p.m.)

17                    * * *

18          THE VIDEOGRAPHER:  The time now is

19  2:01 p.m.  We are back on the record.

20          MS. DU PONT:  Okay.  If we could go

21  ahead and pull up Dr. Waldum's expert report again.

22  It's Exhibit 4.  And go to the bottom of Page 142,

23  which I think is 143 of the PDF.  There we go.  Go

24  to the next page, actually.

25  BY MS. DU PONT:

1        Q.    So your specific causation opinion with

2    respect to Mr. Baudin is that it is more probable

3    than not that Stanley Baudin's long-term treatment

4    with Nexium substantially contributed to the

5    development of his gastric cancer.  That's --

6    that's your opinion, as I understand it; is -- is

7    that true, Dr. Waldum?

8        A.    Yes.

9        Q.    What methodology did you reach -- use

10   to reach that opinion?

11       A.    Once more.

12       Q.    What methodology did you use to reach

13   that opinion?

14       A.    It's not one specific methodology, but

15   it's looking at the other possible mechanisms.

16   The -- the patient had no Barrett's esophagus,

17   which is very important in this case.

18            And the localization of the tumor is at

19   the border between what could be claimed to be

20   cardia and the oxyntic mucosa.  And it was

21   actually, from a biological point of view,

22   surrounded by oxyntic mucosa.

23            So I would, therefore, say that it

24   should be seen as an oxyntic mucosa carcinoma.  And

25   in these carcinomas, I do not know that hiatus

1   hernia play any role in the carcinogenesis.  And --
2   and there were no other reasonable causes of this
3   gastric carcinoma.  And -- so I would say that PPIs
4   more likely than less caused this carcinoma.
5          Q.   Do you agree that Mr. Baudin could have
6   developed gastric cancer even if he had not taken a
7   PPI?
8              MR. RESTAINO:  Objection.
9              THE WITNESS:  I can't say.  I don't
10  know.
11  BY MS. DU PONT:
12         Q.   Can you -- do you think that there were
13  other factors that contributed to Mr. Baudin's
14  gastric cancer?
15             MR. RESTAINO:  Objection.
16             THE WITNESS:  I wouldn't say that
17  obesity -- I -- I mean, that obesity causes hiatal
18  hernia, and -- and obesity could also contribute to
19  gastric carcinoma by their eating habit.  If you
20  eat more and more often, you have more put in the
21  stomach, and you will have higher gastrin values.
22  So gastrin could even be involved in the
23  pathogenesis if there is -- if -- in how obesity
24  predisposes to gastric cancer.
25  BY MS. DU PONT:

1          Q.   So you're saying that Mr. Baudin's

2     obesity could have contributed to his gastric

3     cancer?

4          A.   It could.  But I'm not sure that

5     obesity is a factor because a hiatus hernia was

6     present, and if you have a hiatal hernia, obesity

7     would not provoke anything more.  And -- and there

8     was only minor esophagitis in this patients [sic]

9     due to the PPI --

10               THE REPORTER:  I'm sorry.  There was

11     only -- there was only minor what in this patient?

12               THE WITNESS:  Esophagitis, inflammation

13     in the esophagus due to the PPI treatment, I would

14     say.  So I can't see why his hiatus hernia should

15     contribute to a cancer in the -- at the border

16     between cardia and the oxyntic mucosa.

17     BY MS. DU PONT:

18          Q.   Can you say what percentage -- what

19     percentage -- let me say this differently.

20               What was the percentage contribution of

21     PPIs to his gastric cancer?

22               MR. RESTAINO:  Objection.

23               THE WITNESS:  It is difficult to -- to

24     make any guess on that.  But I would say that -- as

25     I stated, that it's more probable than less that

Helge Waldum, M.D., Ph.D.

```
 1   PPIs contributed.
 2   BY MS. DU PONT:
 3        Q.   But you can't put a particular
 4   percentage on it, right?
 5        A.   51 percent.
 6        Q.   Do you think that the clinical picture
 7   for a patient is important when determining whether
 8   PPIs caused their cancer?
 9             MR. RESTAINO:  Objection.
10             THE WITNESS:  Could you repeat it once
11   more?
12   BY MS. DU PONT:
13        Q.   Do you think the clinical picture for a
14   patient is important when determining what the
15   cause of a patient's cancer is?
16             MR. RESTAINO:  Same objection.
17             THE WITNESS:  I can't answer this
18   question.  I don't know what you mean by the
19   "clinical condition."  You mean that the -- the
20   obesity or something like that?
21   BY MS. DU PONT:
22        Q.   Yes.
23        A.   Yeah?
24        Q.   For example, is it important to know
25   whether a patient is obese or overweight when
```

1    determining what the etiology of their gastric

2    cancer is?

3            A.    It could -- it could play a role.

4            Q.    Is it important to know whether a

5    patient had GERD and for how long when you're

6    determining what caused a patient's gastric cancer?

7            A.    That -- in a way, that is correct, that

8    it's -- it will be important.  But this patient had

9    shown little signs of esophagitis.  So I would say

10   that in this case the duration probably doesn't

11   play a great role.

12           Q.    I don't know if I understood what

13   you're saying.  The fact that Mr. Baudin had GERD

14   for decades didn't play any role in the development

15   of his gastric cancer; is that what you're saying?

16           A.    I said that because he had no or only

17   minor esophagitis.  I think GERD predisposes to

18   gastric -- to esophageal cancer by inducing

19   esophagitis.

20           Q.    Now, you noted that Mr. Baudin had no

21   familial disposition for gastric cancer.  What do

22   you rely on to support that opinion?

23           A.    Only what -- what was told in the

24   records.

25           Q.    There -- there was no genetic testing

1    done on Mr. Baudin, correct?

2         A.   Not as I have heard of any genetic

3    predisposition.

4         Q.   So you can't rule out that he had some

5    genetic predisposition to gastric cancer, because

6    that testing hasn't been done, correct?

7              MR. RESTAINO:  Objection.

8              THE WITNESS:  I don't know his family

9    background, if his father is his father and so on.

10   But otherwise, we have no indication that there are

11   other patients -- other persons in his family

12   that's had gastric cancer.

13   BY MS. DU PONT:

14        Q.   But you don't have enough information

15   in the medical records right now to rule out the

16   fact that he could have some sort of genetic defect

17   that predisposed him to develop gastric cancer,

18   correct?

19             MR. RESTAINO:  Objection.

20             THE WITNESS:  The -- the known

21   etiological factors genetically predisposing to

22   gastric cancer is this of hereditary diffuse

23   gastric cancer where you have a lack of E-cadherin

24   predisposed to gastric carcinomas of diffuse type.

25   And then you have the Spanish family without

1    functioning proton pump.  But this patient had,

2    obviously, gastric acid -- gastric acid production.

3    So he couldn't have that type of cancer.  That is

4    the two most important genetic factors for a

5    gastric cancer.

6    BY MS. DU PONT:

7         Q.   You would agree with me, though, he's

8    had no genetic testing done, correct?

9         A.   Yes.

10        Q.   So you can't rule out that he had a

11   familial disposition or -- yeah, disposition to

12   develop gastric cancer, correct?

13        A.   I have no information suggesting

14   familial disposition.

15        Q.   Now, you wrote in your report that

16   Mr. Baudin has not been infected with H. pylori.

17        A.   Yes.

18        Q.   Why do you -- why do you say that?

19        A.   Firstly, he had -- during the initial

20   endoscopy -- the endoscopy in 2017, a biopsy for

21   the CLO test was taken, and that was negative.  And

22   there were taking biopsy from the stomach of

23   many -- many types, and they were all negative for

24   Helicobacter pylori.  And he had no atrophic

25   gastritis that is necessary to -- for Helicobacter

1    pylori infection to predispose to gastric cancer.

2          So I think that it's quite clear that

3    this patient had not a gastric cancer due to

4    Helicobacter pylori.

5          Q.   The test for H. pylori only confirms

6    whether you have a current infection, correct?

7          A.   That is correct.

8          Q.   So we don't know if he had an H. pylori

9    infection prior to 2000 -- his first test in 2002,

10   correct?

11         A.   That's correct.

12         Q.   So you can't rule out that he never had

13   H. pylori, correct?

14         A.   Correct.

15         Q.   And you write:  He has not had

16   autoimmune atrophic gastritis.

17          What are you relying upon for that

18   opinion?

19         A.   The histology and the -- and the high

20   acid secretion -- gastric acid secretion, requiring

21   drugs to reduce gastric acid secretion.

22          Also, autoimmune gastritis do not

23   induce cancer before having induced atrophy.

24         Q.   Is there -- is there a test you can do

25   to determine whether someone has autoimmune

1    atrophic gastritis?

2         A.    You can determine antibodies or

3    intrinsic factor antibodies against parietal cells.

4    But about unnecessary tests, I would say that you

5    have no indication of autoimmune gastritis in this

6    case, which is -- on the contrary, we -- we know

7    that this patient's had not gastric hypoacidity and

8    no atrophic gastritis in the oxyntic mucosa.

9              That would be enough.  I would say that

10   is much more indication to the specific staining

11   for neuroendocrine cells in a tumor or patients

12   taking PPIs, because there you can find something.

13   Here, you will not find anything.  But, of course,

14   it could be done.

15        Q.    But -- and that testing from autoimmune

16   gastritis has not been done on Mr. Baudin, correct?

17        A.    This patient hasn't (indiscernible) --

18        Q.    And, Doctor, you understand at the time

19   that Mr. Baudin was diagnosed with gastric

20   adenocarcinoma, he had long-standing GERD, a large

21   4- to 5-centimeter hernia, and he was obese.  You

22   understand all those things, right?

23        A.    Yes.  Correct.

24        Q.    And all those factors could have

25   increased his chances of developing gastric

1    adenocarcinoma, correct?

2          A.    Obesity increases the risk of hiatal

3    hernia.  Whether it increases the risk for gastric

4    carcinoma in a person having developed hiatal

5    hernia, I'm not sure of.  And you said one thing

6    more.

7          Q.    GERD.  Long-standing GERD.

8          A.    Yeah, but it seems to be minor because

9    you had so little changes in the esophageal mucosa

10   because of the PPI treatment.

11         Q.    How did you rule out -- well, forget

12   that.

13               You're not opining or offering an

14   opinion on whether Mr. Baudin needed to be on

15   Nexium or any other PPI, right?

16         A.    Once more.

17         Q.    Let me -- let me frame it a little

18   differently.  You believe that it was appropriate

19   for Mr. Baudin to be taking a PPI in this case,

20   correct?

21         A.    Yes.

22         Q.    You're not going to offer an opinion

23   that he didn't need it, right?

24         A.    No.

25         Q.    Nowhere in your report do you discuss

1    nor are you offering an opinion on whether

2    Mr. Baudin had or currently has rebound acid

3    hypersecretion, correct?

4         A.   When taking the PPIs, you can -- you

5    cannot dictate rebound acid hypersecretion

6    because -- because PPIs stop the acid secretion.

7    But --

8         Q.   And you -- you --

9         A.   But after --

10        Q.   Your --

11        A.   -- after -- after surgery, the -- the

12   PPIs before surgery could have contributed to an

13   increase in acid secretion in the remaining

14   stomach.

15        Q.   I'm not sure I understand what you mean

16   by "before the surgery."

17        A.   He had to restart the PPIs after

18   surgery.  And -- and before he took PPIs -- so they

19   tried less -- less efficient drugs in the beginning

20   after surgery.  But he had to go to -- go back to

21   Nexium.  And that -- at that period, he could have

22   had rebound acid hypersecretion due to the PPI use

23   before surgery.

24        Q.   That's not an opinion that you've put

25   forth anywhere in this 143-page report, is it?

Helge Waldum, M.D., Ph.D.

```
 1        A.    That's -- that's correct.  I didn't --
 2        Q.    And you don't intend to offer that
 3   opinion at trial, because you have not disclosed it
 4   in this report, correct?
 5        A.    It's okay.
 6        Q.    What do you mean by "It's okay"?
 7   You're not going to offer that opinion at trial?
 8        A.    I will not -- I mean that the question
 9   of PPI in this case -- after surgery in this case
10   is not important.
11        Q.    It's not important whether or not
12   Mr. Baudin had rebound acid hypersecretion,
13   correct?
14             MR. RESTAINO:  Objection.
15             THE WITNESS:  That is correct,
16   concerning the gastric cancer had developed before.
17   Gastric acid hypersecretion does not contribute to
18   gastric cancer.  It contributes to symptoms.
19   BY MS. DU PONT:
20        Q.    And you're not offering an opinion
21   about whether Mr. Baudin had rebound acid
22   hypersecretion?  That's nowhere in your report.  Do
23   you understand that?
24        A.    That's correct.
25        Q.    And you will not be offering an opinion
```

1    at trial about whether or not Mr. Baudin had

2    rebound acid hypersecretion, correct?

3            A.    That is correct.  It's also impossible

4    to prove because they had taken away a part of the

5    acid-producing stomach afterwards.  So to prove

6    that, you must take him -- take him off PPIs,

7    determine gastric acid secretion 14 days

8    afterwards, and then continue to let him be without

9    any inhibitors or drugs and then retest acid

10   secretion -- gastric acid secretory capacity one --

11   one month afterwards.  It is -- it is impossible to

12   do this, and it is not indicated.

13           Q.    And that's neither here nor there

14   because you're not going to be offering an opinion

15   at trial about rebound acid hypersecretion in

16   Mr. Baudin, correct?

17           A.    That's correct.

18           Q.    And you're not going to offer an

19   opinion at trial on whether the procedure or

20   surgery Mr. Baudin underwent to remove his gastric

21   adenocarcinoma was the right option, correct?

22           A.    Correct.

23           Q.    And you're not going to offer any

24   opinion at trial on whether Mr. Baudin's recent

25   anal fissure is causally related to his PPI use or

```
1    surgery to remove his gastric adenocarcinoma,

2    correct?

3         A.    Correct.

4         Q.    Now, you're aware that none of

5    Mr. Baudin's doctors told him that his PPI use

6    caused his gastric cancer, correct?

7         A.    Correct.

8         Q.    And none of his doctors told him his

9    hypergastrinemia or ECL cell hyperplasia caused his

10   gastric adenocarcinoma, correct?

11             MR. RESTAINO:  Objection.

12             THE WITNESS:  What you say?  None of

13   his doctors --

14   BY MS. DU PONT:

15        Q.    None of his doctors told him that

16   his -- he had hypergastrinemia or a ECL cell

17   hyperplasia, and none of them told him that either

18   of those things were related to gastric cancer,

19   correct?

20             MR. RESTAINO:  Objection.

21             THE WITNESS:  I think it's correct.

22   BY MS. DU PONT:

23        Q.    And none of Mr. Baudin's other experts

24   are offering an opinion on the cause of his gastric

25   cancer, correct?
```

1        A.    Correct.

2        Q.    You're the only person offering the

3    opinion that Mr. Baudin's gastric adenocarcinoma

4    was caused by PPI use, correct?

5        A.    Correct.

6        Q.    Now, as I understand it from our

7    earlier discussion, you disagree with Dr. Tabor who

8    said he saw Barrett's esophagus when he performed

9    the surgery on Mr. Baudin, correct?

10       A.    Are we talking about Barrett's now?

11       Q.    Yes, we're talking about Barrett's.

12       A.    I mean that it is -- should have been

13   shown histologically that he had Barrett's.  And

14   that hasn't been shown.

15       Q.    And you understand, Dr. Waldum, that

16   Mr. Baudin only had a very small portion of his

17   esophagus removed during the surgery, right?

18       A.    Yes.

19       Q.    So it's possible there was Barrett's in

20   the part of the esophagus that was never biopsied,

21   correct?

22             MR. RESTAINO:  Objection.

23             THE WITNESS:  It -- it starts at the

24   lowest possible of the esophagus and -- and grow

25   upwards.

1    BY MS. DU PONT:

2         Q.   But there could have been evidence of

3    Barrett's in the part of the esophagus that was not

4    biopsied, fair?

5              MR. RESTAINO:  Objection.

6              THE WITNESS:  Very unlikely.

7              MS. DU PONT:  I want to pull up

8    Exhibit 140, which is the testimony from Dr. Tabor

9    who performed the surgery -- the endoscopy and the

10   surgery on Mr. Baudin.

11             (WALDUM EXHIBIT 140, Deposition

12   transcript of Dr. John Tabor dated 4/27/21, was

13   marked for identification.)

14             MS. DU PONT:  And let's go to

15   Page 24 -- sorry -- 25, and let's take a look at

16   Line 6.

17   BY MS. DU PONT:

18        Q.   So Dr. Tabor was -- had a deposition

19   taken just like you're being deposed today,

20   Dr. Waldum.

21        A.   Yes.

22        Q.   And he was asked:  Did you also see

23   something called Barrett's esophagus?

24             And he replied:  Yes.

25             And then he was asked:  And what is

Helge Waldum, M.D., Ph.D.

```
 1    Barrett's esophagus?

 2          A.    Yeah.

 3          Q.    It's a change in the esophageal mucosa

 4    from an esophageal type of mucosa to a gastric type

 5    of mucosa.

 6                And can that be a precancerous

 7    condition?

 8                And he responded:  Yes, it can.

 9                So, Doctor, you would agree with me

10    that you disagree with Dr. Tabor who saw Barrett's

11    esophagus, correct?

12          A.    I -- I say that it should have been

13    shown in -- in the -- histologically that this

14    patient had Barrett's esophagus.

15                And as I said, endoscopically, it

16    should be a sharp boundary between columnar

17    epithelium and squamous epithelium that is normally

18    in the esophagus.  It's -- it's a sharp boundary,

19    and -- and it should have been found.  And none of

20    the pathology reports anything about Barrett's

21    esophagus, I think.

22          Q.    Doctor, I didn't ask you about

23    whether -- why you disagree with -- with Dr. Tabor.

24    I'm just asking, do you --

25          A.    I dis --
```

1        Q.    -- do you disagree with him?

2        A.    Yes.

3        Q.    Doctor, you mentioned earlier in the

4    deposition that you had in front of you your report

5    as well as the reports of three of AstraZeneca's

6    experts.

7        A.    That's correct.

8        Q.    Do you have notes on any of those

9    reports?

10       A.    No.

11       Q.    No notes?

12       A.    No notes.

13       Q.    Do you have anything else in front of

14   you today --

15       A.    I have the book.  I have my book.

16       Q.    You have your book.  Okay.

17       A.    Without any notes.

18             MS. DU PONT:  Let me just take a few

19   minutes' break.  Five minutes.

20             THE VIDEOGRAPHER:  The time now is

21   2:28 p.m.  We are off the record.

22                        *  *  *

23             (Whereupon, there was a recess in the

24   proceedings from 2:28 p.m. to 2:38 p.m.)

25                        *  *  *

```
 1              THE VIDEOGRAPHER:  The time now is
 2    2:38 p.m.  We are back on the record.
 3    BY MS. DU PONT:
 4        Q.   Doctor, do you recall at the beginning
 5    of the deposition I asked you whether you had any
 6    amendments to your report, and you gave me just one
 7    amendment about trophic --
 8        A.   Yeah.
 9        Q.   -- whether gastrin was trophic?  Do you
10    recall that?
11        A.   Yeah.  Yes.
12        Q.   And you had no other changes to your
13    report, correct?
14        A.   Correct.
15        Q.   And so over the break, I -- I went back
16    and I looked at your -- your section on Mr. Baudin
17    to see what you had said in your report about
18    Barrett's esophagus.  And the only thing I found is
19    what you wrote about what happened at the
20    endoscopy.
21              You said:  At this endoscopy, a mild
22    esophagitis with macroscopically visible Barrett's
23    intestinal metaplasia (length not described) was
24    found.
25              That's all I found on Barrett's
```

1    esophagus in your report with respect to

2    Mr. Baudin.

3        A.    Yes.

4        Q.    You're not aware of any other

5    discussion in your report about Barrett's esophagus

6    and its relevance to Mr. Baudin, are you?

7        A.    No, I don't think so.  But -- but in

8    the endoscopic report, there was the description of

9    Barrett's of pink mucosa in the distal part of the

10   esophagus.  But no pathological reports have

11   confirmed that.

12       Q.    But you don't state that in your

13   report, that no pathological reports confirm that,

14   do you?

15       A.    Probably not.

16       Q.    So what information did you get between

17   when you submitted this report in November or

18   January of 2022 -- sorry -- November '21 or

19   January of 2022, whenever you finished it, what

20   changed -- what new information did you get

21   available to you that changed your opinion?

22       A.    I have got three reports in

23   pathology --

24       Q.    But you had those pathology reports

25   available to you before you submitted your report,

1    correct?

2         A.   I had not had -- had not the report

3    from -- from Voltaggio.  And, also, I had not

4    report from -- from Miele.  And -- and I had the

5    report from Patricia.  She -- I had.  But she

6    didn't describe Barrett's, I think.

7         Q.   So the new information that you had

8    available to you --

9         A.   Came -- came from your --

10        Q.   -- were from AstraZeneca's experts?

11        A.   Correct.

12        Q.   But yet, you did not -- you did not

13   feel the need to provide me in advance of this

14   deposition with a new report setting forth your

15   opinion about Barrett's esophagus, did you?

16        A.   No, I didn't.  I should have done, but

17   I didn't remember it.

18        Q.   And you understand that this is my one

19   opportunity to ask you questions?

20        A.   Yes --

21        Q.   And you can't just come to the

22   deposition with new opinions like that.  You

23   understand that, right?

24        A.   Okay.

25             MR. RESTAINO:  Objection.

```
 1   BY MS. DU PONT:
 2        Q.   One other follow-up area.  On the last
 3   page of your report, on Page 143 --
 4             MS. DU PONT:  If we can pull that up.
 5   BY MS. DU PONT:
 6        Q.   You write --
 7             MS. DU PONT:  And scroll up just a
 8   little bit.
 9   BY MS. DU PONT:
10        Q.   You write:  The tumor developed in the
11   oxyntic mucosa (the presence of parietal cells in
12   the tissue surrounding the tumor indicates that it
13   is not a cardiac cancer and, thus, not related to
14   reflux disease).  Do you see that?
15        A.   Yes.
16        Q.   And you wrote -- that -- that was your
17   basis here for concluding that Mr. Baudin's tumor
18   was not a cardia cancer, that there were the
19   presence of parietal cells in the tissue
20   surrounding the -- the tumor, right?  That was your
21   basis?
22        A.   Yes.
23             MR. RESTAINO:  Objection.
24             THE WITNESS:  Yes.  And, also, that it
25   was said to be 3 centimeter from the
```

1    gastroesophageal junction.  But I didn't write

2    that.

3    BY MS. DU PONT:

4         Q.   Right.  You did not write that in your

5    report, correct?

6         A.   No.

7         Q.   And you're not providing any other

8    opinions for why Mr. Baudin's cancer was not a

9    cardiac cancer, correct?

10        A.   Correct.

11        Q.   We talked a little bit earlier about

12   the fact that Mr. Baudin had long-standing GERD.

13   Do you recall that conversation?

14        A.   Yes.  Yes.

15        Q.   And you understand --

16        A.   From '99.  From 1999.

17        Q.   1999.

18             You understand that -- that GERD is a

19   risk factor for cardiac cancer, correct?

20        A.   It's a risk factor for esophageal

21   cancer.

22        Q.   And for cardia cancer, correct?

23        A.   But much less --

24        Q.   But it is a risk -- it is a risk factor

25   for cardia cancer, correct?

1          A.   There are some reports indicating that.

2   That is correct.  But it is a little difficult to

3   read these papers, because often the esophageal

4   cancers are distal -- esophageal cancers are

5   included.

6          Q.   But there are some papers that report

7   that there -- that GERD --

8          A.   I -- I --

9          Q.   -- is a risk factor for --

10         MR. RESTAINO:  Wait for a question.

11   BY MS. DU PONT:

12         Q.   -- cardia cancer, correct?

13         A.   Yes.

14         Q.   Now --

15         MR. RESTAINO:  Julie, we're over seven

16   hours.  I'll give you some leeway, but --

17         MS. DU PONT:  Yeah, let me just --

18         MR. RESTAINO:  -- are you just --

19         MS. DU PONT:  One -- one last area of

20   questioning, and it'll just be a handful of

21   questions.  Thanks.  I didn't appreciate that I was

22   over.

23   BY MS. DU PONT:

24         Q.   When we were talking earlier about the

25   endoscopy that was done on Mr. Baudin, do you

 1    recall that?

 2            A.    Yes.

 3            Q.    And do you recall that during the

 4    endoscopy Mr. Baudin started to bronchospasm,

 5    correct?

 6            A.    Correct.

 7            Q.    So the -- the procedure was cut short,

 8    and Dr. Tabor was not able to get as much of the

 9    pathology and biopsy material available during

10    the -- during that procedure, correct?

11            A.    Correct.  He lost -- he lost the

12    polyps.  He didn't take them out.  He snared them,

13    and he -- he hadn't time to take them out.

14            Q.    So the -- there -- there was only a

15    small amount of material available for that

16    endoscopy, correct?

17            A.    Correct.

18            Q.    So when you say that there was no

19    evidence of Barrett's on the endoscopy, we have to

20    recognize that it was limited because of the

21    bronchospasm that occurred, correct?

22                  MR. RESTAINO:  Objection.

23                  THE WITNESS:  That -- that is correct.

24    He hadn't -- hadn't time to take biopsy from the --

25    BY MS. DU PONT:

Helge Waldum, M.D., Ph.D.

1      Q.    Right.

2      A.    -- presumed -- presumed Barrett's.

3            MS. DU PONT:  Okay.  That -- that's the

4   last question I have for now.  I just -- I assume

5   you're going to have some questions, John.

6            MR. RESTAINO:  Yeah, I've got a couple

7   of follow-up questions.

8            MS. DU PONT:  Do you need to take a

9   break?

10           MR. RESTAINO:  I don't think so.

11           MS. DU PONT:  Oh, okay.

12                          * * *

13                      EXAMINATION

14  BY MR. RESTAINO:

15      Q.    I'll just remind Dr. Waldum to look

16  into the camera and not at me, as I just looked at

17  him.

18            Doctor, do you recall a few moments ago

19  you were asked about the role of H. pylori in the

20  development of gastric cancer and whether -- and if

21  it had been ruled out in Mr. Baudin?  Do you recall

22  those questions?

23      A.    Yes.  I -- I meant that at least he

24  hasn't had Helicobacter pylori infection during the

25  last 20 years.

```
 1          Q.   And, Doctor, are you familiar with any
 2     studies that show that individuals who have had
 3     H. pylori but have had the infection eradicated and
 4     are then exposed to proton pump inhibitors actually
 5     have a higher risk of developing gastric cancer
 6     than individuals who have H. pylori eradicated who
 7     are not on an H -- a PPI inhibitor?
 8          A.   I think --
 9               MS. DU PONT:  Objection to form.
10               THE WITNESS:  I think the Cheung study
11     from Hong Kong is the best one.
12     BY MR. RESTAINO:
13          Q.   Okay.  And -- and, Doctor, if -- if one
14     is looking at the pathogenesis of obesity in
15     developing gastric cancer, would you have an
16     opinion to a reasonable degree of medical certainty
17     if an obese person on a PPI has a higher risk of
18     developing cancer as a result of that interaction
19     versus an obese person who is not on a PPI?
20               MS. DU PONT:  Objection to form.
21               THE WITNESS:  I have no information
22     about that.
23     BY MR. RESTAINO:
24          Q.   Okay.
25               MR. RESTAINO:  Could we bring up the --
```

```
 1    his expert report.  And earlier in the day, we were

 2    looking at a Figure 6.  I -- I think it's on

 3    Page 26.  Yes.  There.

 4    BY MR. RESTAINO:

 5         Q.   And, Doctor, there's a -- at the bottom

 6    of that diagram, Figure 1, "Anatomy of the

 7    stomach," there's a reference, Number 6, correct?

 8         A.   What do you mean?

 9         Q.   Meaning, under -- the description of

10    this diagram, it says:  Figure 1 --

11         A.   Yeah.

12         Q.   -- Anatomy of the stomach, reference 6.

13         A.   Yeah.

14         Q.   Does that indicate -- you did not draw

15    this diagram, correct?

16         A.   That is correct.

17         Q.   And where -- it was pointed out to you

18    that the circle with Number 6 pointing to it and on

19    the right it says "Cardia," does that circle also

20    include the lower portion of the esophagus?

21         A.   I wouldn't say that.  So, I'm sorry.

22    It should have been corrected.

23         Q.   And by "corrected," meaning that it

24    includes the -- the esophagus in that circle,

25    correct?
```

1        A.    Correct.

2        Q.    And the esophagus is not the cardia

3   portion of the stomach, is it?

4        A.    Correct.

5        Q.    And can you then go to, in your expert

6   report, Page 20 -- oh, I'm sorry.  I'm sorry.  If

7   you look at --

8             MS. DU PONT:  I'm just going to object

9   to the long line of leading questions of the

10  witness.  But go ahead.

11            MR. RESTAINO:  Okay.

12  BY MR. RESTAINO:

13       Q.    If you look at Number 8 -- 7, 8 and 9

14  in this diagram, and do you see that, sir?

15       A.    Yeah.

16       Q.    And what is the pyloric portion of

17  the -- of the human stomach?

18       A.    It's the distal part.

19       Q.    And if now we can go to Page 28 of your

20  expert report.  And -- one second.  I apologize.

21            MR. RESTAINO:  Yes, I'm sorry, on

22  Page 26.  Scroll down to the bottom so that we're

23  looking at the very last sentence of Page 26.

24  BY MR. RESTAINO:

25       Q.    Do you see there -- could you read the

1    last sentence of Page 26?  It starts with "True

2    digestion."

3          A.    True dige -- with absorption of

4    nutrients occurs when the chyme passes from the

5    stomach through the pyloric valve between the

6    stomach and the duodenum and through the small and

7    large intestines.

8          Q.    And is the pyloric region associated

9    with the cardiac region of the heart?

10         A.    Oh, no.  It's far away from it.

11         Q.    Okay.  So if there's any insinuation or

12   mention of the pyloric region being part of the

13   cardiac region in your report, that would be a

14   typographical error, would it not?

15         A.    Yes.

16         Q.    Regarding adenocarcinomas and

17   neuroendocrine components, have you yourself

18   visualized cardiac -- excuse me -- gastric

19   adenocarcinomas that have contained neuroendocrine

20   components?

21         A.    Yes.

22         Q.    And have you yourself visualized

23   gastric adenocarcinomas which do not contain

24   neuroendocrine components?

25         A.    Yes.

 1        Q.   So neuroendocrine components are not

 2   necessary for the development of a gastric

 3   adenocarcinoma; is that correct?

 4        A.   Correct.

 5        Q.   And you were -- when you were --

 6             MS. DU PONT:  Again, I'm just going to

 7   object to the leading nature of this.  You should

 8   be asking open-ended questions, John.

 9             MR. RESTAINO:  Okay.  I'll behave.

10   BY MR. RESTAINO:

11        Q.   You were asked some questions about

12   additional medical records that were provided to

13   you.  Do you recall that?

14        A.   Yes.

15        Q.   Did you see anything in any medical

16   records recently reviewed that caused you to change

17   any of your opinions?

18        A.   No.

19             MR. RESTAINO:  I don't have any more

20   questions.

21             MS. DU PONT:  Let me just take three

22   minutes, and I'll be right back, okay?  No?

23             MR. RESTAINO:  No, I'm kidding.  I'm

24   kidding.

25             MS. DU PONT:  It's like, what?  I'm not

Helge Waldum, M.D., Ph.D.

1  going to have that many more questions.  Just give

2  me a second.

3            MR. RESTAINO:  I wasn't -- you know, I

4  was shaking my head so it wouldn't be "no" on the

5  record.  It was just, you know -- now you caught me

6  and busted me.

7            MS. DU PONT:  Okay.  We'll be back in a

8  few.  Thanks.

9            THE VIDEOGRAPHER:  The time is

10 2:53 p.m.  We are off the record.

11                      * * *

12            (Whereupon, there was a recess in the

13 proceedings from 2:53 p.m. to 2:57 p.m.)

14                      * * *

15            THE VIDEOGRAPHER:  The time now is

16 2:57 p.m.  We are back on the record.

17            MS. DU PONT:  I'm not going to have any

18 further questions today because I understand I am

19 over time.  But I do want to reserve my right to

20 bring Dr. Waldum back again for another deposition

21 just because he has expressed some new opinions

22 today that were not in his 143-page report.

23            I can see John's face already, and I

24 know he's going to object to that.  But I just

25 wanted to put that on the record.

1          MR. RESTAINO:  And I object.  Any new

2  opinion that he might have offered today, you spent

3  a fair amount of time and did an adequate job in

4  exploring it with him.  But I would object.  Make

5  your motion, if necessary.

6          MS. DU PONT:  Understood.

7          Thank you, Dr. Waldum, for your time

8  today.  And I know it's very late there, so we'll

9  let you go.  I hope you have a nice evening and --

10  and the restaurants are still open to get a decent

11  dinner.

12          THE WITNESS:  Thank -- thank you for

13  your examination.

14          MS. DU PONT:  Okay.

15          THE WITNESS:  It -- it was -- it was

16  okay.

17          MS. DU PONT:  Okay.  I'm glad it was

18  okay.

19          THE WITNESS:  All right.

20          MS. DU PONT:  Have a good evening.

21  Thanks, everyone.

22          THE VIDEOGRAPHER:  The time --

23          MR. RESTAINO:  Thank you.

24          THE VIDEOGRAPHER:  The time now is

25  2:58 p.m.  We are off the record.

1              (Whereupon, the deposition concluded at

2    2:58 p.m.)

3              (Signature reserved.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              DEPOSITION ERRATA SHEET

 2

    Case Caption:  Stanley P. Baudin v. AstraZeneca

 3  Pharmaceuticals, et al.

 4

           DECLARATION UNDER PENALTY OF PERJURY

 5

 6              I declare under penalty of perjury that

 7  I have read the entire transcript of my deposition

 8  taken in the captioned matter or the same has been

 9  read to me, and the same is true and accurate, save

10  and except for changes and/or corrections, if any,

11  as indicated by me on the DEPOSITION ERRATA SHEET

12  hereof, with the understanding that I offer these

13  changes as if still under oath.

14

15

16              Signed on the _____ day of

17              _____, 20____.

18

19

20              _____

21                 HELGE WALDUM, M.D., Ph.D.

22

23

24

25
```

Helge Waldum, M.D., Ph.D.

```
 1              DEPOSITION ERRATA SHEET
 2  Page No._____Line No._____Change to:_____
 3  _____
 4  Reason for change:_____
 5  Page No._____Line No._____Change to:_____
 6  _____
 7  Reason for change:_____
 8  Page No._____Line No._____Change to:_____
 9  _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23  SIGNATURE:_____DATE:_____
24         HELGE WALDUM, M.D., Ph.D.
25
```

Helge Waldum, M.D., Ph.D.

```
1                    DEPOSITION ERRATA SHEET

2      Page No._____Line No._____Change to:_____

3      _____

4      Reason for change:_____

5      Page No._____Line No._____Change to:_____

6      _____

7      Reason for change:_____

8      Page No._____Line No._____Change to:_____

9      _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23     SIGNATURE:_____DATE:_____

24              HELGE WALDUM, M.D., Ph.D.

25
```

1                    REPORTER'S CERTIFICATE

2

3           I, Cindy A. Hayden, RMR, CRR, do hereby

4    certify that there came before me on HELGE

5    WALDUM, M.D., Ph.D., the person hereinbefore named

6    who under the penalty of perjury agreed to testify

7    to the truth and nothing but the truth of his or

8    her knowledge concerning the matters in controversy

9    in this cause; that the witness was thereupon

10   examined under penalty of perjury, the examination

11   reduced to typewriting under my direction, and the

12   deposition is a true record of the testimony given

13   by the witness.

14              I further certify that I am neither

15   attorney or counsel for, nor related to, or

16   employed by any attorney or counsel employed by the

17   parties hereto or financially interested in the

18   action.

19              IN WITNESS WHEREOF, I have hereto set

20   my hand this 7th day of April, 2022.

21

22         _____

23              Cindy A. Hayden, RMR-CRR

24

25